UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN MYERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02023-JRS-DML |
| | ) | |
| SUPERINTENDENT, Indiana State Prison, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner John Myers filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court challenging his murder conviction. A jury convicted Mr. Myers of murder in Morgan County, Indiana in 2006. His conviction was affirmed by the Indiana Court of Appeals. He then challenged his conviction in state post-conviction proceedings but was unsuccessful. Mr. Myers now seeks a writ of habeas corpus, arguing that his counsel provided ineffective assistance during trial, the State presented false evidence, and the State withheld exculpatory evidence.

The record presented in this case is massive, involving several thousand pages of grand jury proceedings, trial transcripts, state post-conviction transcripts, and exhibits from those proceedings. The parties' briefing spans three hundred pages. The Court's lengthy ruling is the product of this record.

After reviewing the record and the parties' briefs in detail, the Court concludes that Mr. Myers received ineffective assistance of counsel at trial in violation of his Sixth Amendment rights. Most notably, Mr. Myers's counsel made false statements to the jury during opening arguments, which counsel admitted to the Indiana Supreme Court in a subsequent attorney disciplinary proceeding. He also failed to object to two significant categories of evidence that should not have

1

been presented to the jury. In the end, these serious errors all but destroyed the defense that trial counsel presented to the jury and tainted the entire trial.

In denying Mr. Myers's ineffective-assistance-of-counsel claim, the Indiana Court of Appeals unreasonably applied clearly established Federal law as determined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Wiggins v. Smith*, 539 U.S. 510 (2003). When these standards are correctly applied, they reveal that Mr. Myers's counsel's errors "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

A federal habeas court "will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (alteration in original) (citation omitted). But this case presents a rare instance where this has occurred. Accordingly, Mr. Myers's petition for a writ of habeas corpus is **GRANTED**. A writ of habeas corpus shall issue ordering Mr. Myers's release from custody unless the State elects to retry Mr. Myers within 120 days of the entry of Final Judgment in this action.

A new trial will likely come only at considerable cost—to the State, yes, but, more important, to the victim's family and community still wounded by their tragic loss. Such costs do not enter into the constitutional analysis; and yet, the Court cannot help but express its empathy for those who must bear them for the sake of our Constitution and its protections.

## I.    BACKGROUND

The factual background necessary to understand Mr. Myers's claims is extensive. The Indiana Court of Appeals summarized much of the factual and procedural background in its opinion denying Mr. Myers post-conviction relief. The Court will set out that background here in

full and will discuss the factual background necessary to understand each of Mr. Myers's claims in Part II below.

On appeal from the denial of post-conviction relief, the Indiana Court of Appeals summarized the relevant factual and procedural history as follows:

> The facts underlying Myers' conviction were set forth as follows in th[e] [Indiana Court of Appeals'] opinion arising out of his direct appeal:
>
>> In the spring of 2000, John Myers II lived approximately seven tenths of a mile from the intersection of North Maple Grove Road and West Maple Grove Road, at 1465 West Maple Grove Road, north of Bloomington in Monroe County. Myers was on vacation from work the week of May 29 through June 2.
>>
>> On the morning of May 31, 2000, Jill Behrman, an accomplished bicyclist who had just completed her freshman year at Indiana University, left her Bloomington home to take a bicycle ride. She logged off of her home computer at 9:32 a.m. Behrman did not report to the Student Recreational Sports Center, where she was scheduled to work from noon to 3:00 p.m. that day, nor did she appear at a postwork lunch scheduled with her father and grandparents. Following nationwide search efforts, Behrman's remains were ultimately discovered on March 9, 2003, in a wooded area near the intersection of Warthen and Duckworth Roads in Morgan County. The cause of her death was ruled to be a contact shotgun wound to the back of the head.
>>
>> With respect to the events surrounding Behrman's disappearance, one report indicated that a young woman matching Behrman's description was seen riding her bicycle north of Bloomington on North Maple Grove Road at approximately 10:00 a.m. the morning of May 31. A tracking dog later corroborated this report. While another report placed Behrman south of Bloomington at 4700 Harrell Road at approximately 9:38 a.m., some authorities later discounted this report due to her log-off time of 9:32 a.m. and the minimum fourteen minutes it would take to bicycle to Harrell Road. The tracking dog did not detect Behrman's scent trail south of Bloomington.
>>
>> At approximately 8:30 a.m. on the morning of May 31, 2000, in the North Maple Grove Road area, a witness saw a white "commercial looking" Ford van without identification on its doors or sides drive slowly past his driveway on North Maple Grove Road, heading south. Two men were inside the van. This witness saw the van two additional times that morning

by approximately 9:00 a.m. and later identified the van as "exactly like" a Bloomington Hospital van.

At some point before noon on May 31, 2000, another witness saw a bicycle later determined to be Behrman's lying off of the east side of North Maple Grove Road near the intersection of North Maple Grove Road and West Maple Grove Road. The location of the bicycle was approximately one mile from Myers' residence and ten and one-half miles from Behrman's house.

On May 31, the date of Behrman's disappearance, two witnesses separately noted that the windows in Myers' trailer were covered, which was unusual. One of these witnesses also observed that Myers' car was parked fifty yards from its normal location and remained out of sight from the road for approximately three days. Myers told this witness that he had parked his car in that secluded spot because he did not want anyone to know he was home.

Myers' account of his activities during his vacation week of May 29 through June 2 was reportedly that he was "here and there." Myers' employer at the time was the Bloomington Hospital warehouse, where he had access to two white panel Ford vans. Besides being "here and there," Myers indicated that he had been mostly at home, that he had gone to a gas station, and that he had gone to Kentucky Kingdom but found it was closed. Myers additionally stated that he and his girlfriend, Carly Goodman, had cancelled their plans to go to Myrtle Beach, South Carolina, and to Kings Island, Ohio, that week. Phone calls made from Myers' trailer on May 31 were at the following times: 9:15 a.m.; 9:17 a.m.; 9:18 a.m.; 10:37 a.m.; 10:45 a.m.; and 6:48 p.m. [Mr. Myers made these calls.] The calls were to drive-in theaters and various state parks.

Myers was reportedly almost hysterical on May 31 and spoke of leaving town and never coming back. Myers' aunt, Debbie Bell, observed that Myers had been very depressed in the preceding month and believed that this was due to problems with his girlfriend. In late April 2000, Myers had called Bell because he had been having problems with his girlfriend and felt like "a balloon full of hot air about to burst."

Carly Goodman was Myers' girlfriend beginning in approximately late October 1999. In March of 2000, Myers took Goodman for a long drive through Gosport, "over a bridge where there was a creek and into some woods." Myers pulled his car into a clearing in the woods where the two of them argued, which scared Goodman. Although it was nighttime, Goodman observed the appearance of this clearing from the car's headlights. In late April or early May of 2000, Goodman broke off her

relationship with Myers. Goodman denied that she and Myers had ever made plans to go to Myrtle Beach or to Kings Island the week of May 29.

On June 5, 2000, Bell again spoke with Myers. Myers mentioned that a girl had been abducted in the area, and he was afraid he would be blamed for it. Myers further stated that the girl's bicycle had been found about a mile from his house and that "they blame [him] for everything." Myers additionally asserted, "[T]hey haven't found her body yet" and guessed that the girl was dead. In that same conversation, Myers indicated that he had been stopped by a roadblock and was "scared" of roadblocks, but he later changed his mind, laughed, and said he was not really "scared."

Following a tip due to this conversation, on June 27, 2000, Detective Rick Crussen of the Bloomington Police Department interviewed Jodie [Myers] and Myers' father, John Myers Sr., at their residence at 3909 West Delap Road. The following day, Detective Crussen interviewed Myers.

On June 27, 2000, immediately after Detective Crussen interviewed Myers' parents and the day before he interviewed Myers, Myers called his grandmother, Betty Swaffard, and asked to borrow $200. Myers told Swaffard he was unable to come to her house for the money because there were roadblocks on Maple Grove Road, and he did not want to leave his home. Myers additionally stated that he was a suspect in the Jill Behrman disappearance. Myers did not come to Swaffard's home for the money.

In July 2000, Bell noticed that John Myers Sr. was unusually nervous and agitated when in Myers' presence. Sometime in approximately August of 2000, Myers' brother, Samuel, who owned a twelve-gauge shotgun and had stored it at his parents' house on Delap Road since approximately 1997, noted that the gun was missing.

Myers raised the topic of Behrman's disappearance multiple times and in multiple contexts following her disappearance. Before Detective Crussen interviewed him, Myers falsely stated to his Bloomington Hospital supervisor that police had questioned him in connection with Behrman's disappearance because her bicycle was found close to his home. Also in June of 2000, Myers stated to a co-worker that he wondered whether authorities had investigated a barn in a field located on Bottom Road off of Maple Grove Road. Additionally, some weeks after Behrman disappeared, Myers told another co-worker during a delivery run that Behrman's bicycle was found in his neighborhood, and that Behrman was probably abducted near that site. Later in 2000 or 2001, while driving with his then-girlfriend, Kanya Bailey, Myers directed Bailey's attention to a location a short distance from his mother's residence and stated he had found Behrman's bicycle there.

In the late spring to late summer of 2001, Myers again raised the topic of Behrman's disappearance with another co-worker. As the two were driving on Bottom and Maple Grove Roads, Myers pointed out where he lived and stated that Behrman's bicycle had been found close to where he used to live. A short time later, while on Maple Grove Road, Myers stated that if he was ever going to hide a body he would hide it in a wooded area up "this way," pointing north. On another occasion, Myers stated to this co-worker that he knew of someone in Florida who had Behrman's identification card or checkbook.

Sometime in November or December of 2001, Myers raised the topic of Behrman's disappearance with a family member, indicating his bet that Behrman would be found in the woods. During this conversation, Myers further indicated his familiarity with the Paragon area and with Horseshoe Bend, where he liked to hunt.

Also in 2001, Myers stated to his mother, Jodie, that he had been fishing in a creek and had found a pair of panties and a bone in a tree. Jodie suggested that this might be helpful in the Behrman case, and Myers agreed to call the FBI. FBI Agent Gary Dunn later returned the call and left a message. Myers told Jodie that they should save the answering machine tape in case they were questioned.

Sometime in 2002, Wendy Owings confessed to Behrman's murder, claiming that she, Alicia Sowders-Evans, and Uriah Clouse struck Behrman with a car on Harrell Road, stabbed her with a knife in her chest and heart, wrapped her body in plastic tied with bungee cords, and disposed of her body in Salt Creek. In September 2002, authorities drained a portion of Salt Creek. They found, among other things, a knife, a bungee cord, and two sheets of plastic. Owings later recanted her confession.

On March 27, 2002, Myers, who at the time was in the Monroe County Jail on an unrelated charge, told Correctional Officer Johnny Kinser that he had found some letters in some food trays one morning that he believed Kinser should look at, apparently in connection with the Behrman disappearance. Myers said he felt bad about what had happened to that "young lady" and that he wished to help find her if he could. Myers additionally compiled a list of places potentially providing clues to Behrman's location. Indiana State Police Trooper James Minton investigated the list, including gravel pits off of Texas Ridge Road between Stinesville and Gosport. A route from Gosport to the intersection of Warthen and Duckworth Roads in Morgan County passes by Horseshoe Bend.

On March 9, 2003, Behrman's remains were discovered by a hunter in a wooded area near the intersection of Warthen and Duckworth Roads in

Morgan County approximately thirty-five to forty yards from a clearing in the timber north of Warthen Road. Authorities recovered approximately half of the bones in Behrman's skeleton. No soft tissue remained. Six rib bones were among the bones missing from her skeleton. There was no evidence of stab or knife wounds, nor was there evidence of blunt force trauma. Investigators recovered a shotgun shell wadding from the scene, as well as 380 number eight shot lead pellets. The wadding found at the scene was typical of a twelve-gauge shotgun shell wadding. The cause of Behrman's death was ruled to be a contact shotgun wound to the back of the head. Scattered skull fragments and the presence of lead pellets in a variety of places, together with certain soil stains consistent with body decomposition, suggested that after being shot, Behrman's body had come to rest and had decomposed at the spot where it was found. No clothing was found at the scene. There is nothing in the record to clarify whether Behrman's clothing, if it had been left at the scene, would or would not have completely disintegrated prior to her body being found.

In March 2003, Myers told another co-worker, who had brought a newspaper to work announcing the discovery of Behrman's remains, that the woods pictured in the newspaper article looked familiar to him, and that he had hunted there before. According to this co-worker, the woods pictured in the newspaper article did not appear distinctive. Myers also stated that it was good that Behrman had been found and that he was surprised that he had not been contacted because he knew the people who police thought had committed the crime. Myers knew Wendy Owings, who had falsely confessed to the crime, as well as Uriah Clouse and Alicia Sowders-Evans. Myers had a "cocky" tone of voice when he made these comments, according to the co-worker.

More than a year later, in November 2004, Myers called his grandmother, Swaffard. Myers, who was upset and stated that he needed time to himself, said to Swaffard, "Grandma, if you just knew the things that I've got on my mind. [I]f the authorities knew it, I'd be in prison for the rest of my life." Myers further stated that his father, John Myers Sr., "knew" and had "[taken] it to the grave with him." Subsequently, when Myers arrived at Swaffard's house, he said with tears in his eyes, "Grandma, I wish I wasn't a bad person. I wish I hadn't done these bad things."

Indiana State Police Detectives Tom Arvin and Rick Lang interviewed Myers again on May 2, 2005. During this taped interview, Myers denied having told anyone in his family that he was "scared" of the roadblocks or that he had talked to anyone besides the police about the case. Also in May of 2005, Myers, who was again in the Monroe County Jail on an unrelated charge, mentioned to his bunkmate that the state police were investigating him because Behrman's bicycle had been found in the vicinity of his house. Myers made approximately three or four references to Behrman's

bicycle and was nervous and pacing at the time. During that conversation, Myers, who was also angry, made reference to the "bitch," and stated to this bunkmate, "[I]f she [referring to Behrman] wouldn't have said anything, . . . none of this would have happened."

On February 17, 2006, Detective Lang took Goodman on a thirty-six-mile drive north of Myers' home on Maple Grove Road and into rural Morgan County. Goodman recognized a clearing in the woods near the corner of Warthen and Duckworth Roads, approximately thirty-five to forty yards from where Behrman's remains were discovered, as the place that Myers had driven her in March 2000.

*Myers v. State*, 887 N.E.2d 170, 176-80 (Ind. Ct. App. 2008) [("*Myers I*")] (footnotes and citations to the record omitted), *trans. denied.*

*Myers v. State*, 33 N.E.3d 1077, 1083-88 (Ind. Ct. App. 2015) (footnote omitted) ("*Myers II*").[1]

Various law enforcement agencies began investigating Ms. Behrman's disappearance after she was reported missing, including the Bloomington Police Department and the Indiana State Police and agencies from surrounding counties. Agent Gary Dunn of the Federal Bureau of Investigation ("FBI") became involved in the search for Ms. Behrman on June 4, 2000, and was the lead investigator until his retirement in January 2003. Ms. Behrman's remains were discovered in March 2003. From this time through trial, Indiana State Police Detectives Rick Lang and Tom Arvin lead the investigation.

Mr. Myers was indicted by a grand jury for murder in April 2006. A twelve-day jury trial began on October 16, 2006. Mr. Myers was found guilty and sentenced to sixty-five years' imprisonment. Mr. Myers's conviction was affirmed on direct appeal. *See Myers I*, 887 N.E.2d at 197.

---

[1] The Indiana Court of Appeals in *Myers I* stated that Mr. Myers's mother, Jodie Myers, made the phone calls from Mr. Myers's trailer the day Ms. Behrman disappeared. But in *Myers II*, the Indiana Court of Appeals recognized that this was incorrect. 33 N.E.3d at 1085 n.1. It is undisputed that Mr. Myers made these calls, and thus the Court altered the above recitation of the facts to so reflect.

Mr. Myers petitioned for post-conviction relief in state court. The state post-conviction court denied relief. The Indiana Court of Appeals affirmed the denial of post-conviction relief. *See Myers II*, 33 N.E.3d at 1083. Mr. Myers filed a petition to transfer with the Indiana Supreme Court, and it denied transfer on November 10, 2015. *See Myers v. State*, 40 N.E.3d 858 (Ind. 2015). He then filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have submitted five briefs, and Mr. Myers's habeas petition is now ripe for ruling.

## II.    LEGAL STANDARDS

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 directs how the Court must consider petitions for habeas relief under § 2254. "In considering habeas corpus petitions challenging state court convictions, [the Court's] review is governed (and greatly limited) by AEDPA." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (citation and quotation marks omitted). "The standards in 28 U.S.C. § 2254(d) were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Id.* (citation and quotation marks omitted).

A federal habeas court cannot grant relief unless the state courts' adjudication of a federal claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The decision federal courts look to is the 'last reasoned state-court decision' to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey*, 877 F.3d at 302 (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)). "Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision[.]" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (citation and quotation marks omitted). "This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion." *Id.* "In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*

"For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct. The issue is whether the decision was unreasonably wrong under an objective standard." *Dassey*, 877 F.3d at 302. "Put another way, [the Court] ask[s] whether the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103). "The bounds of a reasonable application depend on the nature of the relevant rule. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (citation and quotation marks omitted).

## III.   DISCUSSION

Mr. Myers raises three constitutional claims in his habeas petition: (1) trial counsel[2] provided ineffective assistance in violation of the Sixth Amendment; (2) the State violated his due process rights by presenting false evidence to the jury; and (3) the State violated his due process rights by failing to disclose all exculpatory evidence. The respondent maintains that Mr. Myers is not entitled to habeas relief on any of these claims. The Court concludes that Mr. Myers is entitled to relief on his ineffective-assistance-of-counsel claim, and thus the Court will not reach his other two claims.

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland*, 466 U.S. at 687. For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner. *Id.* "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." *Laux v. Zatecky*, 890 F.3d 666, 673-74 (7th Cir. 2018) (citation and quotation marks omitted). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 674 (citation and quotation marks omitted).

---

[2] Mr. Myers was represented by Patrick Baker, Hugh Baker, and Mike Keifer. The Court will use the term "trial counsel" and the pronoun "he" to refer to all three attorneys but will refer to the attorneys by name when appropriate or necessary. Patrick Baker and Hugh Baker represented Mr. Myers during trial, with Patrick Baker serving as lead counsel. Mike Keifer only entered an appearance to read the grand jury transcripts. He testified during the post-conviction hearing that he read no more than half of the grand jury transcripts and shared comments on them and that he may have assisted with the jury questionnaires, but he declined Patrick Baker's offer to assist with trial because he did not have time. *See* PCR Tr. 1071-73.

"The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

The Indiana Court of Appeals in *Myers II* resolved several of the instances where Mr. Myers asserted his counsel provided ineffective assistance by addressing only one of the two *Strickland* prongs. In these instances, this Court reviews the unaddressed prong *de novo* rather than through AEDPA's deferential lens. *See Harris v. Thompson*, 698 F.3d 609, 625 (7th Cir. 2012) ("[When] the state courts address one prong of the two-prong *Strickland v. Washington* test for ineffective assistance of counsel[] but not the other[,] . . . federal courts apply AEDPA deference to the prong the state courts reached but review the unaddressed prong *de novo*."); *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011) ("[I]f a state court does not reach either the issue of performance or prejudice on the merits, then "federal review of this issue 'is not circumscribed by a state court conclusion,' and our review is de novo." (citation and quotation marks omitted)); *see also Porter v. McCollum*, 558 U.S. 30, 38 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

The Indiana Court of Appeals in *Myers II* assessed each allegation of ineffective assistance individually, denying it on either the performance prong, the prejudice prong, or both. But as discussed in further detail below, if counsel rendered deficient performance in multiple respects, the prejudice from each error cannot be adjudged in isolation. *See Hooks v. Workman*, 689 F.3d 1148, 1188 (10th Cir. 2012) (noting that resolving each allegation of ineffective assistance on prejudice grounds is "not . . . sufficient to dispose of [an ineffective assistance] claim because a further analysis of 'cumulative prejudice' [is] necessary"). The prejudice inquiry requires the Court to "evaluate the totality of the available . . . evidence—both that adduced at trial and the

additional available evidence that adequate counsel would have procured." *Harris*, 698 F.3d at 648. "The 'predictive judgment' [required by *Strickland*'s prejudice analysis] does not depend 'on the notion that a single item of omitted evidence . . . would require a new hearing.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 397 (2000)). Instead, the Court " must assess 'the totality of the omitted evidence' under *Strickland* rather than the individual errors," *Washington v. Smith*, 219 F.3d 620, 634-35 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at 695), and determine whether trial counsel's unprofessional errors prejudiced the defense, *id.* (citation and quotation marks omitted).

Accordingly, the Court will not assess each allegation of ineffective assistance in isolation. Instead, the Court will first determine whether trial counsel's performance was deficient in each of the ways alleged by Mr. Myers. The Court will then consider whether the cumulative impact of all trial counsel's errors prejudiced Mr. Myers.

## A.    Deficient Performance

Mr. Myers contends that trial counsel provided deficient performance in thirteen different ways. Ultimately, the Court concludes that trial counsel's performance was deficient in three respects: he made two false statements to the jury during opening, he failed to object to inadmissible bloodhound evidence, and he failed to object to evidence that Ms. Behrman was raped before she was murdered. In the end, the cumulative prejudice flowing from these errors is sufficient to entitle Mr. Myers to relief. Therefore, the Court need not definitively decide two of the allegations of deficient performance. Nevertheless, all thirteen allegations of deficient performance, including those not ultimately decided, are discussed in turn.

## 1.    Presentation of Mr. Myers's Interview with Law Enforcement

Mr. Myers first argues that trial counsel's performance was deficient for failing to present a portion of his interview by law enforcement to the jury. The Court begins with how and what portions of Mr. Myers's interview were presented to the jury.

Mr. Myers was twice interviewed by law enforcement regarding Ms. Behrman's murder on May 2, 2005, for a total of five hours. The first portion of this interview, conducted by Detective Lang and Detective Arvin, occurred before Mr. Myers was arrested for an unrelated offense (the "pre-arrest interview"). After he was arrested and booked into jail, the interview continued with those two detectives and Detective Heck (the "post-arrest interview"). The parties and trial judge discussed this interview and the redaction of it on several occasions throughout the trial. *See, e.g.*, Trial Tr. 407-09, 1391-96, 1861-69, 2314-18.[3] Ultimately, a redacted portion of the pre-arrest interview was played for the jury. *See id.* at 2390; Trial Ex. 96B. But the jury did not hear any portion of the post-arrest interview.

During both the pre- and post-arrest interviews, Mr. Myers consistently denied any involvement in Ms. Behrman's murder and disclaimed any knowledge of it. The jury heard many of these denials during the portions of the pre-arrest interview played during trial. For example, the jury heard Mr. Myers state he does not have "a clue" about the case, Trial Ex. 96B at 13; that he has "never . . . been around any of this," has "no knowledge of [it]," and that if he did he "would be more than happy" to tell them about it, *id.* at 89; when asked about his DNA, that they would "not find any of [his] DNA anywhere because [he has] got nothing to do with [it]," *id.* at 91; and, even though detectives pretended to have a letter from Mr. Myers's father stating that Mr. Myers

---

[3] The Court uses the following citation format throughout this Order: "Trial Tr." – Trial Transcripts; "Trial Ex." – State's Trial Exhibit; "D. Trial Ex." – Defendant's Trial Exhibit; "DA App." – Direct Appeal Appendix; "PCR Tr." – Post-Conviction Hearing Transcript; "PCR Ex." – Post-Conviction Exhibit; "GJ Tr." – Grand Jury Transcript (admitted as PCR Ex. 248); "GJ Ex." – Grand Jury Exhibit (admitted as PCR Ex. 244).

confessed to him, Mr. Myers denied confessing to his father because he "didn't have anything to do with the Behrman case and [has] no knowledge other than what [he] ha[d] seen in the newspapers and what [he] ha[d] heard [as] street rumor," *id.* 91-92.

Because trial counsel agreed not to submit any of the post-arrest interview to the jury, they did not hear any of Mr. Myers's denials during that interview. Mr. Myers argues that trial counsel provided deficient performance by agreeing not to redact and present the post-arrest interview to the jury. He maintains that this was the "most exculpatory" portion of the interview because it contains "ten denials" of his involvement in Ms. Behrman's murder. Filing No. 9 at 24.

Mr. Myers indeed continued to assert his innocence throughout the post-arrest interview. For example, after the detectives told Mr. Myers they were going to test his DNA against evidence they had recovered, Mr. Myers asked if he would get to leave after the DNA "comes back and proves that I'm telling the truth here." PCR Ex. 305A at 139. Later during the post-arrest interview, Mr. Myers continued to assert his innocence, stating "I didn't kill Jill Behrman and I have no involvement with Jill Behrman . . . I don't know how to convince you of that," *id.* at 204, and "I hate being a broken record for you all but I don't . . . not only was I not involved but my knowledge is . . . at zero," *id.* at 229.

The parties had multiple discussions about the May 2 interview and redacting it for the jury during the trial. These discussions provide necessary context for understanding the Indiana Court of Appeals' decision on this allegation of deficient performance and Mr. Myers's arguments as to why it was flawed. At the outset of trial, it appears trial counsel did not realize that certain statements the State attributed to Mr. Myers were from the May 2 interview. *See* Trial Tr. 407. This is supported by the State's representation that trial counsel was instructed by the trial judge to redact the statement but had not yet done so. *See id.* at 408. The trial judge asked Patrick Baker

whether he had redacted the statement, and although he responded "[i]n part," he immediately

clarified that he was referring to "what we addressed here today," which was very little, if any, of

the statement. *Id.* at 409.

On the morning of the fifth day of trial, Friday, October 20, 2006, the parties again

discussed the redaction of the May 2 interview because the State had filed a motion to impose a

deadline on trial counsel to redact the interview. *See* Trial Tr. 1391. After some initial confusion

by trial counsel as to whether he had "the entire" statement, trial counsel acknowledged that he

did. *Id.* at 1394-95. Trial counsel informed the trial court that the redaction would be complete

on the following Monday morning, October 23. *Id.* at 1396.

On the morning of October 23, Hugh Baker informed the trial court that he "spent all day

yesterday reviewing the statement of . . . the defendant," and he would have the proposed

redactions complete "by noon" or "certainly by the end of the day." *Id.* at 1861. Hugh Baker

forewarned the trial court that he found much of the interview objectionable; for example, he

pointed out that "there are numerous numerous pages where the interrogator is not asking questions

but is simply engaging in . . . psycho babble, attempting to extricate a confession." *Id.* at 1862.

After Hugh Baker said the interview was 246 pages, the State interjected that an agreement had

been reached with Patrick Baker that they would stop at page 136 (i.e., the end of the pre-arrest

interview). *Id.* at 1863. Patrick Baker stated that he made no such agreement. *Id.* The trial judge

then questioned why they would spend time redacting the pages after page 136 if they were only

presenting up through page 136, to which Hugh Baker responded, "we probably can live with

that." *Id.* at 1864.

Hugh Baker elaborated on his decision to not present any of the post-arrest interview: "I've

reviewed the [interview] carefully because I wanted to look at the number of times that the

Defendant denied being involved in this and . . . the tactics used." *Id.* He then explained that as long as he could question Detective Lang how long the entire interview lasted, he did not need to present the specific contents of the post-arrest interview. *Id.* at 1865-68; *see also id.* at 2317 (trial counsel arguing to the trial court, "I don't think it's misleading that the exact questioning [during the post-arrest interview] is redacted. The time period is what is crucial here."). The trial court suggested that if they only presented the pre-arrest interview, the length of the post-arrest interview was irrelevant. *Id.* at 1868-69. In the end, Hugh Baker agreed with the trial court that he would focus on the first 136 pages, and the trial court would "hear objections if you start drilling into other stuff." *Id.* at 1869.

Despite this conversation, trial counsel began its cross-examination of Detective Arvin by asking him the length of the full interview. Detective Arvin testified, "there were two interviews that I was present for. The first one was approximately an hour and a half maybe. And the other one was probably an hour, hour and fifteen minutes." *Id.* at 2211. Although Detective Arvin underestimated the total length of the two interviews (which was approximately five hours), he alerted the jury to the fact that there were two interviews that together lasted substantially longer than the interview the jury would hear.

Detective Arvin's testimony led the State to file a motion in limine on the morning of October 25. The State moved to prohibit, among other things, references to the length of the interview since the post-arrest interview would not be presented to the jury. *Id.* at 2314-15. After some discussion, the trial court granted the motion, and instructed trial counsel to "frame your questions focusing on not specific time periods but the interview took [a] long time," thus allowing trial counsel to say that it went on for a "very long time," but "without specifying five hours." *Id.* at 2318.

Again, Mr. Myers maintains that trial counsel provided deficient performance by agreeing to not present the post-arrest interview to the jury. The Indiana Court of Appeals addressed this claim on the merits in *Myers II*, concluding that trial counsel's performance was not deficient nor was Mr. Myers prejudiced by it. It found, in relevant part:

> We have reviewed both the redacted and unredacted interrogation, and Myers has not established either deficient performance or prejudice stemming from the redaction of the post-arrest interview. The post-arrest interview contained several long monologues in which the interviewer attempted to appeal to Myers' moral sensibilities, followed by relatively short responses from Myers. Some of these monologues spanned several pages of transcript and made specific reference to Myers' past substance abuse and recovery process. The trial court described the post-arrest interview as largely filled with "a lot of irrelevant gibberish" that "add[ed] nothing to the factual determination in this case." Trial Transcript at 26. We think this is a fair characterization. Although Myers continued to proclaim his innocence in the post-arrest interview, his denials of involvement were merely cumulative of his previous statements in the pre-arrest interview, which the jury heard. Myers also made statements in the post-arrest interview that the jury could have viewed as flippant under the circumstances. For example, at one point, Myers stated, "you know, as we're sitting there talking, I'm thinking cigarettes, I'm thinking coffee[.]" PCR Exhibit 305A at 154. It was not deficient performance for trial counsel to agree to redact the post-arrest interview in its entirety because it could have harmed Myers and, in any event, would have added little, if anything, to the pre-arrest interview. For the same reason, Myers was not prejudiced by the redaction.

*Myers II*, 33 N.E.3d at 1090.

Mr. Myers contends that the Indiana Court of Appeals' decision is an unreasonable application of *Strickland*. As an initial matter, Mr. Myers appears correct that trial counsel did not review the entire interview until five days into trial. *See* Filing No. 33 at 20-23. This is, at minimum, troubling. But while this failure perhaps informs trial counsel's approach to the post-arrest interview, it is not the core of Mr. Myers's claim. Rather, his claim is that trial counsel provided deficient performance by failing to present the post-arrest interview to the jury. *See* Filing No. 9 at 24.

As to this specific claim, the record reveals that trial counsel agreed to not present the post-arrest interview to the jury only after he had reviewed the entire interview. *Id.* at 1861. Trial counsel did so on the basis that he could still question law enforcement regarding the length of both interviews. Although the trial court ultimately ruled that such questions were inappropriate, *id.* at 2318, it did so only after trial counsel elicited from Detective Arvin that there were two interviews that together were significantly longer than the audio clip the jury would hear, *id.* at 2211. Thus, trial counsel's objective was at least partially achieved.

In light of the foregoing, it is difficult to see how Mr. Myers has carried his burden to establish that the Indiana Court of Appeals' resolution of the performance prong was an unreasonable application of *Strickland*.[4] As correctly explained by the Indiana Court of Appeals, "the post-arrest interview contained several long monologues in which the interviewer attempted to appeal to Myers's moral sensibilities, followed by relatively short response from Myers." *Myers II*, 33 N.E.3d at 1090; *see, e.g.*, PCR Ex. 305A at 219-27. Mr. Myers is correct that the post-arrest interview also contained several additional denials of his involvement with Ms. Behrman's murder, but the Indiana Court of Appeals again correctly observed that "his denials of involvement were merely cumulative of his previous statements in the pre-arrest interview, which the jury heard." *Myers II*, 33 N.E.3d at 1090. Finally, the Indiana Court of Appeals was correct that Mr. Myers made statements during the post-arrest interview that the jury may have viewed as flippant, such as his statement, "'you know, as we're sitting there talking, I'm thinking cigarettes, I'm thinking coffee.'"[5] *Id.* (quoting PCR Ex. 305A at 154); *see also, e.g.*, PCR Ex. 305A at 186.

---

[4] To the extent that Mr. Myers argues that his counsel's failure permitted the State to present a false picture of the May 2 interview, that argument is addressed below.

[5] Mr. Myers argues that, had trial counsel's performance not been deficient, much of the unfavorable portions of the post-arrest interview would have been redacted, as was true for the pre-arrest interview. This is undoubtedly true for certain portions of the post-arrest interview. For example, the trial court excluded all reference to polygraphs, Trial Tr. 331, so such references in the post-arrest interview would not have been presented to the jury. But Mr. Myers

To summarize, Mr. Myers's trial counsel decided that he need not present the post-arrest interview—even though he knew it contained additional denials of involvement that were generally helpful, *see* PCR Tr. 593—so long as he could put before the jury the length of the interrogation and the tactics used, which he at least did in part. This allowed him to attack the methods used to interrogate Mr. Myers, while not presenting the jury with cumulative denials that were mixed in amongst certain unfavorable statements by Mr. Myers and "several long monologues," *id.*, or in trial counsel's words, "numerous pages . . . [of] psycho babble."[6] Trial Tr. 1862. The Indiana Court of Appeals relied on these factors to conclude that trial counsel's performance was not deficient because his approach to the post-arrest interview was a reasonable trial strategy.

The Supreme Court made clear in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690-91; *see United States v. Jansen*, 884 F.3d 649, 656 (7th Cir. 2018) ("Generally when an attorney articulates a strategic reason for a decision, the court defers to that choice." (citation and quotation marks omitted)). Because the record is not inconsistent with its

does not explain on what basis other unfavorable portions of the post-arrest interview would have been redacted. This is true not only for the "I'm thinking cigarettes" comment on which the Indiana Court of Appeals relied, but also similarly unfavorable comments. For example, Mr. Myers responded to a lengthy monologue by Detective Heck—during which he stated that Mr. Myers's body language showed he wanted to "get rid" of his burden caused by his involvement in Ms. Behrman's murder—by stating, "My body language wants a cigarette." PCR Ex. 305A at 186. Thus, Mr. Myers has failed to show that the Indiana Court of Appeals was mistaken in concluding that portions of the post-arrest interview would not be favorable to Mr. Myers.

[6] Mr. Myers argues that the Indiana Court of Appeals engaged in post-hoc rationalization of trial counsel's strategy, which is forbidden when assessing counsel's performance. *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003). Unlike in *Wiggins*, the Indiana Court of Appeals' recitation is a fair approximation of what the record reveals trial counsel's strategy appeared to be at the time. Of course, counsel's strategy is not always apparent from the trial records (or their post-conviction testimony). But it appears from the trial records that, after reviewing the entire statement, trial counsel did not believe that the additional cumulative denials were helpful enough to outweigh exposing the jury to "numerous pages . . . of psycho babble." Trial Tr. 1862. As explained above, trial counsel's expressed strategy at the time was to tell the jury that there were two interviews lasting five hours and was at least partially successful in pursuing this strategy.

assessment that trial counsel made a strategic decision not to present the post-arrest interview to the jury, the Indiana Court of Appeals did not unreasonably apply *Strickland*.

## 2. Failure to Object to Testimony and Arguments Regarding the May 2, 2005 Interview That Inaccurately Describe the Interview

Mr. Myers's second allegation of deficient performance also relates to the May 2, 2005 interview. He argues that trial counsel failed to object to certain testimony and arguments by the State that were "inaccurate and inadmissible." Filing No. 9 at 26. Specifically, Mr. Myers contends that trial counsel should have objected to the following: (1) the State argued during opening that Mr. Myers was "nonchalant" during the interview, Trial Tr. 460, and Detective Arvin testified that Mr. Myers was "cavalier," "nonchalant," and "rehearsed," during the interview, *id.* at 2207, 2244; (2) Detective Arvin testified that Mr. Myers "never adamantly denied" the crime and "never expressly denied it," *id.* at 2211-12; and (3) Detective Lang testified that he did not expect Mr. Myers to confess during the interview based on his "prior intelligence" and because "murder . . . is one of the least [sic] things somebody's going to confess to," *id.* at 2380-81.

The Indiana Court of Appeals addressed these arguments on the merits in *Myers II*. It "[a]ssum[ed] *arguendo* that the testimony was objectionable," but concluded that Mr. Myers could not establish prejudice from any of trial counsel's alleged failures. *Myers II*, 33 N.E.3d at 1090. Because the Indiana Court of Appeals did not address trial counsel's performance, this Court must review it *de novo*. *See Porter*, 558 U.S. at 38; *Rompilla*, 545 U.S. at 390.

Mr. Myers fails to develop his arguments with respect to these allegations of deficient performance. To the extent he points to these statements as part of the prejudice flowing from trial counsel's failure to admit the post-arrest interview, *see* Filing No. 9 at 26; Filing No. 33 at 25-26, trial counsel's performance was not deficient for the reasons outlined above and thus prejudice need not be assessed. If Mr. Myers meant them to be standalone allegations of deficient

performance, he has not attempted to explain why an objection to any of the above challenged statements would have been sustained. This is perhaps why the Indiana Court of Appeals thought it easier to resolve these allegations of ineffective assistance on the prejudice prong. Before doing so, it noted that the "sum total of [Mr.] Myers' argument that this testimony was inadmissible is contained in . . . [one] conclusory statement in his appellant's brief" that the "opinion evidence offered by [Detective] Arvin was objectionable, irrelevant and prejudicial." *Myers II*, 33 N.E.3d at 1090 (quotation marks omitted).

Without further development of these claims, Mr. Myers has failed to demonstrate that the challenged statements were objectionable even under *de novo* review. He does not explain on what legal basis trial counsel should have objected to these statements, nor explained why the objections would have been sustained under Indiana law. *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2000) ("An ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence. If evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test[.]"). Without such development, Mr. Myers has failed to carry his burden to establish that trial counsel's performance was deficient for failing to object to these statements.

### 3. Trial Counsel's False Statements during Opening Arguments

Mr. Myers argues that trial counsel provided ineffective assistance by making two false statements to the jury during opening arguments. Trial counsel made the following statements that Mr. Myers contends were false: (1) shortly after Ms. Behrman disappeared a tracking dog went to the home of Ms. Behrman's co-worker Mr. Hollars, but the police pulled the dog away; and (2) Mr. Hollars and Ms. Behrman were seen arguing days before she disappeared.

Understanding this claim requires an understanding of trial counsel's defense strategy. During opening, trial counsel offered two theories for who else may have murdered Ms. Behrman and an alibi defense. He referenced these theories throughout trial and during closing argument. The first theory (the "Owings theory") was that Ms. Owings, Ms. Sowders, and Mr. Clouse hit Ms. Behrman with a vehicle when they were driving south of Ms. Behrman's residence while high on drugs, then killed her to cover up their crime, placed her body in Salt Creek, and eventually moved it to where it was ultimately found three years later. Trial Tr. 471-72. This theory, trial counsel argued, was supported by several things, including Ms. Owings's confession to law enforcement, portions of which were corroborated. *Id.* at 473. Trial counsel maintained that the corroborating evidence included that Ms. Behrman was last seen by a high school classmate riding on 4700 Harrell Road, which was several miles south of her residence, and a significant distance from Mr. Myers's residence, which was several miles north of her residence. *Id.* at 471-73. This, trial counsel said, was "[t]heory number one." *Id.* at 474.

"Theory number two," trial counsel explained, was that Ms. Behrman's supervisor at the Student Recreational Sports Center ("SRSC"), Mr. Hollars, killed Ms. Behrman. *Id.* at 474. This theory (the "Hollars theory") was problematic for reasons that are explored in some detail below, as trial counsel's pursuit of this theory pervades several of Mr. Myers's claims and the Indiana Court of Appeals' resolution of them. At this juncture, it is sufficient to explain that this theory was predicated on allegations that Mr. Hollars (who was married to someone else) and Ms. Behrman were in a romantic relationship, Ms. Behrman became pregnant, and Mr. Hollars killed her to cover it up.

Lastly, trial counsel offered an alibi defense. The alibi defense was based on phone records showing that Mr. Myers was at his residence several miles north of Ms. Behrman's residence

during the timeframe Ms. Behrman disappeared. *See* D. Trial Ex. A. Trial counsel argued that if Ms. Behrman rode south, the phone records established that it was "absolutely impossible for [Mr. Myers] to be involved." Trial Tr. 475. Establishing that Ms. Behrman rode south also aligned with the Owings theory, which alleged that Ms. Owings, Ms. Sowders, and Mr. Clouse hit Ms. Behrman with a vehicle when she was riding south of her residence on Harrell Road.

Trial counsel's false statements related to the Hollars theory. During opening, Patrick Baker introduced the Hollars theory as follows:

> They sent dogs out. They sent dogs out right after the disappearance on May 31st. You'll hear from [Detective] Tom Arvin that a dog followed a scent, went to a home of a coworker. Did he go inside? No. He pulled the dog off. Why did he pull the dog off? He goes up to the house where the coworker lives, and he calls the dog off. Did he question him? Yes. Questioned him about a gun, a 12-gauge shotgun. The man was a skeet shooter. Name's Brian Hollars. Brian Hollars was seen arguing with Jill Behrman a day or two days before she disappeared. . . . Theory number two. Coworker who was possibly involved with her with a dog going up to his house was involved.

*Id.* at 474. Simply put, Patrick Baker introduced the jury to the Hollars theory by stating that evidence will show that Mr. Hollars and Ms. Behrman were in some sort of dispute immediately before she disappeared, and despite the fact that a bloodhound tracked Ms. Behrman's scent to Mr. Hollars's residence on the day she disappeared, law enforcement covered it up.

Hugh Baker further explained the Hollars theory later during opening, arguing that Mr. Hollars may have been the older man rumored to have asked Ms. Behrman on a date, that his alibi was not solid, and that law enforcement failed to test Mr. Hollars's shotgun. *See id.* 481-82. He also repeated Patrick Baker's false statements regarding the bloodhound. *Id.* at 481-82 ("[T]he police ruled [Mr. Hollars] out, *ignored the fact that the dog went up to his house*, ignored the fact that he worked with her . . . that they knew that there was a rumor that she had a crush on him. (emphasis added)). Finally, throughout trial, trial counsel attempted to show that Ms. Behrman

may have been pregnant, that Mr. Hollars may have been in a relationship with her, and because Mr. Hollars was married, the pregnancy gave Mr. Hollars motive to murder Ms. Behrman.

However, the two critical facts on which Patrick Baker relied to cast suspicion on Mr. Hollars were false: a bloodhound did not follow Ms. Behrman's scent to Mr. Hollars's residence, let alone was one purposefully pulled away by Detective Arvin, nor were Mr. Hollars and Ms. Behrman seen arguing a day or two before she disappeared. The parties both acknowledge that no evidence supported either of these contentions.[7]

Several years after the trial had concluded, Patrick Baker was disciplined by the Indiana Supreme Court for, among other things, making the false statement regarding the bloodhound during opening. *See In re Baker*, 955 N.E.2d 729 (Ind. 2011).[8] Patrick Baker stipulated to the

---

[7] Mr. Myers argued to the Indiana Court of Appeals that trial counsel additionally misled the jury by stating that he would call Monroe County Prosecutor Carl Salzman who would testify that Mr. Myers was never a suspect and that Owings, Sowders, and Clouse were his primary suspects. Trial counsel never called Mr. Salzman as a witness. Mr. Myers briefly references this argument in his habeas petition, Filing No. 9 and 28, but does not elaborate on it in his reply brief. The Indiana Court of Appeals concluded that Mr. Myers had failed to carry his burden to show that this was deficient performance because he failed during the post-conviction hearing to elicit any "testimony from trial counsel concerning the failure to call Salzman as a witness" and thus "made no attempt to discount the possibility that trial counsel made a strategic decision not to call Salzman to testify." *Myers II*, 33 N.E.3d at 1095. This analysis is potentially problematic. *See Reeves v. Alabama*, 138 S. Ct. 22, 26 (2017) (Sotomayor, J., dissenting from the denial of cert.) ("This Court has never . . . required that a defendant present evidence of his counsel's actions or reasoning in the form of testimony from counsel, nor has it ever rejected an ineffective-assistance claim solely because the record did not include such testimony."). Nevertheless, Mr. Myers's failure to attempt to explain to this Court why the analysis is an unreasonable application of *Strickland*'s performance prong precludes success on this claim.

[8] Patrick Baker was also disciplined for improperly soliciting Mr. Myers as a client and unreasonably collecting expenses from Mr. Myers's mother that need not have been collected. *In re Baker*, 955 N.E.2d at 729-30. The Court has grave concerns about Patrick Baker's testimony during the post-conviction hearing, which occurred in 2013, that directly contradicts facts he stipulated were true to the Indiana Supreme Court in 2011. Although these contradictions do not impact the Court's resolution of any of the claims discussed herein, they are nevertheless troubling because they cast doubt on Patrick Baker's honesty while testifying under oath during the post-conviction proceedings. For example, he stipulated to the Indiana Supreme Court that "[w]ithout invitation from [Mr. Myers] *or anyone else*, [Patrick Baker] visited [Mr. Myers] in jail and agreed to represent him without charge." *In re Baker*, 955 N.E.2d 729, 729 (Ind. 2011) (emphasis added). Yet during the post-conviction hearing, Patrick Baker testified that he received a voicemail from an unknown individual who asked him if he would help Mr. Myers, which prompted him to visit Mr. Myers in jail. PCR Tr. 493-94. Even the State's proposed conclusions of law for the post-conviction court recognized that Patrick Baker's testimony at the post-conviction hearing was contradicted by the facts to which he stipulated before the Indiana Supreme Court, and thus urged the post-conviction court to reject this aspect of Mr. Baker's testimony. *See* DA App. at 542. Nevertheless, it appears that Patrick Baker's testimony as it relates to his representation of Mr. Myers was otherwise taken as true.

following facts during his attorney disciplinary proceeding: "During his opening statement, [Patrick Baker] stated that search dogs were sent out shortly after the victim's disappearance and one dog 'alerted' at the home of [Mr. Hollars], but the dog was called off. These statements were false and [Patrick Baker] should have known that no evidence would be admitted at trial to support them." *Id.* at 729.

The Indiana Court of Appeals addressed Mr. Myers's claim regarding trial counsel's false statements on the merits in *Myers II*. Beginning with the performance prong, it agreed with Mr. Myers that "[t]rial counsel did not present evidence to support the[] claims" made during opening. *Myers II*, 33 N.E.3d at 1091. The Indiana Court of Appeals also acknowledged that Patrick Baker was disciplined by the Indiana Supreme Court, but noted that the disciplinary proceeding did not address whether his performance was deficient or whether Mr. Myers was prejudiced by it.[9] *Id.* Nevertheless, it "presume[d] . . . that an attorney who tells the jury that he will present evidence that he either knows or should know will not be presented has acted unreasonably for the purposes of the *Strickland* analysis." *Id.* "Thus," the Indiana Court of Appeals concluded, "at least with respect to trial counsel's statement that a search dog alerted to Hollars's residence, we accept Myers's argument that trial counsel's performance was deficient. We are left to consider whether the statements prejudiced Myers within the meaning of *Strickland*." *Id.*

Arguably, the Indiana Court of Appeals "accepted" only that trial counsel's false statement that a dog alerted at Mr. Hollars's residence was false and thus constituted deficient performance, which leaves this Court to analyze *de novo* whether trial counsel's false statements regarding Mr. Hollars and Ms. Behrman arguing the day before she disappeared also amount to deficient

---

[9] The Indiana Supreme Court specifically noted "that there is no allegation in th[e] [attorney discipline] proceeding that [Patrick Baker] provided substandard services to [Mr. Myers] or that [Patrick Baker's] improper representations during his opening statement prejudiced [Mr. Myers] or the State." *In re Baker*, 955 N.E.2d at 729.

performance. *See Harris*, 698 F.3d at 625; *Sussman*, 636 F.3d at 350. The respondent, understandably, does not advance an argument that it was not deficient performance for trial counsel to make this false statement during opening. No strategic or other reason has been suggested at any stage of this case as to why trial counsel made these false statements.

Of course, failing to follow through on statements during opening does not always amount to deficient performance, such as when "unforeseeable events" or "unexpected developments . . . warrant . . . changes in previously announced trial strategies." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003) (citations and quotation marks omitted). But this is not such a case, since the statements at issue were nothing more than false representations about what the evidence would show, and trial counsel should have known these statements were false when he made them. These false statements served no purpose but to undermine the defense offered and diminish trial counsel's credibility with the jury. *See id.* ("[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening." (citation and quotation marks omitted)); *id.* at 259 ("Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility."). Such harmful conduct constitutes deficient performance. *See id.*; *see also English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) ("[I]t was objectively unreasonable for [the defendant's] trial attorney to decide before trial to call . . . a [certain] witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated [that witness] and her story prior to opening statements."); *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993) ("The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging

failure sufficient of itself to support a claim of ineffectiveness of counsel."); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) (holding counsel's performance deficient and prejudicial where counsel promised the jury evidence that another suspect committed the crime and then failed to call any defense witnesses without explaining why to the jury).

Accordingly, the Court concludes that it was deficient performance for trial counsel to make the above false statements during opening. The Court will consider the prejudice flowing from this deficient performance, along with the other aspects of trial counsel's performance that were deficient, in the prejudice analysis below.

4.  **Failure to Sufficiently Challenge the State's Theory that Ms. Behrman Rode North and to Object to Improper Testimony that She Rode South**

Mr. Myers next contends that trial counsel provided deficient performance by failing to adequately challenge the State's evidence that Ms. Behrman rode north on the day she disappeared. Whether Ms. Behrman rode her bicycle north or south of her house on the day she disappeared was important for investigators when they were attempting to solve Ms. Behrman's murder. It was also critical at trial. Ms. Behrman logged off her home computer at 9:32 a.m. the morning she disappeared. She was scheduled to work at the SRSC at noon. Mr. Myers's phone records show that he was at home—several miles northwest of Ms. Behrman's residence—during the timeframe when Ms. Behrman disappeared. Specifically, Mr. Myers called several Indiana State Parks at 9:15, 9:17, and 9:18 a.m., and he called nearby movie theaters at 10:37 and 10:45 a.m. *See* D. Trial Ex. A. Given this, if Ms. Behrman had ridden south on the day she disappeared, Mr. Myers had a solid alibi. Establishing that Ms. Behrman rode south would have also corroborated the Owings theory—that Ms. Owings, Ms. Sowders, and Mr. Clouse hit Ms. Behrman with a vehicle when she was riding south of her residence, killed her, dumped her bike, and hid her body.

Trial counsel recognized how beneficial establishing that Ms. Behrman rode south would be for Mr. Myers's alibi defense. Indeed, trial counsel highlighted on several occasions during both opening and closing that the evidence showed Ms. Behrman rode south. During opening, trial counsel pointed out that Ms. Behrman was last seen south on Harrell Road by her former high school classmate, Maral Papakhian.[10] Trial Tr. 472. Trial counsel then argued that Mr. Myers's phone records make it impossible for him to have murdered Ms. Behrman: "This man's at home making telephone calls at the exact time when she's last seen [south on Harrell Road]." *Id.* at 475. During closing, trial counsel again argued that the phone records establish Mr. Myers's innocence given that Ms. Behrman was last seen south on Harrell Road. *Id.* at 2781. Trial counsel argued further that Agent Dunn "worked this case for three years" and "believed that theory because it matches as to where Jill Behrman was last seen, 4700 South [Harrell] Road." *Id.* at 2781-82. This southern route theory, trial counsel continued, was "corroborated by the Wendy Owings statement." *Id.* at 2782.

The State presented evidence that Ms. Behrman rode north—in the direction of Mr. Myers's residence—and attempted to undermine the evidence that she rode south. As discussed further below, the State presented evidence that six days after Ms. Behrman disappeared, Deputy Charles Douthett handled a bloodhound that tracked Ms. Behrman's scent along the northern route. *See id.* at 957-91. The State called Robert England, who testified that he saw a female cyclist in her early twenties on North Maple Grove Road who matched Ms. Behrman's description either on Wednesday (the day Ms. Behrman disappeared) or Thursday. *See id.* at 1019-26. Dr. Norman Houze—the leader of a bicycle group Ms. Behrman was in—testified that Ms. Behrman could

---

[10] Various spellings of Ms. Papakhian's name appear in the records. The State reports that her name is misspelled in the trial transcripts, and the proper spelling is "Papakhian." Filing No. 20-16 at 14 n.8. The Court will use this spelling, but different spellings are used if quoting from another source.

have ridden the northern route to where her bicycle was found and back in time to make her noon shift at the SRSC. *See id.* at 1265-71.

Detective Arvin offered testimony attempting to undermine Ms. Papakhian's sighting of Ms. Behrman. Detective Arvin testified that he interviewed Ms. Papakhian and disagreed with Agent Dunn's original conclusion that Ms. Papakhian saw Ms. Behrman on the Wednesday morning she went missing. *Id.* at 2228. Instead, after interviewing her and five other individuals who were at the same party as Ms. Papakhian the night before she saw Ms. Behrman, *id.* at 2203, Detective Arvin concluded that it was "more likely Tuesday that she saw Jill Behrman," *id.* at 2228; *see also id.* at 2230-32.

During the post-conviction hearing, Patrick Baker was asked about his strategy with respect to whether he wanted to establish that Ms. Behrman rode north or south the morning she went missing. Patrick Baker answered as follows:

Q.    What did you want the jury to believe about where Jill rode her bike the morning of May 31st?

A.    I didn't want her going north. I think . . . our strategy was to show that she was going on a southern route from her home. There were two theories, a southern route and a northern route, Judge.

Q.    But you wanted the jury to believe that she had ridden south.

A.    Yes.

Q.    Do you recall that part of the evidence . .

A.    Well, I . . no. I . . can I explain, Judge? We wanted the jury to believe that she couldn't have made it to [Mr. Myers'] house and back in time for work. So I don't know if we differentiated between the southern route and maybe partially of the northern route but we wanted the jury to believe that she couldn't have ridden to his house and back.

PCR Tr. 598-99.

Mr. Myers sets forth two allegations of deficient performance with respect to how trial counsel handled the issue of whether Ms. Behrman rode north or south the morning she disappeared. The Court will address each in turn.

### a.  Failure to Challenge the State's Northern Route Theory

Mr. Myers argues that trial counsel provided deficient performance by failing to use readily available evidence to show that Ms. Behrman rode south on the day she disappeared. *See* Trial Tr. 2746. He points to three specific ways in which trial counsel should have undermined the State's northern theory: (1) cross-examining Ms. Behrman's parents regarding their prior belief that she would not have ridden north; (2) impeaching Dr. Houze's timed reconstruction of the northern route; and (3) presenting evidence that Ms. Behrman hated riding through traffic, including crossing Highway 37, which she was required to do on the northern route. *See* Filing No. 33 at 48.

The Indiana Court of Appeals addressed these contentions on the merits in *Myers II*:

Myers' arguments on this issue presume that the only reasonable strategy trial counsel could have pursued was one that depended heavily on establishing that Behrman rode south rather than north on the date of her disappearance. But trial counsel were not limited to presenting a single theory of defense. Indeed, in a case such as this, based solely on circumstantial evidence, the most advantageous approach may be to establish reasonable doubt by presenting multiple possible alternative theories of the crime that point away from the accused's guilt. As the U.S. Supreme Court has explained, "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington v. Richter*, 562 U.S. 86, 109 (2011).

At the PCR hearing, when asked what he wanted the jury to believe concerning Behrman's bicycle route, Patrick Baker initially stated that he "didn't want her going north." PCR Transcript at 598. He went on to clarify, however, that he had "two theories, a southern route and a northern route". *Id.* Specifically, he testified as follows:

We wanted the jury to believe that she couldn't have made it to [Myers'] house and back in time for work. So I don't know if we differentiated between

the southern route and maybe partially of the northern route but we wanted the jury to believe that she couldn't have ridden to his house and back.

*Id.* at 598–99. Thus, it was not trial counsel's strategy to eliminate the possibility that Behrman had ridden north—rather, trial counsel sought to establish that Behrman would not have followed the north route all the way to Myers' residence in light of her schedule that day.

We cannot conclude that trial counsel's decision to pursue a defense theory that allowed for the possibility that Behrman had ridden north was unreasonable. As an initial matter, we note that trial counsel presented evidence supporting the theory that Behrman had ridden south. Trial counsel elicited testimony that Maral Papakhian, a high school classmate of Behrman's, had reported seeing Behrman riding her bike on Harrell Road, *i.e.*, the southern route, on the morning of her disappearance. The jury was also presented with evidence of Owings' confession, in which she stated that she and Sowders[] had been passengers in Clouse's vehicle when he struck Behrman and abducted her on Harrell Road. Additionally, in both opening statements and closing arguments, trial counsel argued that the evidence presented supported a conclusion that Behrman had ridden south.

We also note, however, that trial counsel's Hollars theory was premised in part on the fact that a bloodhound had scented Behrman on the northern route near Hollars' residence. Thus, presenting a theory of defense that depended on proving to a certainty that Behrman had ridden south would have undermined this alternative theory. Moreover, there was other evidence that Behrman had ridden north. Robert England testified that he saw a cyclist matching Behrman's description riding north on Maple Grove Road either at 10:00 a.m. on the day Behrman disappeared or at 9:00 a.m. the next day. Moreover, Behrman's bike was discovered on the north route, less than one mile from Myers' residence. Although it has been suggested that Behrman could have taken the south route, been abducted and subdued there, and her bike dumped on the north route, the timeline for such a scenario is tight. Behrman logged off of her computer at 9:32 a.m. and her bike was spotted near Myers' residence "before noon." Trial Transcript at 1226. Additionally, evidence from the bloodhound tracking search was consistent with Behrman having ridden the bike to its final location as opposed to being driven there in a vehicle. Thus, although it is not impossible for the bike to have been dumped, we cannot conclude that it was unreasonable for trial counsel to decline to pursue a theory of defense that was wholly dependent on the jury reaching such a conclusion. While it might have been helpful to the defense to conclusively eliminate the possibility that Behrman had ridden north that morning, the evidence simply did not allow for such certainty.

*Myers II*, 33 N.E.3d at 1095-96.

Mr. Myers contends that the Indiana Court of Appeals' decision was an unreasonable determination of the facts as well as an unreasonable application of *Strickland*. For example, Mr. Myers argues that the "two theories" to which Patrick Baker referred were actually two arguments supporting the same theory. *See* Filing No. 33 at 50. As Patrick Baker testified during the post-conviction hearing, he did not differentiate between two theories at trial, he was simply trying to prove that Ms. Behrman could not have ridden near Mr. Myers's residence and back in time to show up to work at the SRSC. If trial counsel could show this—either by showing that she rode south or by showing she only "partially" rode north, *see* PCR Tr. 598—then Mr. Myers's alibi that he was home making phone calls would be very persuasive. To posit that such a strategy would lead trial counsel to withhold evidence that Ms. Behrman rode south—even if it undermined trial counsel's Hollars theory[11]—is perplexing at best. More important, the notion that trial counsel strategically withheld evidence that Ms. Behrman rode south is contrary to trial counsel's actual conduct at trial. During both opening and closing, and throughout trial more generally, trial counsel repeatedly argued and attempted to prove that Ms. Behrman rode south. *See, e.g.*, Trial Tr. 472, 475-76, 2780-81.

For these reasons, and reasons similar to those set forth below regarding the Indiana Court of Appeals' resolution of Mr. Myers's claim regarding the bloodhound tracking evidence, the Indiana Court of Appeals' resolution of this claim may well be an unreasonable application of *Strickland* and *Wiggins*. Despite the Court's concern, it need not ultimately decide this question. As discussed below, the three instances of deficient performance identified by the Court are more

---

[11] As discussed further below, evidence that Ms. Behrman rode south would have hardly, if at all, undermined the Hollars theory. Even if Ms. Behrman rode north past Mr. Hollars' residence, there was no evidence that Mr. Hollars was home. Instead, the nearly undisputed evidence was that Mr. Hollars was at work at the SRSC. Moreover, as concluded below, trial counsel's investigation of the bloodhound evidence was deficient such that he did not understand the bloodhound evidence well enough to determine whether its potential detriment to the alibi defense was worth whatever minimal support it provided to the Hollars theory.

than sufficient for Mr. Myers to establish prejudice and be entitled to habeas relief. Accordingly, the Court need not resolve whether trial counsel's performance was deficient for not presenting the additional evidence that Ms. Behrman rode south.

### b. Failure to Object to Alleged Hearsay Regarding Ms. Papakhian

Mr. Myers next argues that trial counsel failed to object to Detective Arvin's testimony undermining Ms. Papakhian's sighting of Ms. Behrman riding south the Wednesday morning she disappeared. Specifically, Mr. Myers argues that Detective Arvin concluded the timeline did not fit for Ms. Papakhian to have seen Ms. Behrman on Wednesday morning based at least in part on statements of other individuals he interviewed and that, without objection, Detective Arvin placed the hearsay statements of those individuals before the jury. The Indiana Court of Appeals addressed this claim on the merits in *Myers II* as follows:

> Myers also argues that trial counsel were ineffective for failing to object to hearsay testimony discrediting Papakhian's sighting of Behrman on Harrell Road on the morning of her disappearance. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *Boatner v. State*, 934 N.E.2d 184 (Ind. Ct. App. 2010). As a general rule, hearsay is inadmissible unless the statement falls within one of the established hearsay exceptions. *Yamobi v. State*, 672 N.E.2d 1344 (Ind. 1996).

> Detective Arvin testified that Papakhian told police she believed she saw Behrman on the 4700 block of Harrell Road on the morning of Wednesday, May 31, but that she could not be one hundred percent certain that she had not seen her on Tuesday. Detective Arvin testified further that when he interviewed Papakhian, she recalled having an argument with her boyfriend at a small party the night before the sighting, and she named several other people who had attended the party. Detective Arvin testified that he interviewed five people as a result of his interview with Papakhian, and that he ultimately reported to Detective Lang "that the timeline that [Papakhian] had presented did not fit." Trial Transcript at 2203. He testified further that based on his investigation, he believed that it was more likely that Papakhian had seen Behrman on Tuesday, the day before her disappearance. Detective Arvin explained that Papakhian told him that she regularly left her house forty-five minutes before her 10:20 a.m. class (i.e., at 9:35 a.m.) and Detective Arvin determined that it would take her only three minutes to drive to the 4700 block of Harrell Road. Because Behrman had logged off of her computer at 9:32 a.m., and it would take a minimum of fifteen minutes for her to bike from the Behrman residence to Harrell Road (not

including additional time to change clothes, put on cycling shoes, fill a water bottle, etc.), Detective Arvin believed that Behrman could not have made it to the 4700 block of Harrell Road in time for Papakhian to have seen her there on the date of her disappearance.

Myers argues that Detective Arvin testified to statements made to him by the other partygoers Papakhian identified, and that a hearsay objection to this testimony would have been sustained. But Myers has not directed our attention to a single out-of-court statement made by these unnamed individuals and admitted into evidence through Detective Arvin's testimony. Instead, Detective Arvin testified that after interviewing Papakhian and five other witnesses, he came to the conclusion that Papakhian's timeline did not fit and she had probably seen Behrman on Tuesday. When giving a further explanation of why he reached the conclusion, Detective Arvin referred not to any statements or information gathered from the partygoers, but to the timeline he had worked out based on Papakhian's statements and Behrman's computer logoff time. Because Myers has not established that Detective Arvin testified to any out-of-court statements made by the unnamed witnesses he interviewed, Myers has not established that trial counsel were ineffective for failing to object based on hearsay.

*Myers II*, 33 N.E.3d at 1097-98. The Indiana Court of Appeals also noted that Mr. Myers did not argue that trial counsel should have objected to the out-of-court statements of Ms. Papakhian "and for good reason. Because Papakhian did not testify at trial, the only way to get evidence of her sighting before the jury was through the testimony of others." *Id.* at 1098 n.6.

Mr. Myers argues that this was an unreasonable application of *Strickland* in two respects. First, he argues that Detective Arvin's testimony "clearly suggests that his conclusions were based on his interview with partygoers." Filing No. 33 at 45 (citing Trial Tr. 2203, 2226-28). Second, he argues that even though Detective Arvin "*also* testified at trial, on redirect, that the timeline did not fit based on his estimates of the time it would have taken Jill to ride from her home to the approximate location Papakhian saw Behrman (4700 South Harrell Road), and the driving time from Papakhian's residence to that location, there are problems with this testimony as well." *Id.* at 46 (citation omitted).

As to Mr. Myers's first argument, the Court agrees that Detective Arvin's testimony suggests his conclusion that the timeline "did not fit" was reached at least in part due to what the partygoers told him. During direct examination, Detective Arvin testified that he interviewed five other people while investigating Ms. Papakhian's sighting and ultimately concluded that the "timeline that she had presented did not fit." Trial Tr. 2203. Trial counsel pressed Detective Arvin about this during cross-examination:

> Q.    . . . [The FBI] had focused on Wednesday, the day . . . she disappeared as the day that . . . Papa[khian] . . . saw her. Correct?
>
> . . . .
>
> A.    She had stated that she believed that she'd seen Jill on that date, but then . . . when I re-interviewed her, she told me that she recalled that the night before she had seen Jill she had attended a party and that she had forgotten to mention that to the . . . FBI. So I set out to find out . . . when the party was . . . . When I asked her about the party, she named several people that were present at the party.
>
> Q.    . . . [B]ut the FBI believed that she had seen her on Wednesday and conducted a three-year investigation based upon that belief, didn't they?
>
> A.    I'm thinking the FBI may have thought that she saw her on Wednesday, but based on my investigation, I believe that it was more likely Tuesday that she saw Jill Behrman.

*Id.* at 2227-28.

Although Detective Arvin's testimony shows he relied in part on what the other partygoers told him about the date of the party in reaching his conclusion, he never shared what any of the five partygoers he interviewed told him. Simply put, Detective Arvin's testimony included no out-of-court statements of the partygoers. This is the basis on which the Indiana Court of Appeals rejected Mr. Myers's assertion that his counsel should have raised a hearsay objection. It began by defining hearsay as "an out-of-court statement offered in court to prove the truth of the matter asserted." *Myers II*, 33 N.E.3d at 1097 (citing *Boatner*, 934 N.E.2d 184). Then it ultimately

concluded that "[b]ecause Myers has not established that Detective Arvin testified to any out-of-court statements made by the unnamed witnesses he interviewed, Myers has not established that trial counsel were ineffective for failing to object based on hearsay." *Id.* at 1098.

This is a reasonable application of *Strickland*. Notably, Mr. Myers has again not identified a specific out-of-court statement offered through Detective Arvin. Without a specific hearsay statement about which an objection would have been sustained, it cannot have been deficient performance for trial counsel to fail to raise such an objection. *See Hough*, 272 F.3d at 898. This failure dooms Mr. Myers's claim.[12]

### 5. Failure to Challenge Bloodhound Evidence

Mr. Myers maintains that trial counsel provided deficient performance by failing to exclude or otherwise impeach the bloodhound evidence offered by Deputy Douthett. The Indiana Court of Appeals summarized the factual background of this claim in *Myers II* as follows:

---

[12] Even though Mr. Myers's specific allegation of deficient performance lacks merit, it is worth noting that much about trial counsel's performance with respect to Ms. Papakhian's sighting of Ms. Behrman was, at best, underwhelming. For example, Mr. Myers points out that Detective Arvin's interviews with the partygoers fell well short of casting doubt on Ms. Papakhian's initial memory—which she first reported two days after Ms. Behrman disappeared—that she saw Ms. Behrman on the Wednesday morning Ms. Behrman disappeared. Filing No. 33 at 44-45. Detective Arvin testified during the post-conviction hearing that his trial testimony that the timeline did not fit was "based on the interview[s] with all of the parties involved." PCR Tr. 1190. But he clarified that none of the partygoers undermined Ms. Papakhian's original report—which Agent Dunn believed—that she saw Ms. Behrman on Wednesday. Instead, all the partygoers told Detective Arvin that "nobody could remember what night the party was." *Id.* This is not only unsurprising given that Detective Arvin conducted these interviews three years later, but it also shows that his interviews with the partygoers did not, as he implied during trial, provide him information undermining Ms. Papakhian's report. The partygoers simply did not remember.

Nevertheless, this failure was not presented as a ground for relief in state court. Mr. Myers's claim was simply that trial counsel was deficient for failing to object to the alleged hearsay statements offered through Detective Arvin. *See* Filing No. 20-14 at 45-46. Although in this Court Mr. Myers toes the line between focusing on the unraised hearsay objection and expanding his claim to include failing to "otherwise correct" Detective Arvin's misleading testimony, *see, e.g.*, Filing No. 33 at 44, the Court cannot conclude that the Indiana Court of Appeals' resolution of a claim was unreasonable when the claim presented to this Court has been meaningfully altered. If Mr. Myers truly intended to also argue to this Court that trial counsel's performance was additionally deficient for conducting a deficient cross-examination of Detective Arvin, such a claim was not raised in state court and thus is procedurally defaulted. *See Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (explaining that one type of procedural default occurs when a petitioner failed to exhaust claims through one complete round of state court review).

At trial, Porter County Sheriff's Deputy and canine handler Charles Douthett testified concerning a search he performed with his bloodhound, Sam. Deputy Douthett testified that he had been working with Sam for over ten years, and that he and Sam had attended numerous seminars and trainings and worked homicide investigations in six states. Deputy Douthett testified further that he and Sam had conducted numerous real-world tracking searches, including some cases involving tracking bicyclists. Deputy Douthett went on to describe the process used to present a bloodhound with a scent and to track that scent.

Deputy Douthett testified further that the FBI contacted him and asked him to come to Bloomington to conduct a tracking search in the Behrman case. An exhaustive description of the tracking search is not necessary here. It suffices for our purposes to note that Deputy Douthett and Sam were taken to a spot on North Maple Grove Road roughly one-half mile southwest of where Behrman's bike had been discovered. Sam tracked Behrman's scent to the spot the bike had been found and continued tracking the scent northward briefly before losing the scent and doubling back to the starting point of the search. At that point, Deputy Douthett and Sam got into a vehicle and were driven southward along the path Sam had been following. They stopped and got out of the vehicle at an intersection a few hundred yards away from Highway 37. Hollars' residence is very close to this intersection. Sam was able to pick the scent back up at that point and she followed it across Highway 37 before turning south on Kinser Pike.

*Myers II*, 33 N.E.3d at 1098.

The following map is a representation of a larger map that was admitted during trial. The blue lines represent the relevant locations where the bloodhound tracked according to Deputy Douthett's testimony, the red dot (just south of the "2") is where Ms. Behrman's bike was found, the black dot (just north of the "3") is Mr. Hollars's residence, and the blue dot (east/northeast of the "2") is Mr. Myers's residence. The bloodhound tracked from the "1" to the "2," before being dropped at the "3" and tracking along the blue line.



*See* Trial Ex. 74; Trial Tr. 1094.

Toward the end of Deputy Douthett's testimony, he was explicitly asked by the State, "at any time during your track did Samantha [the bloodhound] take you . . . to any houses," and Deputy Douthett responded, "[n]o." Trial Tr. 986. In summation, Deputy Douthett testified that what the bloodhound

> show[ed] us was possibly the bicycle route that the person had taken from Bloomington up to the point where the field entrance was because there was no scent. The dog did not show signs of a scent trail from that position anywhere farther north. The fact that we were running a nose down trail on the sidewalk which was 15 feet from the roadway was a strong indicator to me that we were following either a walking or bicycle trail.

*Id.* at 988-89.

As discussed above, whether Ms. Behrman rode north or south of her residence on the day she disappeared featured prominently at trial. To undermine Mr. Myers's alibi and the Owings

theory, the State attempted to prove that Ms. Behrman rode north to where her bicycle was found. The State did so primarily via the testimony of Deputy Douthett. His testimony, if credited, showed that Ms. Behrman rode north to the field where her bicycle was found and stopped there. This not only undermined Mr. Myers's alibi, given that the field was very close to his residence, but it also undermined the Owings theory, which depended on Ms. Behrman being hit while riding south of her residence and her bike being dumped in the field where it was found.

Mr. Myers argued during state post-conviction proceedings that trial counsel's performance was deficient for failing to object to or otherwise impeach Deputy Douthett's bloodhound evidence. Mr. Myers pointed out that Indiana common law deems bloodhound tracking evidence too unreliable to be admissible, and thus trial counsel should have objected to Deputy Douthett's testimony regarding his bloodhound track.

The Indiana Court of Appeals in *Myers II* briefly mentioned the common-law authorities on which Mr. Myers relied to argue the evidence was inadmissible, and it also noted that the question may now be governed by Indiana Evidence Rule 702(b). *See Myers II*, 33 N.E.3d at 1099. But it ultimately concluded that it "need not address whether the bloodhound tracking evidence in this case was admissible or subject to impeachment" because "[a]n objection to inadmissible evidence may be waived as part of reasonable trial strategy, which will not be second-guessed by this court," and "[t]rial counsel may also choose to forego opportunities to impeach evidence when doing so serves a reasonable strategic purpose." *Id.* (citations and quotation marks omitted). It then explained its conclusion that trial counsel's failure to object or impeach Deputy Douthett's bloodhound tracking evidence was a strategic decision:

> At the PCR hearing, Patrick Baker testified that he could not recall whether he considered objecting to the bloodhound tracking evidence. Likewise, he could not recall whether he considered consulting with an expert on bloodhounds or researched the admissibility of such evidence, although he believed he or someone

in his office had probably done some research on the issue. He noted on cross-examination that the bloodhound evidence put Behrman within a reasonable proximity of Hollars' house around the time of her disappearance.

It is Myers' burden to overcome the presumption that there were strategic reasons for the decisions trial counsel made. If Myers cannot satisfy that burden, he cannot establish deficient performance. Patrick Baker's inability to recall at the time of the PCR hearing whether he researched bloodhound evidence or considered objecting to its introduction at trial over six years earlier is insufficient to overcome the presumption in this case. This is so because we judge counsel's performance "by the standard of objective reasonableness, not his subjective state of mind." *Woodson v. State*, 961 N.E.2d 1035, 1041 (Ind. Ct. App. 2012) (citing *Harrington v. Richter*, 562 U.S. 86), *trans. denied*. "Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington v. Richter*, 562 U.S. at 109 (internal citation omitted).

Judging trial counsel's performance by an objective standard of reasonableness, as we must, we conclude that there were valid strategic reasons for declining to object to or impeach the bloodhound tracking evidence irrespective of Patrick Baker's inability to recall his thoughts on the subject. One of trial counsel's tactics throughout trial was to cast suspicion on Hollars, and the bloodhound tracking evidence supported that strategy because it placed Behrman near Hollars' residence. Indeed, trial counsel relied on the bloodhound tracking evidence and its link to Hollars in both opening statements and closing arguments. We will not speculate on the ultimate wisdom of trial counsel's strategic decisions on this issue. Because Myers has not overcome the presumption that trial counsel acted competently in declining to object to or impeach the bloodhound tracking evidence, he has not established ineffective assistance in this regard.

*Id.* at 1099-1100.

The Court first explains why the foregoing is an unreasonable application of *Strickland* and *Wiggins*. While doing so, the Court also explains why, had the Indiana Court of Appeals reasonably applied *Strickland* and *Wiggins*, it would have concluded that trial counsel's investigation of the bloodhound evidence was deficient. The Court also explains why an adequate investigation of the bloodhound evidence would have led trial counsel to object to it. Given that the Indiana Court of Appeals' decision was based on an unreasonable application of *Strickland* and *Wiggins*, the Court must turn next to whether the Court's own *de novo* review governs or

whether the Court must consider what other grounds could have supported the Indiana Court of Appeals' decision. Although the Supreme Court's decision in *Wilson* suggests this Court should simply review this allegation of deficient performance *de novo*, the Court applies currently controlling Seventh Circuit precedent requiring an analysis of what other grounds could have supported the Indiana Court of Appeals' decision. Ultimately, neither the state post-conviction court's alternative basis nor the respondent's proposed resolution could have supported the Indiana Court of Appeals' decision. This leaves the Court's *de novo* conclusion that trial counsel's performance was deficient for failing to object to the bloodhound evidence.

### a. Indiana Court of Appeals' Analysis of *Strickland*'s Performance Prong

Mr. Myers contends that the Indiana Court of Appeals' decision constitutes an unreasonable application of clearly established federal law as set forth by the Supreme Court in *Strickland* and *Wiggins* for two related reasons. First, he argues that the Indiana Court of Appeals engaged in the post-hoc rationalization it foreswore. Trial counsel's actual conduct and statements at trial, contends Mr. Myers, clearly show both that he wanted to prove that Ms. Behrman rode south, and that trial counsel did not make a strategic decision to let in the bloodhound evidence to support the Hollars theory.

Second, Mr. Myers argues that, even assuming trial counsel made a strategic decision not to object to the bloodhound evidence "because it placed Behrman near Hollars' residence," *Myers II*, 33 N.E.3d at 1100, trial counsel failed to reasonably investigate the evidence before deciding to pursue this strategy. Mr. Myers maintains that it was contrary to *Strickland* and *Wiggins* for the Indiana Court of Appeals to defer to trial counsel's purported strategy without assessing the reasonableness of trial counsel's investigation before deciding on that strategy.

The Indiana Court of Appeals' decision was unreasonable on both bases for reasons that significantly overlap. This Court will focus primarily on Mr. Myers's second argument because the Indiana Court of Appeals completely failed to consider whether trial counsel conducted a reasonable investigation before deciding on the purported strategy. While explaining this conclusion, this Court will also discuss how trial counsel's actual conduct both undermines the notion that he made a strategic decision regarding the bloodhound evidence, as well as bolsters the conclusion that trial counsel's investigation was deficient. In the end, this analysis shows not only that the Indiana Court of Appeals unreasonably applied *Strickland* and *Wiggins*, but also that trial counsel's performance was deficient.

The Indiana Court of Appeals reasoned that trial counsel made a strategic decision not to object to Deputy Douthett's bloodhound testimony "because it placed Behrman near Hollars' residence," *Myers II*, 33 N.E.3d at 1099, and thus that evidence supported trial counsel's Hollars theory. Identifying a strategy counsel may have been pursuing and then deferring to it should not have been the entirety of the Indiana Court of Appeals' analysis. To apply *Strickland* and *Wiggins*, it had to examine whether trial counsel's strategic decision was made after a reasonably competent investigation of the facts and law underlying that strategic choice. *See Wiggins*, 539 U.S. at 527 ("[A] reviewing court must consider the reasonableness of the investigation said to support [the asserted] strategy."). The Indiana Court of Appeals did not do this analysis at all, and, as explained further below, such a failure constitutes an unreasonable application of *Strickland* and *Wiggins*.[13]

---

[13] The Indiana Court of Appeals acknowledged that *Strickland* requires a consideration of counsel's investigation, *see Myers II*, 33 N.E.3d at 1089, and even held that trial counsel reasonably truncated his investigation into the Owings theory, *id.* at 1112 n.13. But it did not address trial counsel's investigation or lack thereof regarding the bloodhound evidence, even though Mr. Myers argued that trial counsel "did not understand the bloodhound evidence." Filing No. 20-16 at 13.

*See id.* at 528 ("The Court of Appeals' assumption that the investigation was adequate . . . reflected an unreasonable application of *Strickland*.).

"The Supreme Court held in *Wiggins* . . . that 'the deference owed to . . . strategic judgments' depends on 'the adequacy of the investigations supporting those judgments.'" *Jordan v. Hepp*, 831 F.3d 837, 848 (7th Cir. 2016) (quoting *Wiggins*, 539 U.S. at 521). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Thus, labelling a decision as strategic, as the Indiana Court of Appeals did here, does not automatically insulate it from review. *See Jansen*, 884 F.3d at 656 ("[A]n attorney's decisions are not immune from examination simply because they are deemed tactical." (citation and quotation marks omitted)). Instead, the Indiana Court of Appeals had to examine whether the strategic decision was made after a reasonable investigation into the law and facts was performed. *See id.* ("A strategic choice based on a misunderstanding of law or fact . . . can amount to ineffective assistance." (citation and quotation marks omitted)). "In assessing counsel's investigation," a court must engage in a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689).

Had the Indiana Court of Appeals considered trial counsel's investigation, it would have recognized that trial counsel did not adequately investigate the bloodhound evidence in the case, including Deputy Douthett's bloodhound search, before deciding to not object to or meaningfully impeach Deputy Douthett's testimony. Several related factors lead to this conclusion.

First, and most important, trial counsel failed to take basic steps to investigate the bloodhound evidence even though he knew of the bloodhound searches in May 2005, long before

trial.  *See* PCR Tr. 600.  Although trial counsel reviewed the grand jury transcripts, Deputy

Douthett did not testify during grand jury proceedings, nor did trial counsel depose him, even

though he was on the State's witness list.  *See, e.g.*, Trial Tr. 990.  Patrick Baker could not recall

what, if any, steps he took to investigate the bloodhound evidence as a factual or legal matter.  *See*

*Myers II*, 33 N.E.3d at 1099 (noting that Patrick Baker could not recall "whether he considered

objecting to the bloodhound tracking evidence[,] . . . [or] whether he considered consulting with

an expert on bloodhounds or researched the admissibility of such evidence."); *see also* PCR Tr.

599-600.  Critically, Patrick Baker admitted to the Indiana Supreme Court that his investigation

regarding the bloodhound evidence was inadequate.  Patrick Baker stipulated to the Indiana

Supreme Court that he "should have known" that no evidence would be admitted at trial to support

his statements during opening regarding what the bloodhound evidence would show.  *See In re*

*Baker*, 955 N.E.2d at 729.

It is clear trial counsel's investigation was wholly deficient because he did not know even

basic information about what occurred during the bloodhound searches in this case.  Had trial

counsel conducted a reasonable investigation—for example, by deposing Deputy Douthett—he

would have known that neither Deputy Douthett nor Detective Arvin[14] would testify that a

bloodhound tracked to any residence, let alone to Mr. Hollars's.  Trial counsel also would have

learned, more generally, that Deputy Douthett's testimony would completely undermine Mr.

Myers's alibi.

---

[14] Detective Arvin, who trial counsel said would testify about the bloodhound tracking to Mr. Hollars' residence, testified near the end of the State's case.  He testified that he had never been a canine officer, never owned a tracking dog, and never even "been with a tracking dog on this case."  Trial Tr. 2199.  Even more damaging for trial counsel's promise, Detective Arvin testified that he was not involved in investigating Ms. Behrman's case until Ms. Behrman's remains were found in 2003—years after any bloodhound tracking occurred.  *Id.* at 2199, 2223.

Only with this information could trial counsel have made an appropriate strategic judgment regarding whether he should challenge the admissibility of the bloodhound evidence. Trial counsel would have had adequate information to make the strategic decision whether (1) he should move to exclude the bloodhound evidence in order to keep out by far the best evidence undermining his alibi defense (and evidence that also undermined his Owings theory); or (2) even though it harmed these defenses, the bloodhound evidence was worth admitting because it supported the Hollars theory by showing that Ms. Behrman rode near, but long past, Mr. Hollars residence. When one considers that the latter evidence hardly cast suspicion on Mr. Hollars since the nearly undisputed evidence shows Mr. Hollars was working at the SRSC and no evidence was presented showing Mr. Hollars was home, trial counsel's choice would have been objectively clear. But because trial counsel failed to investigate, he, at minimum, thought the bloodhound evidence cast significantly more suspicion on Mr. Hollars than it did—namely, he thought the bloodhound tracked directly to Mr. Hollars's door and was pulled away by law enforcement.

Second, trial counsel's handling of Deputy Douthett's testimony shows that his "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 529 U.S. at 526. Deputy Douthett testified early during trial regarding the bloodhound tracking. As noted above, Deputy Douthett concluded his testimony by explaining that his bloodhound showed that Ms. Behrman rode to the field where her bike was found and stopped there—that is, Ms. Behrman rode to the field near Mr. Myers's residence where she was abducted. Trial Tr. 988-89.

Despite this detailed testimony that Ms. Behrman's ride ended very near Mr. Myers's residence, Patrick Baker did not ask Deputy Douthett *any* questions about it during cross-examination. Nor did he ask any questions about the proximity of the bike route to Mr. Hollars's residence. Instead, Patrick Baker asked Deputy Douthett five questions during cross-examination,

all of which related to a bloodhound track *south* of Bloomington that Deputy Douthett performed more than two weeks later, on June 23, 2000. Deputy Douthett testified that he was called back to perform a bloodhound track on that date because "they had a possible witness that observed . . . Ms. Behrman riding her bicycle south of Bloomington." *Id.* at 989. Neither party asked Deputy Douthett more questions.

Patrick Baker, however, asked the trial judge for an opportunity to compare Deputy Douthett's trail log, which he had just received, to Deputy Douthett's testimony because his testimony was "very confusing." *Id.* at 990. After the trial judge asked if he wanted to compare it to Deputy Douthett's grand jury testimony, the State explained that Deputy Douthett did not testify during grand jury proceedings, but that he was listed as a witness and Patrick Baker "could have deposed" him. *Id.* Patrick Baker then asked that Deputy Douthett remain under subpoena so Deputy Douthett could be recalled if necessary, but he was not recalled during trial. *Id.* at 990-91.

In the end, trial counsel's conduct during and immediately after Deputy Douthett's testimony supports the conclusion that his conduct was the result of a lack of investigation and preparation rather than a strategic choice. *See Wiggins*, 539 U.S. at 526 ("The record of the . . . proceedings underscores the unreasonableness of counsel's conduct by suggesting that [the] failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."). He failed to ask any questions regarding the northern route even though, according to the Indiana Court of Appeals, he made the strategic decision to let this testimony in to show the northern route's proximity to Mr. Hollars's residence. The lack of questions by trial counsel regarding the northern route, combined with his admitted confusion and desire to consider recalling Deputy Douthett, point to counsel's unawareness of what Deputy Douthett would testify to, not to his exercise of strategic judgment.

Third, trial counsel's pivot from his arguments during opening to those made at closing shows his fundamental misunderstanding of the bloodhound evidence—a misunderstanding that would not have occurred had he properly investigated the evidence before trial. Again, trial counsel promised during opening that Detective Arvin would testify that a bloodhound tracked to Mr. Hollars's residence on the day Ms. Behrman disappeared, May 31, 2000, but was pulled away. *See* Trial Tr. 474. By the end of trial, no evidence had been produced of a bloodhound tracking to Mr. Hollars's residence or evidence that Detective Arvin at all participated in bloodhound searches.

As trial counsel must have anticipated, during closing the State pointed out trial counsel's unfulfilled promise made during opening. *See id.* at 2817 ("[The bloodhound] never tracked at Brian Hollars' front door as you heard the Defense [during] opening."). It is therefore unsurprising that trial counsel no longer argued that Detective Arvin pulled a bloodhound away that had tracked Ms. Behrman's scent to Mr. Hollars's residence. Instead, trial counsel argued the most the evidence showed—that "Samantha [tracked] . . . *near* the house of Mr. Hollars, but the trail was stopped." *Id.* at 2792 (emphasis added).

Thus the bloodhound evidence that trial counsel maintained supported the Hollars theory at closing was completely different from the evidence promised during opening: it was Deputy Douthett's bloodhound tracking (not Detective Arvin's) on June 6 (not May 31) that tracked "near" Mr. Hollars's residence (not to his door then pulled away) that supported the Hollars theory. This change can only be explained by trial counsel's unawareness of what the bloodhound evidence would show before trial, discovering that whatever he thought it would show before trial was incorrect, and then significantly changing his argument in closing to tailor it to what the evidence revealed.

These three related factors show that trial counsel's handling of the bloodhound evidence was caused by a lack of investigation and preparation rather than a strategy. The Court thus agrees with Mr. Myers that the purported strategic decision on which the Indiana Court of Appeals relied appears to be more a "*post hoc* rationalization of counsel's conduct [rather] than an accurate description" of what occurred. *Wiggins*, 539 U.S. at 526-27.

But, more important, even if it was trial counsel's strategy to not object to Deputy Douthett's bloodhound evidence because it would show Ms. Behrman rode near Mr. Hollars's residence, he chose this strategy without having first reasonably investigated the evidence.[15] The Indiana Court of Appeals did not at all discuss trial counsel's investigation of the bloodhound evidence before deferring to trial counsel's purported strategy regarding this evidence. Contrary to *Wiggins*, the Indiana Court of Appeals "merely assumed that the investigation was adequate." 539 U.S. at 528. A court cannot defer to trial counsel's strategic judgment without assessing "'the adequacy of the investigations supporting th[at] [strategy].'" *Jordan*, 831 F.3d at 848 (quoting *Wiggins*, 539 U.S. at 521). The Indiana Court of Appeals—despite recognizing earlier in its opinion that trial counsel should have known its representations about the bloodhound evidence were false—ignored this fact and its implications when analyzing this claim. It concluded that there was an objectively reasonable strategy supporting trial counsel's failure to object without assessing whether trial counsel could have settled on such a strategy given trial counsel's lack of investigation and misunderstanding of the evidence—an analysis that *Strickland* and *Wiggins* mandate before deferring to a proposed strategic justification. *Wiggins*, 539 U.S. at 527 ("[A]

---

[15] Alternatively, trial counsel did not object to or impeach the bloodhound evidence because his failure to investigate its admissibility left him without the knowledge that there were valid bases on which to object. Such a lack of legal knowledge regarding an important piece of evidence that undermined Mr. Myers's alibi would amount to deficient performance. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

reviewing court must consider the reasonableness of the investigation said to support th[e] strategy."); *see Strickland*, 466 U.S. at 690-91.

For these reasons, the Indiana Court of Appeals' decision with respect to this allegation of deficient performance "involved an unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2254(d)(1). It did so by failing to analyze whether a reasonable investigation supported the purported strategy, as clearly required by *Strickland* and *Wiggins*. *See Wiggins*, 539 U.S. at 528 ("The Court of Appeals' assumption that the investigation was adequate . . . reflected an unreasonable application of *Strickland*."). Indeed, the Indiana Court of Appeals noted that this analysis was necessary when evaluating ineffective-assistance-of-counsel claims earlier in its opinion, but simply failed to consider it when analyzing this allegation of deficient performance. Failing to properly apply these aspects of *Strickland* and *Wiggins* constitutes an "'error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Ward*, 835 F.3d at 703 (quoting *Richter*, 562 U.S. at 103).

### b. <u>Appropriate Standard of Review</u>

The Court has concluded that the Indiana Court of Appeals unreasonably applied *Strickland* and *Wiggins* to this allegation of deficient performance, but the Court's inquiry cannot end there. Federal courts have debated whether, even after concluding that a state court unreasonably applied clearly established federal law as determined by the Supreme Court, the federal habeas court then reviews the issue *de novo* or if deferential review under § 2254(d) is still required. This debate centers on the "could have supported" framework set forth by the Supreme Court in *Richter*:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those

arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Richter*, 562 U.S. at 102. "Prior to *Richter*, if a state court offered a rationale to support its decision denying *habeas* relief, [the federal habeas court] assessed the *actual* reason offered by the state court to determine whether the decision was the result of an unreasonable application of federal law." *Whatley v. Zatecky*, 833 F.3d 762, 774 (7th Cir. 2016). But after *Richter*, the Seventh Circuit questioned:

> first, whether *Richter* (a) applies only to cases in which the state court offers no reasoning, or instead (b) holds in effect that federal courts should always entirely disregard the state court's rationale and decide independently if the bottom line is justifiable; and second, if *Richter* applies only to summary dispositions, how a federal court should evaluate a case in which the state court offers a reason, but that reason is either wrong as a matter of law or patently irrational.

*Id.* (quoting *Brady v. Pfister*, 711 F.3d 818, 824-25 (7th Cir. 2013)).

In other words, unlike in *Richter* but like this case, "[t]he problem is . . . not silence; it is what to do if the last state court to render a decision offers a bad reason for its decision." *Brady*, 711 F.3d at 826. "At that point," the Seventh Circuit held, "we concluded that although we would no longer attach significance to the state court's expressed *reasons*, we would still apply AEDPA deference to the *judgment*." *Whatley*, 833 F.3d at 775 (citing *Brady*, 711 F.3d at 827). Thus, even "[i]f a state court's rationale does not pass muster under . . . Section 2254(d)(1) . . . , the only consequence is that further inquiry is necessary." *Brady*, 711 F.3d at 827. To conduct this inquiry, "the federal court should turn to the remainder of the state record, including explanations offered by lower courts." *Id.*; *see Whatley*, 833 F.3d at 775. In other words, the federal court should apply *Richter*'s "could have supported" framework. *See Whatley*, 833 F.3d at 775 (noting that a petitioner is not "entitle[d] . . . to *de novo* review simply because the state court's rationale is unsound").

Whether these holdings remain the law—that is, whether *Richter*'s "could have supported" framework applies when the last state court provides a reasoned decision—was cast into doubt by the Supreme Court's decision in *Wilson v. Sellers*, 138 S. Ct. 1188 (2018); *see Thomas v. Vannoy*, 898 F.3d 561, 568 (5th Cir. 2018) (noting without deciding that *Wilson* may have undermined the "continued viability" of the Fifth Circuit's application of *Richter*'s "could have supported" framework even when the state court provided a reason for its decision). In *Wilson*, the Supreme Court stated that application of AEDPA deference is "a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion. In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." 138 S. Ct. at 1192. In so stating, it cited to three pre-*Richter* cases where the Supreme Court did not apply the "could have supported" framework even after finding specific reasons provided by the state court involved an unreasonable application of Supreme Court precedents. *Id.* (citing *Porter*, 558 U.S. at 39-44; *Rompilla*, 545 U.S. at 388-392; *Wiggins*, 539 U.S. at 523-538).

The Supreme Court in *Wilson* further explained that *Richter* does not control in all § 2254 cases, noting that if it "[h]ad . . . intended *Richter*'s 'could have supported' framework to apply even where there is a reasoned decision by a lower state court," its decision issued the same day in *Premo v. Moore*, 562 U.S. 115 (2011), "would have looked very different." *Wilson*, 138 S. Ct. at 1195. Instead, in *Premo*, the Supreme Court "focused exclusively on the actual reasons given by the lower state court, and we deferred to those reasons under AEDPA." *Id.* at 1195-96. Indeed, throughout *Wilson* the Supreme Court juxtaposes the "look through" presumption it adopts with the "could have supported" framework, which is difficult to square if the latter approach applied in all cases, even when reasons are provided for a state court's decision. *See id.* at 1193-95.

*Wilson* casts serious doubt on the continued application of the *Richter* framework when the last state court decision provides reasons for the decision. Ultimately, the Court need not decide whether *Wilson* calls into doubt the Seventh Circuit's decisions in *Brady* and *Whatley*. Even applying the "could have supported" framework, as the Court does below, failing to object to or otherwise attempt to impeach the bloodhound evidence amounted to an "'error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Ward*, 835 F.3d at 703 (quoting *Richter*, 562 U.S. at 103).

Justice Gorsuch, dissenting on other grounds in *Wilson*, aptly explained what the "could have supported" framework from *Richter* requires. It does not require "a federal court to imagine its own arguments for denying habeas relief and engage in decision-making-by-hypothetical." *Wilson*, 138 S. Ct. at 1199 (Gorsuch, J., dissenting). Instead,

> [i]n our adversarial system a federal court generally isn't required to imagine or hypothesize arguments that neither the parties before it nor any lower court has presented. To determine if a reasonable basis "could have supported" a summary denial of habeas relief under *Richter*, a federal court must look to the state lower court opinion (if there is one), any argument presented by the parties in the state proceedings, and any argument presented in the federal habeas proceeding. Of course, a federal court sometimes may consider on its own motion alternative bases for denying habeas relief apparent in the law and the record, but it does not generally bear an *obligation* to do so.

*Id.* (Gorsuch, J., dissenting). This is consistent with the approach set out by the Seventh Circuit in *Brady*, 711 F.3d at 827, and *Whatley*, 833 F.3d at 775, and the mode of analysis the Court will apply here.

The state post-conviction court and the respondent both offer an alternative basis to conclude that trial counsel's performance regarding the bloodhound evidence was not deficient. The state post-conviction court agreed that the bloodhound evidence could have been excluded had trial counsel objected but reasoned that a different strategy than that offered by the Indiana

Court of Appeals led trial counsel not object to it. The respondent argues that, even if trial counsel would have objected to the bloodhound evidence, the objection would not have been sustained. Filing No. 20 at 39-40. The Court discusses and ultimately rejects each argument in turn.

### c.      State Post-Conviction Court's Alternative Basis

The state post-conviction court had a different basis for ruling against Mr. Myers on this claim than the Indiana Court of Appeals. Notably, the state post-conviction court agreed with Mr. Myers that trial counsel's handling of the bloodhound evidence was suboptimal, and it also agreed that had trial counsel objected to the bloodhound evidence, it would have been excluded. But it held that trial counsel did not object to the bloodhound evidence in support of a different strategy. The state post-conviction court's factual findings in full were as follows:

> The issues brought up by [Mr. Myers] . . . ha[ve] merit. The promised bloodhound evidence was not fleshed out well by [trial counsel]. His opening statement was not supported fully by the evidence. The court does take issue with [Mr. Myers'] position that [trial counsel] should have objected to the bloodhound evidence. The trail the dog laid down kept going a long way past [Mr. Myers'] home and would insinuate to the jury that [Ms. Behrman] did not go to [Mr. Myers'] home. The court agrees . . . that better use could have been made of this. To say that trial counsel should have attempted to exclude this evidence is an overreach that the court will not take. Using the submitted evidence had value to [Mr. Myers'] case. Allowing bloodhound evidence in is error if counsel so chooses to object in any given case. Here it was not error such that *Strickland, id* can be used to reverse the verdict.

DA App. at 752; *see also id.* at 758 ("Allowing bloodhound evidence was a valid trial tactic.").

The state post-conviction court, like the Indiana Court of Appeals in *Myers II*, held that it was a strategic choice to not object to the bloodhound evidence. But the purported strategy underlying trial counsel's choice was different. Unlike the Indiana Court of Appeals' conclusion that trial counsel admitted the bloodhound evidence to support the Hollars theory, the state post-conviction court reasoned that the bloodhound evidence more generally aided Mr. Myers's defense because it established that Ms. Behrman rode "a long way past [Mr. Myers' home]." *Id.* at 752.

The state post-conviction court's resolution of this claim is both factually and legally flawed. This Court focuses on the factual flaw, however, because the state post-conviction court's decision is clearly "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Factual determinations are not unreasonable under § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance," nor are they unreasonable if "[r]easonable minds reviewing the record might disagree about the finding in question." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation and quotation marks omitted). But here, the state post-conviction court's factual premise is indisputably incorrect.

The state post-conviction court concluded that "[a]llowing bloodhound evidence was a valid trial tactic," DA App. at 758, based entirely on the factual premise that "[t]he trail the dog laid down kept going a long way past [Mr. Myers'] home and would insinuate to the jury that [Ms. Behrman] did not go to [Mr. Myers'] home," *id.* at 752. But the bloodhound evidence did not show this. As the above map shows, the bloodhound tracked a long way past *Mr. Hollars*'s residence, not Mr. Myers's.[16] *See* Trial Ex. 74. Mr. Myers's residence was north and east of the field where Ms. Behrman's bicycle was recovered, and Deputy Douthett explicitly testified that the bloodhound's scent trail ended at the field. Trial Tr. 988 ("The dog did not show signs of a scent trail from that position anywhere farther north.").

In short, the bloodhound did not track "a long way past" Mr. Myers's residence, but tracked directly to the field where Ms. Behrman's bike was located, which is less than a mile from Mr. Myers's residence. Unlike evidence that Ms. Behrman rode long past Mr. Myers's residence,

---

[16] Oddly enough, the state post-conviction court suggested that the bloodhound tracking near but past Mr. Myers residence makes it *less* likely Mr. Myers was involved. But the Indiana Court of Appeals in *Myers II* held that evidence that Ms. Behrman rode near but past Mr. Hollars' residence cast suspicion on him.

which may have helped Mr. Myers's defense, evidence that her ride ended in a field shortly before Mr. Myers's residence hinders it, especially considering it undermines Mr. Myers's alibi that he was home making phone calls. For this reason, the state post-conviction court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[17] It is thus not entitled to AEDPA deference.

###    d.    Respondent's Alternative Basis

The Court turns next to the respondent's contention that trial counsel's performance was not deficient because an objection to the bloodhound evidence would have been overruled. *See Hough*, 272 F.3d at 898 ("An ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence."). The parties dispute whether bloodhound evidence is admissible under Indiana law. The Court's analysis is significantly hindered by the respondent's failure to meaningfully engage with the critical issues governing the admissibility of bloodhound evidence. Mr. Myers primarily relies on Indiana Supreme Court cases discussed below, which hold that bloodhound tracking evidence is inadmissible. These cases, however, were decided prior to Indiana's adoption of the Indiana Rules of Evidence in 1994. Nevertheless, Mr. Myers argues that the prior common law cases retain persuasive value.

Given that the respondent does not meaningfully confront these complicated questions and Mr. Myers's arguments regarding them, this Court is not obligated to construct such arguments for the respondent. *Wilson*, 138 S. Ct. at 1199 (Gorsuch, J., dissenting). Thus, after showing why the authorities on which the State relies are irrelevant to the admissibility of bloodhound evidence, the

---

[17] It is an open question whether meeting the § 2254(d)(2) standard necessarily requires meeting the § 2254(e)(1) standard. *See Wood v. Allen*, 558 U.S. 290, 300 (2010); *Price v. Thurmer*, 637 F.3d 831, 837 (7th Cir. 2011). Although the Court analyzes the factual determination under § 2254(d)(2), the arguably more demanding standard of § 2254(e)(1) is also met because there is no evidence in the record even suggesting that the bloodhound tracked long past Mr. Myers's residence, as the state post-conviction court concludes. Instead, Deputy Douthett's testimony shows the bloodhound did not track as far north or east as Mr. Myers's residence.

Court concludes that the respondent has failed to show another basis that "could have supported" the Indiana Court of Appeals' decision. *See id.* In the alternative, the Court goes on to address the admissibility question directly, concluding that all indications point to the continued inadmissibility of bloodhound evidence in Indiana. During this analysis, the Court addresses the authorities on which the State relies to contend otherwise, concluding they are irrelevant.

The most compelling basis for this Court to conclude that the bloodhound evidence would have been excluded had trial counsel objected to it is that the state post-conviction court reached this exact conclusion. In analyzing Mr. Myers' claim regarding the bloodhound evidence, it noted that "[a]llowing bloodhound evidence in is error if counsel so chooses to object in any given case." DA App. at 752. The state post-conviction court reached this conclusion even though the State argued that bloodhound evidence was admissible following the adoption of the Indiana Rules of Evidence. *See id.* at 545. Given the respect owed by a federal habeas court to state-court decisions on questions of state law, this Court should adhere to that decision, even though the state post-conviction court is not the last reasoned decision being reviewed in this action. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." (citation and quotation marks omitted)); *Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016) ("A federal court cannot disagree with a state court's resolution of an issue of state law."). This basis alone is sufficient to reject the respondent's position.

Even if the state post-conviction court's decision was not determinative, all other Indiana authorities suggest that the state post-conviction court's determination was correct. Bloodhound tracking evidence has been inadmissible in Indiana for over a century. It was first held inadmissible by the Indiana Supreme Court in *Ruse v. State*, 115 N.E. 778 (1917). In *Ruse*, the

Indiana Supreme Court analyzed decisions from other state courts on both sides of the issue, but ultimately agreed with courts that had held "that the conclusions of the bloodhound are generally too unreliable to be accepted as evidence," reasoning as follows:

> When it is considered that the use of bloodhounds, even under the most favorable conditions, is attended with some degree of uncertainty, which may readily lead to the conviction or accusation of innocent persons, and that, at best, evidence as to their conduct in following a supposed trail is properly not of great probative value, it follows, as is suggested in *Brott v. State*, 70 Neb. 395, 398, that both reason and instinct condemn such evidence, and courts should be too jealous of the life and liberty of human beings to permit its reception in a criminal case as proof of guilt.

*Id.* at 781. Since *Ruse*, the Indiana Supreme Court has twice reaffirmed that bloodhound tracking evidence is inadmissible. *See Brafford v. State*, 516 N.E.2d 45, 49 (Ind. 1987) ("It has long been held in Indiana that tracking dog or 'bloodhound evidence' is not sufficiently reliable to be admitted into evidence." (citing *Ruse*, 115 N.E. 778)); *Hill v. State*, 531 N.E.2d 1382, 1384 (Ind. 1989) ("[E]vidence of the result of the use of a tracking dog is not admissible." (citing *Brafford*, 516 N.E.2d 45)); *see also Hill*, 531 N.E.2d at 1385 ("It flows *a fortiori* from th[e] rule [in *Ruse*] that no satisfactory foundation for the admission of bloodhound evidence can be made. The rule is based on upon the unobtainability of scientific and other information which can furnish a satisfactory basis or reason for admitting such evidence.") (DeBruler, J., dissenting). These cases, however, were decided prior to Indiana's adoption of the Indiana Rules of Evidence in 1994.

The respondent does not argue that the Indiana Rules of Evidence—particularly Rule 702 governing expert testimony—undermine the reasoning or holdings of *Ruse* and its progeny. Instead, the respondent argues that these cases are simply distinguishable from the instant case. The States contends that, unlike in *Ruse*, *Brafford*, and *Hill*, the bloodhound here "was not used to prove the identity of [Ms. Behrman's] killer, but to prove confirm [sic] portions of the route [Ms. Behrman] took on the day she died." Filing No. 20 at 39. As an initial matter, the bloodhound

evidence was certainly used to prove that Mr. Myers was the perpetrator, at the very least because it was used to show that Ms. Behrman rode north toward his house; had Ms. Behrman ridden south, Mr. Myers had an alibi. But the Court understands the State to argue that *Ruse* and its progeny only prevent bloodhound tracking evidence if the bloodhound is tracking the alleged perpetrator, not, as here, the victim. This interpretation of these cases is too narrow.

The Indiana Supreme Court in *Ruse* made clear that bloodhound evidence generally was inadmissible because it is unreliable. *See* 115 N.E. at 781 ("We agree fully with the statement in *Brott v. State* [70 Neb. 395, 97 N. W. 593, 63 L. R. A. 789], that the 'conclusions of the bloodhound are generally too unreliable to be accepted as evidence in either civil or criminal cases.'").

The subsequent Indiana Supreme Court decisions similarly stated *Ruse*'s holding in categorical terms. *See Hill*, 531 N.E.2d at 1384 ("[E]vidence of the result of the use of a tracking dog is not admissible."); *Brafford*, 516 N.E.2d at 49 ("It has long been held in Indiana that tracking dog or 'bloodhound evidence' is not sufficiently reliable to be admitted into evidence."). The holdings of these cases are not that bloodhound evidence is inadmissible when the bloodhound is tracking a perpetrator, but that bloodhound evidence is inadmissible altogether because it is unreliable. *Cf. Hubbard v. State*, 742 N.E.2d 919, 923 n.9 (Ind. 2001) (noting that the reason why polygraph test results are being offered is irrelevant because they are "unreliable" regardless of why they are offered).

The State next argues that even under the common law "the behavior of animals has been held to be relevant and admissible evidence." Filing No. 20 at 39 (collecting cases). But the three cases on which the State relies are wholly inapplicable to the question of whether bloodhound tracking evidence is admissible. First, in *Price v. State*, 911 N.E.2d 716, 720-21 (Ind. Ct. App. 2009), the court held that a dog's loud screaming when hit with a belt was sufficient evidence to

convict the defendant of cruelty to animals. Second, *Ross v. Lowe*, 619 N.E.2d 911, 914 (Ind. 1993), was a negligence action in which the Indiana Supreme Court discussed the standard of care owed to invitees for preventing injury from a dog kept on the property. Third, in *Neufhoff v. State*, 708 N.E.2d 889, 891 (Ind. Ct. App. 1999), the Indiana Court of Appeals held that a probable cause affidavit that relied on the alerting of a drug sniffing dog was sufficiently reliable to establish probable cause. Not only do these cases not relate specifically to bloodhound tracking evidence, but none of them even deal with the admissibility of evidence at all. The respondent's reliance on these cases is illustrative of the little assistance provided to the Court in analyzing this question of Indiana law.[18]

This leaves the Court to determine what role *Ruse* and its progeny play in determining the admissibility of bloodhound evidence following the adoption of the Indiana Rules of Evidence. As noted by the Indiana Court of Appeals in *Myers II*, these cases were decided prior to the adoption of the Indiana Rules of Evidence in 1994 and thus are no longer strictly binding precedent. 33 N.E.3d at 1099; *see Albores v. State*, 63 N.E.3d 34, *6 (Ind. Ct. App. 2016) (noting that *Brafford* "was decided prior to the adoption of the Indiana Rules of Evidence and is no longer controlling"). But no Indiana court has decided whether or to what degree they remain persuasive.

Mr. Myers contends that *Ruse* and its progeny continue to provide guidance even after the adoption of the Rules of Evidence. *See* Filing No. 33 at 59, 61. Specifically, he suggests that

---

[18] The State relied on nearly the same arguments before the state post-conviction court. For example, the State argued that Indiana "[d]ecisions since the adoption of the rules have allowed such evidence to prove a route taken without comment." DA App. at 545 (citing *Hill v. State*, 773 N.E.2d 336, 339 (Ind. Ct. App. 2002)). But the Indiana Court of Appeals decision in *Hill*, much like the cases on which the respondent relies here, has no bearing on the admissibility of bloodhound evidence. The admissibility of bloodhound evidence was not discussed at all in *Hill*; the Indiana Court of Appeals merely mentioned that a bloodhound was utilized to track the perpetrator and did not mention, let alone rely, on that fact again. *See Hill*, 773 N.E.2d at 339. This is far from legal authority that Indiana courts "have allowed" bloodhound evidence to be admissible, as the issue was not even presented or addressed in the case. Most important, the state post-conviction court was unconvinced, as it concluded that bloodhound evidence is inadmissible should counsel object to it. *See* DA App. at 752.

previous common law decisions provide a baseline for deciding whether bloodhound evidence is reliable enough to pass through Rule 702(b). Filing No. 33 at 61. Although the *Myers II* court did not reach any ultimate conclusions regarding admissibility, it suggested that Rule 702 governs. Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

What role *Ruse* and its progeny have in determining whether Deputy Douthett's testimony rests on "reliable scientific principles" under Rule 702(b) is the critical question presented by Mr. Myers. Indiana courts have not definitively decided the weight that should be given to common law precedents following the enactment of the Indiana Rules of Evidence. But significant guidance is available. On one hand, the Indiana Supreme Court has noted that "the Rules of Evidence generally superseded previously existing common law." *Specht v. State*, 734 N.E.2d 239, 240 (Ind. 2000); *see McIntyre v. State*, 717 N.E.2d 114, 121 (Ind. 1999) (suggesting that it is an open question whether "common law decisions . . . survive the Indiana Rules of Evidence"). Nevertheless, Indiana courts have continued to apply the common law when it is consistent with the Rules of Evidence and there is "no reason to depart from the well established common law rule." *Jackson v. State*, 728 N.E.2d 147, 153 (Ind. 2000). Indeed, Indiana courts regularly look to the common law for guidance even when the Rules of Evidence now govern the analysis. *See Lafayette v. State*, 917 N.E.2d 660, 662-64 (Ind. 2009) (examining common law precedents regarding Rule 404(b) and noting that the Indiana Supreme Court's first examination of the rule "largely tracked the common law of evidence . . . that had developed prior to our adoption of the

Rules of Evidence"); *Jiosa v. State*, 755 N.E.2d 605, 607 (Ind. 2001) (noting that when the Rule of Evidence at issue does not specifically address the legal question, "pre-1994 cases are instructive," and concluding that "[t]he common law presumption was not changed by the adoption of the Rules of Evidence"); *Ealy v. State*, 685 N.E.2d 1047, 1055 (Ind. 1997) ("Prior to the enactment of the [Indiana Rules of Evidence], we long held it proper for an expert to give an opinion based upon an autopsy report prepared by another. We see no reason to change that now."); *id.* (finding support for an interpretation of a Rule of Evidence by noting that the interpretation is "consistent with our own" common law); *Grinstead v. State*, 684 N.E.2d 482, 487 (Ind. 1997) (considering pre-1994 cases to determine whether expert testimony regarding blood spatter was admissible under Rule 702). Notably, the respondent does not cite, nor could the Court locate, a single instance where an Indiana court has held that long-standing common law precedents were irrelevant merely because an Indiana Rule of Evidence now governs the legal question when the Rule at issue did not explicitly undermine those precedents.

Given this, the Court follows the same course here. The above precedents show that Indiana courts regularly look to common law precedents when applying the Rules of Evidence. Thus, in determining whether bloodhound evidence "rests on reliable scientific principles" under Rule 702(b), Indiana courts would likely continue to follow the determination in *Ruse* and its progeny that it does not.

Finally, the one source to have addressed this question other than the state post-conviction court in this case concluded that Indiana Rule of Evidence 702 did not change the inadmissibility of bloodhound evidence established in *Ruse*. The preeminent Indiana evidence treatise written by Judge Robert Miller explicitly addresses the issue of the admissibility of bloodhound evidence

following the enactment of the Rules of Evidence.[19]   Judge Miller concludes that bloodhound tracking testimony is not "expert scientific testimony" under Rule 702(b), but that *Ruse* and its progeny nevertheless remain controlling law: "Earlier Indiana cases applied a 'reliability' test even as to plainly non-scientific evidence.  For example, tracking dog, or 'bloodhound,' evidence was deemed insufficiently reliable for admission.  Nothing in Rule 702 appears to require a different result."  13 R. Miller, Ind. Prac., Indiana Evidence § 702.208 (4th ed.) (citing *Hill*, 531 N.E.2d at 1384; *Brafford*, 516 N.E.2d at 49).

The Court finds Judge Miller's position persuasive, not least because it is consistent with how Indiana courts have treated the admissibility of polygraph evidence both before and after the enactment of the Indiana Rules of Evidence.  Long before the Indiana Rules of Evidence were adopted, Indiana courts consistently deemed polygraph evidence inadmissible because "the test is not sufficiently accurate to permit its admission and the fear the jury will give undue weight to the validity of a polygraph test."  *Hall v. State*, 514 N.E.2d 1265 (Ind. 1987).  After the Indiana Rules of Evidence were adopted, Indiana courts continued to exclude polygraph evidence, often without discussing the Indiana Rules of Evidence generally or Rule 702 specifically.  *See Majors v. State*, 773 N.E.2d 231, 238 (Ind. 2002); *Gray v. State*, 758 N.E.2d 519, 522 (Ind. 2001).  Indiana courts follow this pattern even though a "polygraph examiner is an expert witness" subject to the requirements of Rules 403 and 702.  *Hubbard v. State*, 742 N.E.2d 919, 924 (Ind. 2001).

For all the foregoing reasons, had trial counsel objected to the bloodhound evidence that objection would have been sustained. [20]  Not only is this the conclusion of the only state court in

---

[19] The Indiana Supreme Court regularly relies on Judge Miller's evidence treatise.  *See, e.g.*, *Malenchik v. State*, 928 N.E.2d 564, 574 (Ind. 2010); *Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 984 (Ind. 2006); *Ealy*, 685 N.E.2d at 1051.
[20] Mr. Myers argues in the alternative that even if the bloodhound evidence would not have been excluded altogether, trial counsel's performance was deficient for failing to impeach Deputy Douthett's testimony.  *See* Filing No. 33 at 62-64.  For example, there was evidence that prior to Deputy Douthett's use of the bloodhound on June 6, 2000 (six days after Ms. Behrman disappeared), law enforcement attempted to use other scent tracking dogs to help locate Ms. Behrman, but they did not pick up her scent near where her bicycle was found.  *See* PCR Ex. 232 at 28.  This

this case to have addressed the issue, but all other legal sources addressing the question point in the same direction, albeit for different reasons. The respondent's contention that trial counsel was not deficient for failing to object to the bloodhound evidence because an objection would have been overruled does not provide a basis that could have supported the Indiana Court of Appeals' conclusion.

In sum, trial counsel failed to conduct an unreasonable investigation into the bloodhound evidence before deciding not to object to it. Had a reasonable investigation been conducted, trial counsel would have realized that the bloodhound evidence did not support the Hollars theory in the manner he thought (and barely, if at all, supported it), which made it obviously worth excluding given that it completely undermined Mr. Myers' alibi defense. The Indiana Court of Appeals unreasonably applied *Strickland* and *Wiggins* in concluding otherwise, and neither the state post-conviction court nor the respondent offers a justification that otherwise could have supported the Indiana Court of Appeals' decision. The Court will therefore consider this instance of deficient performance in the prejudice analysis below.

---

significantly undermines evidence that during a later bloodhound search—after the scent has further dissipated—the bloodhound was able to pick up Ms. Behrman's scent at that location.

Moreover, although Deputy Douthett testified that he attempted to track Ms. Behrman's scent along the southern route but there were no "strong" scent trails, Trial Tr. 986, Agent Dunn testified to the grand jury that Deputy Douthett told him Samantha picked up Ms. Behrman's scent on the southern route. *See* GJ Tr. 1337. The jury did not hear this evidence, or any of the other bases on which Deputy Douthett's testimony could have been undermined. *See* Filing No. 33 at 62-64. Although the Court need not reach this issue, there is significant evidence trial counsel could have used to undermine the trustworthiness of the bloodhound tracking presented by Deputy Douthett, *see, e.g.*, Filing No. 33 at 62-64, but trial counsel entirely failed to do so. Had the Court not concluded that an objection to the bloodhound evidence would have been sustained, this would have been an alternative basis to conclude that trial counsel's performance regarding the bloodhound evidence was deficient.

### 6. Failure to Impeach Ms. Swaffard

Mr. Myers argues trial counsel provided deficient performance by failing to impeach Betty Swaffard's testimony. The Indiana Court of Appeals summarized Ms. Swaffard's testimony during direct- and cross-examination as follows:

> Swaffard, Myers' maternal grandmother, testified to certain statements Myers made to her following Behrman's disappearance. Specifically, Swaffard testified that on June 27, 2000, the date Detective Crussen interviewed Myers' parents, Myers called Swaffard and asked to borrow money. Swaffard told Myers that he would have to come to her house to pick up the money, and he said he could not come because there were road blocks up on Maple Grove Road, and he did not want to go out because he was a suspect in Behrman's disappearance. Swaffard testified further that in November 2004, Myers called her and asked her to look after his daughter because he needed some time alone to think. Swaffard asked what was on his mind, and Myers said, "Grandma, if you just knew the things that I've got on my mind . . . . [I]f the authorities knew it, I'd be in prison for the rest of my life." *Trial Transcript* at 1833. Myers stated further that his father had known it and "took it to the grave with him." *Id.* Later that evening, when Myers dropped his daughter off at Swaffard's house, he had tears in his eyes and said, "Grandma, I wish I wasn't a bad person. I wish I hadn't done these bad things." *Id.* at 1833–34. On cross-examination, trial counsel asked Swaffard only two questions, both of which were apparently intended to establish that Swaffard had developed an unusually close relationship with Detective Lang. First, counsel asked Swaffard whether she knew Detective Lang's telephone number, and she responded affirmatively. Second, counsel asked what Detective Lang's phone number was, and Swaffard began to answer but was interrupted by an objection from the State. The trial court sustained the objection, and trial counsel declined to cross-examine Swaffard further.

*Myers II*, 33 N.E.3d at 1100.

Mr. Myers argues that trial counsel had ample grounds on which to impeach Ms. Swaffard and it was deficient performance not to do so. Specifically, Mr. Myers points to the fact that Detective Lang began recording Ms. Swaffard's phone calls with her consent in late April and May 2005. PCR Tr. 1196-97, 1259. During these calls—which trial counsel listened to before trial, *id.* at 582—Mr. Myers repeatedly and adamantly denied involvement in Ms. Behrman's murder, PCR Ex. 101A at 21-27. These denials, Mr. Myers contends, would have impeached Ms. Swafford's testimony regarding Mr. Myers. Filing No. 9 at 35-36; Filing No. 33 at 64-67.

Patrick Baker was questioned regarding his strategy with respect to Ms. Swaffard's testimony during the post-conviction hearing. He testified that Ms. Swaffard had "very damaging evidence and it was probably the most challenging explanation of the entire trial and I think probably remains the most challenging explanation as to how a grandma could start a murder case against her grandson." PCR Tr. 584. "[B]ased upon that," Patrick Baker explained, "and based upon the questioning . . . of . . . Mr. Sonnega . . . we wanted to ask her very few questions, if any at all." *Id.* Patrick Baker explained further that Ms. Swaffard's "presentation was very credible so it wasn't just her testimony. It was her presentation and . . . her demeanor." *Id.* at 585. In sum, his strategy was "to get her off the stand . . . because the longer she was before the jury, we felt, the more damaging it could be." *Id.* at 584.

The Indiana Court of Appeals rejected Mr. Myers' allegation of deficient performance in *Myers II*, reasoning that "[t]his is the sort of second-guessing of trial strategy in which we will not engage on appeal. 'It is well settled that the nature and extent of cross-examination is a matter of strategy delegated to trial counsel.' Myers has not established that a strategy of limiting the jury's exposure to Swaffard's testimony and denying her the opportunity to elaborate further thereon fell outside the wide range of constitutionally competent assistance." *Myers II*, 33 N.E.3d at 1101 (citation omitted).

Mr. Myers contends that this was an unreasonable application of *Strickland*'s performance prong. Specifically, he argues that "[t]he state court's assumption that counsel's presentation was adequate, without any assessment of whether counsel's conduct[] 'actually demonstrated reasonable professional judgment'" was unreasonable. Filing No. 33 at 66-67 (quoting *Wiggins*, 539 U.S. at 528). Mr. Myers further argues that "'if no reason is or can be given for a tactic, the

label "tactic" will not prevent it from being used as evidence of ineffective assistance of counsel.'" *Id.* at 66 (quoting *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001)).

As an initial matter, there *was* a strategic reason given by trial counsel for essentially declining to cross examine Ms. Swaffard—namely, that her evidence, presentation, and demeanor were extremely damaging to Mr. Myers and thus trial counsel wanted her off the stand as quickly as possible. *See* PCR Tr. 584-85. The Indiana Court of Appeals recognized trial counsel's testimony and credited trial counsel's strategy regarding cross-examination. *See Myers II*, 33 N.E.3d at 1100-01.

Furthermore, Mr. Myers is incorrect that the Indiana Court of Appeals failed to assess "whether counsel's conduct[] 'actually demonstrated reasonable professional judgment.'" Filing No. 33 at 66-67 (quoting *Wiggins*, 539 U.S. at 528). Again, trial counsel explained his strategy behind failing to cross-examine Ms. Swaffard. And one premise of this strategy—that Ms. Swaffard's testimony was extremely damaging evidence for Mr. Myers—is undoubtedly true.

The Supreme Court made clear in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690-91; *see Jansen*, 884 F.3d at 656 ("Generally when an attorney articulates a strategic reason for a decision, the court defers to that choice." (citation and quotation marks omitted)). And "deciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *Peterson v. Douma*, 751 F.3d 524, 531 (7th Cir. 2014) (citation and quotation marks omitted). These principles are precisely what the Indiana Court of Appeals recognized and applied when concluding that trial counsel's performance was not deficient.

Moreover, unlike with other allegations of deficient performance, Mr. Myers raises no issue over whether trial counsel sufficiently investigated potential impeachment evidence for Ms.

Swaffard before choosing this strategy. This is likely because Patrick Baker testified that he reviewed the recorded conversations between Mr. Myers and Ms. Swaffard. He simply decided that it was better to end Ms. Swaffard's testimony as quickly as possible—after two brief questions—rather than delve into this or any other evidence. Given that there is no allegation that trial counsel's investigation into Ms. Swaffard was deficient—trial counsel's testimony that he reviewed those calls went undisputed—trial counsel's strategic decision is "virtually unchallengeable," *Strickland*, 466 U.S. at 691. This is the conclusion reached by the Indiana Court of Appeals, and it was not an unreasonable application of *Strickland*.

Accordingly, Mr. Myers has not shown that trial counsel's performance was deficient for failing to sufficiently cross-examine Ms. Swaffard.

### 7. Failure to Object to Improper Religious Vouching for Ms. Swaffard

Mr. Myers argues that trial counsel provided deficient performance by failing to object to alleged improper religious vouching for Ms. Swaffard's credibility by the State. Specifically, Mr. Myers contends that, without objection, the State began Ms. Swaffard's testimony with the fact that she engages in Bible study and is a lay counselor at her church and then, during closing, the State referenced Ms. Swaffard's religious convictions to bolster the credibility of her testimony. For example, the State argued during closing that "with great prayer . . . [Ms. Swaffard] did come forward," Trial Tr. 2747, and at the conclusion of closing, "[t]hanks to Betty Swaffard and her courage and her strength and the grace of God she came forward and told you the truth," *id.* at 2827.

The Indiana Court of Appeals addressed this issue on the merits in *Myers II*, concluding that trial counsel's failure to object was not deficient performance and, even if it was, Mr. Myers was not prejudiced by it. *See Myers II*, 33 N.E.3d at 1101-03. The Court need not consider the

Indiana Court of Appeals' discussion of prejudice, however, because its performance analysis forecloses this claim.

The Indiana Court of Appeals recognized that Indiana Rule of Evidence 610 provides that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." After analyzing the alleged improper religious bolstering by the State, *id.* at 1101-02, the Indiana Court of Appeals held that it "cannot conclude that Swaffard's testimony concerning her religious involvement constitutes vouching, religious or otherwise," *id.* at 1102. It continued: "Although the relevance of Swaffard's religious involvement is certainly questionable . . . , her testimony contained no express or implied assertion that she was more or less likely to tell the truth due to her religious beliefs. Thus, Myers has not established a reasonable probability that an objection on this basis would have been sustained." *Id.*

Whether an objection under Rule 610—or any other Indiana Rule of Evidence—would be sustained is purely a question of state law. This Court cannot second-guess that determination, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson*, 131 S. Ct. at 16 (citation and quotation marks omitted); *see Miller*, 820 F.3d at 277 ("A federal court cannot disagree with a state court's resolution of an issue of state law."). Thus, "although claims of ineffective assistance of counsel can be premised on an attorney's failure to raise state-law issues, federal courts reviewing such claims must defer to state-court precedent concerning the questions of state law underlying the defendant's ineffectiveness claim." *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (citations omitted); *see Harper v. Brown*, 865 F.3d 857, 859 (7th Cir. 2017) (holding that a habeas petitioner's argument was really an attack on a state court's resolution of a question of state law embedded within its analysis of a

*Strickland* claim, and that federal courts are not empowered to review such questions of state law under § 2254).

Since this Court must accept the Indiana Court of Appeals' determination that any objection to the alleged improper vouching would not have been sustained, Mr. Myers cannot establish that his trial counsel's performance was deficient in this respect. This is because "[i]f evidence admitted without objection is, in fact, admissible, then failing to object to [that] evidence cannot be a professionally unreasonable action." *Jones v. Brown*, 756 F.3d 1000, 1009 (7th Cir. 2014) (citation and quotation marks omitted); *Hough*, 272 F.3d at 898 ("An ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence. If evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test[.]").

In sum, this Court must accept the Indiana Court of Appeals' conclusion that any objection to the alleged improper vouching would not have been sustained, and it cannot be deficient performance to not raise an objection that would have been overruled. Accordingly, Mr. Myers has failed to show that trial counsel rendered deficient performance by failing to object to alleged improper religious vouching for Ms. Swaffard's credibility.

### 8. Failure to Impeach Carly Goodman

Carly Goodman was a senior in high school and Mr. Myers' girlfriend from late 1999 to through early 2000. She testified during trial that, among other things, while they were dating, Mr. Myers took her to the very location in the woods where Ms. Behrman's remains were found in 2003. Mr. Myers argues that trial counsel provided deficient performance by failing to impeach Ms. Goodman's testimony regarding her identification of the location in which Ms. Behrman's remains were found as a location Mr. Myers had previously taken her. He contends that Ms.

Goodman previously made inconsistent statements about her identification of the site, and trial counsel should have used these inconsistent statements to impeach her testimony.

The Indiana Court of Appeals in *Myers II* summarized the factual background of this claim as follows:

> Goodman testified that one night in March 2000, Myers, her then-boyfriend, took her for a long car ride through Gosport to a wooded area, where he parked in a "clearance" surrounded by a wooded area. *Trial Transcript* at 1899. Goodman testified that after Myers stopped the car, the couple argued and that she was afraid and wanted to go home. Goodman testified further that in February of 2006, she went for a drive with Detective Lang to identify places that Myers had taken her during their relationship. She recognized one place as the wooded area where she and Myers had argued in March 2000. This was the same area where Behrman's remains were discovered in 2003.

*Myers II*, 33 N.E.3d at 1103.

Mr. Myers' claim focuses on the failure to impeach Ms. Goodman's identification of the site. Ms. Goodman testified at trial that during a drive with Mr. Myers he parked in a clearance that was completely surrounded by woods. Trial Tr. 1899-1900. She was then shown Exhibit 12, which was a picture of where Ms. Behrman's remains were found. *Id.* She stated she recognized the place, and when asked by the State what she recognized about it, she replied, "[t]hat's where [Mr. Myers] took me." *Id.* at 1900.

Patrick Baker conducted a brief cross-examination of Ms. Goodman, focusing on her ability to identify the clearance in Exhibit 12 as the specific clearing to which Mr. Myers took her. He asked her how she could "differentiate that clearance from any other clearance?" *Id.* at 1906. She responded that "it's just what looks familiar to me." *Id.* When Patrick Baker next asked, "[b]ut . . . that could be anywhere, correct," she responded, "yes." *Id.* Cross-examination concluded shortly thereafter following a few questions regarding how well Ms. Goodman knows

Detective Lang and how familiar she is with the wooded areas near Bloomington. *See id.* at 1906-07.

Mr. Myers argues that trial counsel should have impeached Ms. Goodman's testimony that she recognized the exact place Ms. Behrman's remains were found via allegedly inconsistent statements she made to Detective Lang. Specifically, Mr. Myers contends that Detective Lang's grand jury testimony was that Ms. Goodman "did *not* say that cut-away was *the one* to which Myers took her, but could only say it was *similar to* it." Filing No. 33 at 70.

Patrick Baker testified during the post-conviction hearing regarding his strategy with respect to Ms. Goodman's testimony. He stated that his strategy from the outset was to "minimize" her testimony because she "had a lot of information, 404(b) evidence, that regarded domestic battery situations" with Mr. Myers, "regarded her being held against her will in a trailer, I think, for three or four days without any clothes," and "protective orders that she had filed against [Mr. Myers], all of which . . . [the trial judge] had . . . ruled in our favor but we did not want her bringing any of those issues up." PCR Tr. 581. Patrick Baker was then asked whether he had any plans to undermine her testimony with any prior inconsistent statements. He responded that he did not "know specifically," but that he also had to "judge the witnesses as they c[a]me up and . . . the demeanor and the fear . . . on her face was so evident, I think that whatever strategies we may have had or contemplated were changed at that moment based upon her apparent fear." *Id.* at 582.

The Indiana Court of Appeals addressed the performance prong on the merits in *Myers II.* It first acknowledged Patrick Baker's testimony at the post-conviction hearing discussed above, then reasoned that trial counsel's performance was not deficient:

> Myers dismisses trial counsel's explanation of his strategy as unreasonable. He
> asserts that counsel could have cross-examined Goodman concerning her prior
> statements made to Detective Lang at the time she identified the site without
> eliciting or opening the door to prejudicial and inadmissible testimony . . . . We

will not engage in this sort of second-guessing of trial counsel's strategic decisions concerning the nature and scope of cross-examination. Myers has not established that his trial counsel's strategy was unreasonable; to the contrary, it was quite reasonable for trial counsel to minimize the jury's exposure to Goodman's fearful demeanor and avoid any inadvertent mention of highly prejudicial and inadmissible evidence by limiting the scope and duration of his cross-examination, while simultaneously eliciting testimony casting doubt on the reliability of her identification of the area.

*Myers II*, 33 N.E.3d at 1103-04.

Mr. Myers contends the Indiana Court of Appeals' resolution of the performance prong constitutes an unreasonable application of *Strickland*. His primary argument is that there "was no reason to believe that impeaching Goodman with her prior inconsistent statements to Lang would have elicited prohibited 404(b) evidence," as the trial court was vigilantly prohibiting such evidence from being admitted. Filing No. 33 at 71. Moreover, Mr. Myers contends that trial counsel "*did* cross examine Goodman, in an attempt to show her identification was implausible in light of the lack of distinguishing features of this particular area of the woods." *Id.* (citing Trial Tr. 1905-07). This shows, says Mr. Myers, that "the state court's theory is based on a 'post-hoc rationalization of counsel's conduct [rather] than an accurate description of [counsel's] deliberations.'" *Id.* (first alteration in original) (quoting *Wiggins*, 539 U.S. at 526-27).

As an initial matter, while Mr. Myers addresses the concern about risking Rule 404(b) testimony from Ms. Goodman, he fails to explain how trial counsel's concern about Ms. Goodman's fearful demeanor did not provide a reasonable strategic justification to limit her cross-examination. After all, Patrick Baker explained during the post-conviction hearing "that whatever strategies we may have had or contemplated were changed [during Ms. Goodman's testimony] based upon her apparent fear." PCR Tr. 582. The state courts accepted this testimony and Mr. Myers does not dispute it. As noted above, "[g]enerally when an attorney articulates a strategic

reason for a decision, the court defers to that choice." *Jansen*, 884 F.3d at 656 (quoting *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)).

Given this strategy, Mr. Myers' position fails for essentially the same reasons his claim regarding his trial counsel's alleged failure to sufficiently cross-examine Ms. Swaffard did—namely, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690-91; *see Bryant v. Brown*, 873 F.3d 988, 996 (7th Cir. 2017) (quoting *Jones v. Butler*, 778 F.3d 575, 584 (7th Cir. 2015) ("A 'decision not to impeach a particular witness is normally considered a strategic choice within the discretion of counsel.'"). This is precisely the path the Indiana Court of Appeals followed when it concluded that it would not "second-guess[] . . . trial counsel's strategic decisions concerning the nature and scope of cross-examination," especially given that it is a reasonable strategy to "minimize the jury's exposure to Goodman's fearful demeanor." *Myers II*, 33 N.E.3d at 1104.

Mr. Myers resists this conclusion by arguing that the proffered strategy is merely a post-hoc rationalization for trial counsel's decisions. But Patrick Baker testified that his strategy developed at the very time Ms. Goodman was on the stand because that was when he could observe her demeanor and consider its impact on the jury. Moreover, the objective evidence at least partially corroborates that this was Patrick Baker's asserted strategy at the time. During cross-examination, he briefly attempted to undermine the reliability of Ms. Goodman's identification of the clearance and was rather successful in doing so. *See* Trial Tr. 1906 (Ms. Goodman responding "yes" when Patrick Baker asked if the State's picture of the clearance "could be anywhere"). He then asked only a few more questions—the entirety of cross-examination spans less than two full transcript pages—before concluding his cross-examination. Such a brief cross-examination—after

at least partially undermining her identification of the clearance—of a witness that both parties agree was important is consistent with Patrick Baker's testimony that, given Ms. Goodman's fearful demeanor, he changed what strategy he previously had in the moment and instead chose to expose the jury to her fearful demeanor as little as possible.

In sum, even though Mr. Myers now argues trial counsel should have done more to impeach Ms. Goodman's testimony, the Indiana Court of Appeals reasonably applied *Strickland* in concluding that trial counsel's strategy is "virtually unchallengeable," *Strickland*, 466 U.S. at 690-91, under these circumstances.

### 9.     Failure to Object to Carly Goodman's Testimony under Rule 404(b)

Mr. Myers argues that trial counsel provided deficient performance by failing to object under Indiana Rule of Evidence 404(b) to certain testimony by Ms. Goodman.  Generally, Rule 404(b) prohibits admission of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Prior to trial, the parties and the trial judge discussed at some length Mr. Myers' motion *in limine* to exclude Rule 404(b) evidence that may have been admitted through Ms. Goodman's testimony.  *See* Trial Tr. 352-75.  The trial court granted motions *in limine* with respect to several categories of evidence Ms. Goodman might offer.  For example, the trial court prohibited any reference to two protective orders Ms. Goodman had sought against Mr. Myers and the reasons she had sought those protective orders.  *Id.* at 363-64.  The trial court also excluded any evidence from the State that Mr. Myers would make Ms. Goodman strip naked in his trailer and take her clothing as a means to control her.  *Id.* at 375.

Early during Ms. Goodman's testimony, trial counsel raised several objections because the State's open-ended questions risked Ms. Goodman straying into forbidden testimony.  *See id.* at

1883-86. The trial court warned the State during a bench conference that the State's questions were "leaving it wide open for her to start talking about . . . protective order stuff," and reminded the State to "not go there." *Id.* at 1886. Trial counsel continued to raise numerous objections, some of which were sustained. *See, e.g.*, *id.* at 1887-91.

Mr. Myers argues that, even though trial counsel objected to many of the State's questions, trial counsel failed to object to damaging Rule 404(b) testimony. Specifically, Mr. Myers points to the following sequences during the State's questioning of Ms. Goodman:

Q.      What did you do [during the ride with Mr. Myers]?

A.      I asked for him to take me home.

Q.      Did he take you home?

A.      No.

Q.      How'd you feel?

A.      Scared.

. . . .

Q.      And when you parked the car in the clearance, was this a romantic . . . romantic type of . . .

       PATRICK BAKER:   Objection to leading.

       THE COURT:            Sustained.

       MR. SONNEGA:       Okay. Rephrase.

Q.      What did you and the Defendant do when he parked his car . . .

       PATRICK BAKER:   Objection, Judge, to relevance.

       THE COURT:            Overruled.

A.      We argued.

Q.    Did you kiss him?

A.    No.

Q.    Did you want to go home?

A.    Yes.

Q.    Were you scared?

A.    Yes.

. . . .

Q.    How long did you spend at that location?

A.    It's hard to say.  Maybe a half an hour, 45 minutes.

Trial Tr. 1893, 1899-1900, 1901.[21]

Mr. Myers argues that trial counsel should have objected to the foregoing questions under Rule 404(b) because they were unrelated to the purpose of Ms. Goodman's testimony—that is, to show Mr. Myers had knowledge of the location where Ms. Behrman's remains were found, *see id.* at 367—and were prejudicial.  They were especially prejudicial, says Mr. Myers, considering that evidence that Ms. Behrman was raped (which is discussed further below) was improperly presented to the jury.  "After hearing reference to a rape at the same location," Mr. Myers contends, "the jury was left to wonder if Goodman had also been raped."  Filing No. 9 at 39.

The Indiana Court of Appeals addressed this claim on the merits in *Myers II*.  As an initial matter, it concluded that the argument was waived because it was not fully developed:

> Myers also argues that his trial counsel were ineffective for failing to object to Goodman's description of Myers' behavior during the March 2000 car trip, which he calls 'prejudicial 404(b) testimony.'  *Appellant's Brief at* 46.  Myers does not, however, cite the applicable language of Indiana Evidence Rule 404(b) or make

---

[21] Ostensibly to show that objections to the latter questions would have been sustained, Mr. Myers asserts that "[a] relevance objection about whether the trip to the woods was romantic was sustained."  Filing No. 9 at 39.  But the objection in question was not for relevance, but for leading.  *See* Trial Tr. 1899.  In fact, when the State rephrased the question, trial counsel's relevance objection was overruled.  *See id.*

any attempt to apply it. Accordingly, this argument is waived for lack of cogency. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (explaining that "[a] party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record"), *trans. denied.*

*Myers II*, 33 N.E.3d at 1105-06.

The respondent first argues that the Indiana Court of Appeals' finding of waiver constitutes an independent and adequate state law basis for denying this claim, making this claim procedurally defaulted. *See* Filing No. 20 at 46-47. The respondent is correct that one type of procedural default occurs when the state court decides a federal claim on an independent and adequate state law basis. *See Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) ("A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.").

Mr. Myers resists this conclusion, arguing that the Indiana Court of Appeals' invocation of waiver is not an "adequate" procedural ruling. He points out that Mr. Myers' appellate brief clearly invoked Rule 404(b), pointed to the allegedly inappropriate questions and testimony in the record, cited another state case that analyzes Rule 404(b) evidence, and discussed why this evidence was prejudicial. *See* Filing No. 33 at 76.

Although Mr. Myers did not quote the language of Rule 404(b) in his post-conviction appellate brief, he clearly invoked the rule as the basis for this claim of ineffective assistance. *See* Filing No. 20-14 at 56 ("Counsel's failure to object to prejudicial 404(b) testimony was ineffective assistance."). He also attempted to apply it; in his brief, he explicitly argued that Ms. Goodman's testimony was admitted over trial counsel's pre-trial objection under the latter portion of Rule 404(b) "to show knowledge of the crime scene," *id.* (citing Trial Tr. 367), and whether she "wanted to go home, or was scared was not relevant for that purpose," *id.*

Given this, it is a close question as to whether the Indiana Court of Appeals relied upon an independent and adequate state law ground. *See Crockett v. Butler*, 807 F.3d 160, 167 (7th Cir. 2015) (holding that a state rule may be inadequate if it is applied "'infrequently, unexpectedly, or freakishly'" (quoting *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990)). But it is not one the Court must ultimately answer, as the Indiana Court of Appeals went on to address the merits of Mr. Myers' claim. The Court will therefore bypass this more difficult question of procedural default, as Mr. Myers' claim must be denied on the merits. *See Washington v. Boughton*, 884 F.3d 692, 698 (7th Cir. 2018) ("Rather than work our way through the maze of these procedural arguments, however, we think it best to cut to the chase and deny [the petitioner's] due process claim on the merits."); *see also Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010).

The Indiana Court of Appeals also addressed Mr. Myers' claim on the merits. After detailing the evidence set forth above, the Indiana Court of Appeals first rejected Mr. Myers' contention that Ms. Goodman's testimony, considered in conjunction with Dr. Radentz's testimony that Ms. Behrman had been raped, left an impression that Ms. Goodman had also been raped. *See Myers II*, 33 N.E.3d at 1106 ("Nothing about Goodman's testimony implied that she had been raped."). It then went on to explain why any objection under Rule 404(b) would not have been sustained anyway:

> In any event, it is apparent that the testimony was admitted to show that Myers was familiar with the area in which Behrman's remains were discovered and to explain why Goodman was still able to remember the location so vividly several years later, and not to establish that Myers had a propensity to commit murder or any other crime. Thus, the testimony did not violate Evidence Rule 404(b), and Myers points to no danger of unfair prejudice aside from his unpersuasive argument that the testimony left the jury with the impression that Goodman had been raped. *See Embry v. State*, 923 N.E.2d 1, 9 (Ind. Ct. App. 2010) (explaining that "[i]n assessing the admissibility of 404(b) evidence a trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence

Rule 403"), *trans. denied*. Thus, Myers has not established a reasonable probability that an objection on the basis of Evidence Rule 404(b) would have been sustained, and he is consequently unable to show that counsel performed deficiently by failing to object on that basis.

*Myers II*, 33 N.E.3d at 1106.

In short, the Indiana Court of Appeals held that the proposed Rule 404(b) objection would not have been sustained. As discussed above, whether an unmade evidentiary objection would have been sustained under the Indiana Rules of Evidence is purely a question of state law. This Court cannot second-guess that determination, as "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Wilson*, 131 S. Ct. at 16 (quoting *Estelle* v. McGuire, 502 U.S. 62, 67 (1991)); *see also Miller*, 820 F.3d at 277; *Shaw*, 721 F.3d at 914.

Since this Court must accept the Indiana Court of Appeals' determination that the proposed Rule 404(b) objections would not have been sustained, Mr. Myers cannot establish that his trial counsel's performance was deficient in this respect. This is because "[i]f evidence admitted without objection is, in fact, admissible, then failing to object to [that] evidence cannot be a professionally unreasonable action." *Jones*, 756 F.3d at 1008-09 (quoting *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001)).

Accordingly, Mr. Myers has failed to show that trial counsel rendered deficient performance by failing to object to certain of Ms. Goodman's testimony under Rule 404(b).

### 10. Failure to Object to Testimony that Ms. Behrman was Raped

Mr. Myers argues trial counsel provided deficient performance by failing to object under Indiana Rule of Evidence 403 to Dr. Radentz's testimony that Ms. Behrman was raped before she was murdered. Dr. Radentz is a forensic pathologist who testified as an expert witness for the State during trial. *See* Trial Tr. 1413-61. Among other things, he testified that the cause of Ms.

Behrman's death was a "contact shotgun wound to the back of the head," *id.* at 1420, that Ms. Behrman was killed at the site where her remains were located, *id.* at 1423, that she was raped prior to being killed, *id.* at 1423, and that, of the bones that were remaining (no soft tissue remained), there was no evidence of stabbing, being struck by a vehicle, or other trauma, *id.* at 1425, 1450.

At issue here is Dr. Radentz's testimony that Ms. Behrman was raped prior to being killed, describing this as a "classic scenario . . . of a rape homicide." *Id.* at 1423. Trial counsel did not object to this or any of Dr. Radentz's other rape testimony, which is discussed in more detail in the prejudice analysis below.

Whether Rule 403 should have precluded the admission of the evidence that Ms. Behrman was raped was first addressed by the Indiana Court of Appeals on direct appeal in *Myers I*:

> Myers was not charged with rape. At trial, forensic pathologist Dr. Stephen Radentz nevertheless testified that the circumstances surrounding the disposal of Behrman's remains suggested the classic scenario for a rape-homicide. The court subsequently submitted Jury Question 84 without objection to Dr. Radentz, which asked in part, "Do you believe the body was raped before being shot?", to which Dr. Radentz answered, "Yes." Tr. p. 1454. During follow-up cross-examination, Dr. Radentz admitted there was no physical evidence to support such an assertion. During additional re-direct examination, however, he testified based upon his training and experience that due to the facts that Behrman's remains were found in a remote area, without clothing, and with a "depersonalizing" shotgun wound to the back of the head, Behrman's case was a "rape homicide . . . until proven otherwise." Tr. p. 1460. Although Myers specifically challenges on appeal the court's submission of Question 84 to Dr. Radentz, defense counsel did not object to Jury Question 84, which, but for a claim of fundamental error, waives the issue. Myers also claims, however, that [all of] Dr. Radentz's references to rape constituted fundamental error.

*Myers I*, 887 N.E.2d at 186.

Although the Indiana Court of Appeals in *Myers I* concluded that Dr. Radentz's testimony did not violate Rule 702, it determined that it did violate Rule 403, which states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . .

unfair prejudice." The Indiana Court of Appeals reasoned: "With respect to the probative value of Dr. Radentz's testimony, an essential element of rape is penetration, no matter how slight. Because none of Behrman's soft tissue remained, there was no physical evidence to support the rape determination. In addition, Myers was not charged with rape. We agree that the rape testimony was more prejudicial than probative." *Myers I*, 887 N.E.2d at 186-87.

Having determined that the rape testimony should have been excluded under Rule 403, the Indiana Court of Appeals turned to whether it "constituted fundamental error," which requires a showing that the error is "so prejudicial to the rights of the defendant as to make a fair trial impossible." *See id.* at 187 (quoting *Myers v. State*, 718 N.E.2d 783, 790 (Ind. Ct. App. 1999)) ("In determining whether an alleged error rendered a judicial proceeding unfair, we must consider whether the resulting harm or potential for harm is substantial. We look to the totality of the circumstances and decide whether the error had a substantial influence upon the outcome."). The Indiana Court of Appeals concluded the error did not amount to fundamental error and therefore denied relief. *See id.*

During post-conviction proceedings, Mr. Myers argued that his counsel was ineffective for failing to object to testimony regarding rape. The Indiana Court of Appeals in *Myers II* denied this claim on the prejudice prong of *Strickland*, without addressing trial counsel's performance. *See Myers II*, 33 N.E.3d at 1106-07. This Court must therefore review trial counsel's performance *de novo*. *See Porter*, 558 U.S. at 38; *Rompilla*, 545 U.S. at 390.

As an initial matter, the respondent's argument regarding this claim is at best confusing. The respondent first asserts that the Indiana Court of Appeals in *Myers II* "held that the [rape] testimony should have been objected to." Filing No. 20 at 49. But the *Myers II* court did not assess trial counsel's performance, deciding only that Mr. Myers was not prejudiced. 33 N.E.2d

at 1106-07. Although this at first appears to be a concession that trial counsel's performance was deficient, the respondent then goes on to argue that the lack of objection was part of trial counsel's strategy. Specifically, the respondent argues that trial counsel purposefully did not object to Dr. Radentz's opinion because, given that there was "no physical evidence indicating that Myers had killed Jill [Behrman]," it allowed Mr. Myers "to argue that someone had moved the body from Salt Creek," which "suited Myers' Owings theory very well." Filing No. 20 at 49.

There are multiple problems with this line of reasoning, to the extent the Court can correctly discern the respondent's position. First, the notion that Dr. Radentz's testimony generally was helpful to Mr. Myers' theory that Ms. Owings, or perhaps others, may have moved Ms. Behrman's body from Salt Creek to where it was eventually found is incorrect. Dr. Radentz testified repeatedly that he did not believe that Ms. Behrman was killed elsewhere and her body moved. *See, e.g.*, Trial Tr. 1417 (stating that he had never seen a deceased person's body moved and then shot); *id.* at 1423-24 (explaining at length why in his expert opinion Ms. Behrman was killed at the location her remains were found).

Second, and more important, it appears that the respondent's argument that Dr. Radentz's testimony could have been helpful to Mr. Myers—and thus it may have been strategic not to object to it—is based on the entirety of Dr. Radentz's opinion testimony, not the specific rape testimony at issue here. Whatever assistance Dr. Radentz's testimony generally provided for Mr. Myers' theory that Ms. Behrman's body was moved—which, as noted, is likely none—his testimony that Ms. Behrman was raped could have been objected to without impacting the purportedly helpful testimony regarding whether the body was moved. In other words, Dr. Radentz's testimony that there was no physical evidence connecting Mr. Myers to the crime scene could have been admitted even if his rape testimony was excluded.

These two reasons show that the respondent's attempt to provide a strategic justification for trial counsel's failure is simply an impermissible "*post-hoc* rationalization," *Wiggins*, 539 U.S. at 526-27, of trial counsel's failure to object—a rationalization that the state courts did not consider let alone accept—and an implausible rationalization at that.

In the end, the Court concludes that it was objectively deficient performance for trial counsel not to object to Dr. Radentz's testimony regarding rape. The Indiana Court of Appeals in *Myers I* concluded that the evidence should have been excluded under Rule 403. *See Myers I*, 887 N.E.2d at 186-87. And there is no possible strategic reason for failing to object to this testimony. Indeed, Hugh Baker's own contemporaneous conduct shows that he too believed the rape testimony to be damaging to Mr. Myers' case. He attempted—with some, albeit limited, success—during cross-examination to undermine Dr. Radentz's conclusion that Ms. Behrman was raped. *See* Trial Tr. 1458-61. But, had he raised a Rule 403 objection, all of the rape testimony would have been excluded, and the State, among other things, would not have been able to argue during its closing argument that Mr. Myers had motive to murder Ms. Behrman. *See House v. Bell*, 547 U.S. 518, 540 (2006) ("When identity is in question, motive is key."). Given the foregoing, trial counsel's inexplicable failure to object to Dr. Radentz's rape testimony constitutes deficient performance.

As noted above, the prejudice analysis must consider the cumulative prejudice flowing from all of trial counsel's errors. Accordingly, the Court will consider the prejudice from trial counsel's failure to object to Dr. Radentz's rape testimony in the prejudice analysis below.

11.     **Failure to Object to Evidence Regarding Mr. Myers' Access to Shotguns**

Mr. Myers maintains that trial counsel performed deficiently by failing to object to allegedly irrelevant evidence regarding shotguns. During trial, the State introduced evidence that

shotguns were missing from a barn near Mr. Myers' home, as well as evidence that Mr. Myers

sold shotguns to his uncle at Mr. Myers' father's funeral. Trial Tr. 1798-1802. This evidence was

irrelevant and prejudicial, says Mr. Myers, because the shotguns went missing after Ms. Behrman

was murdered and thus none of them could have been the murder weapon. Mr. Myers suggests

trial counsel knew this because Detective Lang testified to as much during grand jury proceedings.

Filing No. 9 at 41. Therefore, had his trial counsel objected as to relevancy, Mr. Myers contends

that the objection would have been sustained.

The Indiana Court of Appeals addressed this allegation on the merits, concluding that trial

counsel's performance was not deficient, nor was Mr. Myers prejudiced. *See Myers II*, 33 N.E.3d

at 1107-09. It agreed with Mr. Myers that "'[e]vidence of weapons possessed by a defendant but

not used in the crime for which the defendant is charged should generally not be introduced

because the evidence is irrelevant and highly prejudicial.'" *Id.* at 1108 (quoting *Oldham v. State*,

779 N.E.2d 1162, 1174 (Ind. Ct. App. 2002)). But it disagreed that Detective Lang's grand jury

testimony completely foreclosed the possibility that one of the stolen shotguns was the murder

weapon. It began by quoting the following portion of Detective Lang's testimony:

> I talked to Mr. Maher, [the owner of the barn], the burglary he reported in
> November 2000, which would have been after the death obviously of [Behrman]. I
> asked him if it could be possible that he would not have known between May and
> November when he reported it that any of those weapons were missing? In his
> opinion, he said no. I don't know. You know I mean he . . . if they were all missing,
> I'm sure he's correct. If he took one, you know, it could have been out and he would
> not [have] noticed it in my opinion. But, he said that the air conditioner was
> removed and that was what tipped him off that something was wrong and then he
> found the guns were gone, so. He stated that he made trips to the barn on several
> occasions enough between May and November that he would have known
> somewhere in between that time that they would have been gone.

*Id.* (quoting Grand Jury Tr. 5483-84). Based on this testimony, the Indiana Court of Appeals

agreed with the post-conviction court's conclusion that the "testimony concerning the guns [was]

relevant because they (or at least one of them) could have been taken during a previous, undiscovered entry." *Id.* And if the evidence was relevant, the Indiana Court of Appeals reasoned, any objection would not have been sustained. *Id.*

Mr. Myers cannot assail this decision by the Indiana Court of Appeals for the same reasons discussed above regarding his claim that trial counsel should have objected to allegedly improper vouching for Ms. Swaffard's credibility—namely, whether an objection would have been sustained is purely a question of state law that this Court cannot reexamine. *See Wilson*, 131 S. Ct. at 16 (quoting *Estelle*, 502 U.S. at 67); *Miller*, 820 F.3d at 277. In analyzing Mr. Myers' allegation of deficient performance, the Indiana Court of Appeals determined as a matter of state evidentiary law that the shotgun evidence was relevant. This Court must defer to determinations of state law embedded in ineffective assistance of counsel claims. *See Harper*, 865 F.3d at 859; *Shaw*, 721 F.3d at 914. Doing so precludes this Court from concluding that trial counsel rendered deficient performance for not objecting to the gun evidence, given that any such objection would have been overruled. *See Jones*, 756 F.3d at 1009; *Hough*, 272 F.3d at 898.

Accordingly, Mr. Myers has failed to show that trial counsel's performance was deficient in this respect.

### 12. Failure to Object to John Roell's Testimony

Mr. Myers argues that trial counsel provided deficient performance by failing to object to the testimony of Mr. Myers' former cellmate at the Monroe County Jail, John Roell. Mr. Roell testified at trial that, among other things, Mr. Myers made comments appearing to implicate himself in Ms. Behrman's murder. Mr. Myers argues that trial counsel should have moved to exclude Mr. Roell's testimony under Rule 403, which provides in relevant part that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . .

unfair prejudice." In support of this argument, Mr. Myers primarily relies on the numerous inconsistencies between Mr. Roell's deposition and trial testimony to argue that the probative value of his testimony was minimal given his lack of credibility.

The Indiana Court of Appeals addressed this claim on the merits in *Myers II*. *See Myers II*, 33 N.E.3d at 1109-10. It set forth the relevant state law governing objections under Indiana Evidence Rule 403, before reasoning as follows:

> The crux of Myers' argument is that the probative value of Roell's testimony was low because he was not a credible witness due to inconsistencies among his initial statement to police, his deposition testimony, and his trial testimony. But it was for the trier of fact, not the trial court, to judge Roell's credibility. Ultimately, Myers' argument in this regard goes to the weight to be afforded to Roell's testimony, not its admissibility. *See Embrey v. State*, 989 N.E.2d 1260, 1268 (Ind. Ct. App. 2013) ("[i]nconsistencies in witness testimony go to the weight and credibility of the testimony, the resolution of which is within the province of the trier of fact" (internal quotation omitted)). Roell's testimony, if credited by the trier of fact, was highly probative of Myers' guilt.

*Myers II*, 33 N.E.3d at 1109. It then went on to note that Mr. Myers' argument regarding prejudice was underdeveloped and would not be made for him. *Id.* at 1110. Given these determinations, the Indiana Court of Appeals concluded that Mr. Myers had "not satisfied his burden of establishing that an objection to Roell's testimony on the basis of Evidence Rule 403 would have been sustained, he has consequently failed to establish deficient performance and resulting prejudice." *Id.*

As with other alleged errors on trial counsel's part, the Indiana Court of Appeals determined that, as a matter of state evidentiary law, the suggested objection would not have been sustained. Again, this state-law determination is unreviewable by this federal habeas court. *See Wilson*, 131 S. Ct. at 16; *Miller*, 820 F.3d at 277. Such is true even when, as here, it is embedded in an ineffective assistance of counsel claim. *See Harper*, 865 F.3d at 859; *Shaw*, 721 F.3d at 914. Accordingly, accepting that the objection to Mr. Roell's testimony would have been overruled,

Mr. Myers cannot establish that his counsel rendered deficient performance by failing to object. *See Jones*, 756 F.3d at 1009; *Hough*, 272 F.3d at 898.

### 13.    Failure to Present Evidence Supporting the Theory that Ms. Owings, Ms. Sowders, and Mr. Clouse May have Murdered Ms. Behrman

Mr. Myers' final allegation of deficient performance is that trial counsel failed to impeach Ms. Owings's testimony with inculpatory evidence that she and others murdered Ms. Behrman. Filing No. 9 at 44. Specifically, Mr. Myers contends that trial counsel failed to "impeach Owings; produce evidence corroborating Owings's confession; produce witnesses to whom Owings, Clouse, and Sowders made incriminating statements; produce evidence of Owings, Clouse, and Sowders false or shaky alibis; [and] produce evidence of Sowders's flight to Texas." Filing No. 9 at 44-45; Filing No. 33 at 87-100.

The Indiana Court of Appeals addressed this claim on the merits in *Myers II*. It relied on Hugh Baker's testimony during the post-conviction hearing that the failure to present much of the above evidence was a strategic decision:

> Trial counsel Hugh Baker . . . testified that the defense team made a strategic decision not to pursue Owings' confession as its primary theory of defense. Specifically, he testified as follows:
>
> > . . . [W]e felt that trying to present to a jury and convince a jury what the Federal Bureau of Investigations, the Bloomington Police Department, and the Indiana State Police had concluded was false was not a good strategy, that is the Owings' confession. She'd recanted this confession. And they hadn't found Jill Behrman in the . . . in Salt Creek. Rather, she was found . . . her remains were found in Morgan County and she . . . hadn't died from drowning but she'd died from 99.9 percent certainty of being shot.
>
> *PCR Transcript* at 840. For these reasons, a decision not to pursue the Owings theory would clearly reflect a reasonable strategic judgment.

*Myers II*, 33 N.E.3d at 1111. Mr. Myers, however, argued to the Indiana Court of Appeals and argues here that trial counsel pursued the Owings theory during trial, thus it was deficient

performance not to present significant evidence in support of it. After noting that trial counsel "pursued the Owings theory to some extent," the Indiana Court of Appeals concluded that, contrary to Mr. Myers' argument, trial counsel was not "obligated to take an all-or-nothing approach to the Owings theory—either forego it entirely or present all evidence supporting it." *Id.* at 1112. The Indiana Court of Appeals, because the State called Owings to testify as to why she recanted, reasoned:

> trial counsel did not act unreasonably by making a strategic decision to attempt to present just enough evidence to keep the possibility of Owings' involvement alive in the minds of the jurors, without making the Owings theory the crux of Myers' defense. Indeed, it appears to us that trial counsel's decision to pursue the Owings theory to only a limited extent was actually quite shrewd because it prevented the jury from being exposed to all of the many conflicting versions of the story Owings, Sowders–Evans, and Clouse allegedly told. This information might have resulted not only in the elimination in the jurors' minds of the possibility that Owings' confession was true, but also in trial counsel's loss of credibility with the jury. As the State argues in its brief, "the best counsel could hope for was to keep Owings on the delicate, razor-thin edge of jurors' credibility assessments. That strategy would have been ruined if counsel had pursued the over-zealous course of action advocated by Myers in this proceeding." Appellee's Brief at 50. Accordingly, Myers has not established that trial counsel performed deficiently in this regard.

*Id.*

Mr. Myers details at length the evidence regarding the Owings theory that was not put before the jury. *See* Filing No. 33 at 89-93. This includes evidence that Ms. Owings gave a false alibi and that she confessed to non-law enforcement individuals that she killed Ms. Behrman long before she confessed to law enforcement. The latter undermines the State's theory at trial that Ms. Owings only confessed to receive beneficial treatment with respect to pending drug charges against her (which itself is a somewhat dubious justification for confessing to murder). Mr. Myers also points to evidence that Mr. Clouse and Ms. Sowders also confessed to non-law enforcement individuals, which could have undermined the State's argument at trial that there was no such evidence.

With this evidence in mind, Mr. Myers argues that the Indiana Court of Appeals unreasonably applied *Strickland* and *Wiggins* in concluding that trial counsel's performance was not deficient in this respect. *See* Filing No. 33 at 96-98. Specifically, he argues that (1) its reasoning represents an impermissible post-hoc rationalization of trial counsel's conduct because trial counsel actually wanted to and attempted to prove the Owings theory at trial, rather than presenting "just enough" evidence to keep the jury interested; and (2) trial counsel could not have adequately made the posited strategic decision because trial counsel unreasonably failed to sufficiently investigate much of the above evidence supporting the Owings theory. *Id.*

The Court has serious concerns regarding trial counsel's performance related to the Owings theory, as well as the Indiana Court of Appeals resolution of this claim.[22] Whether the Indiana Court of Appeals' analysis was an objectively unreasonable application of *Strickland*, however, presents a difficult question. Therefore, as the Court did with Mr. Myers' claim regarding trial counsel's alleged failure to challenge the State's theory that Ms. Behrman rode north, the Court will not ultimately resolve this instance of deficient performance. As discussed below, the three instances of deficient performance identified are more than sufficient for Mr. Myers to establish prejudice and thus be entitled to habeas relief, making resolution of this claim unnecessary.

## B.      Prejudice

Trial counsel's performance was deficient in at least the three ways identified above, so the Court must consider the prejudice flowing from those errors. To do so, the Court will turn first to the Indiana Court of Appeals' analysis of prejudice in *Myers II*. After concluding that the Indiana

---

[22] It is striking to the Court that Hugh Baker testified during the post-conviction hearing that it was not sound trial strategy to attempt to "convince a jury what the Federal Bureau of Investigations, the Bloomington Police Department, and the Indiana State Police had concluded was false," PCR Tr. 840, yet this is precisely what trial counsel did in focusing much of their defense on the Hollars theory. As noted below, even Mr. Myers's own witness, Agent Dunn, testified that Mr. Hollars was "absolutely" excluded as a suspect. Trial Tr. 2599-61. The evidence implicating Ms. Owings available to trial counsel was by far more inculpatory than that implicating Mr. Hollars.

Court of Appeals unreasonably applied *Strickland* in concluding that Mr. Myers was not prejudiced by trial counsel's deficient performance, the Court then turns to its own prejudice analysis.

### 1.    Indiana Court of Appeals' Analysis of Prejudice

The Indiana Court of Appeals in *Myers II* addressed each allegation of ineffective assistance in isolation. *See Myers II*, 33 N.E.3d at 1089-1114. Certain claims were decided on only the performance prong, others were decided on only the prejudice prong, and others were decided on both. For example, regarding whether trial counsel was ineffective for making false statements during opening, the Indiana Court of Appeals held that it was deficient performance for trial counsel to make these unfulfilled promises, but concluded Mr. Myers was not prejudiced by this error. *See Myers II*, 33 N.E.3d at 1091-95. The Indiana Court of Appeals bypassed whether trial counsel's handling of Dr. Radentz's improper rape testimony constituted deficient performance and instead decided only that Mr. Myers was not prejudiced by that evidence. *See id.* at 1106-07.

After reviewing each allegation of ineffective assistance in this manner, the Indiana Court of Appeals turned to Mr. Myers's contention "that the cumulative effect of trial counsel's errors amounted to ineffective assistance entitling him to a new trial." *Id.* at 1114. Its resolution of this claim, in full, is as follows:

> We have reviewed each of Myers' claims of error in detail and concluded that none of them amount to ineffective assistance of counsel. Indeed, most of Myers' claims of ineffective assistance are nothing more than quarrels with trial counsel's reasonable strategic decisions. "Alleged '[t]rial irregularities which standing alone do not amount to error do not gain the stature of reversible error when taken together.'" *Kubsch v. State*, 934 N.E.2d at 1154 (quoting *Reaves v. State*, 586 N.E.2d 847, 858 (Ind. 1992)) (alteration in original). Accordingly, we are unpersuaded by Myers' cumulative error argument.

*Id.*

Although the Indiana Court of Appeals correctly set out *Strickland*'s prejudice standard at the outset of its opinion, Mr. Myers is correct that it unreasonably applied that standard in its analysis. The prejudice analysis requires the reviewing court to "assess 'the totality of the omitted evidence' under *Strickland* rather than the individual errors," *Washington*, 219 F.3d at 634-35 (quoting *Strickland*, 466 U.S. at 695), and determine whether trial counsel's unprofessional errors prejudiced the defense, *id.*; *see also Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (holding that the state court's prejudice analysis was an unreasonable application of *Strickland* "insofar as it failed to evaluate the totality of the available . . . evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"); *Sussman*, 636 F.3d at 360-61 (explaining that when faced with multiple errors by counsel, the Court "must consider the[ir] cumulative impact" to determine prejudice). Thus "even if [counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect" can amount to prejudice under *Strickland*. *Martin*, 424 F.3d at 592; *see Hooks*, 689 F.3d at 1188 (noting that resolving each allegation of ineffective assistance on prejudice grounds is "not . . . sufficient to dispose of [an ineffective assistance] claim because a further analysis of 'cumulative prejudice' [is] necessary").

The Indiana Court of Appeals in *Myers II* failed to consider the cumulative prejudice of trial counsel's instances of deficient performance, even though it decided multiple of Mr. Myers's claims based on a lack of prejudice. Instead, it referred to its assessment of trial counsel's errors in isolation, noting that "none of them amount to ineffective assistance of counsel." *Myers II*, 33 N.E.3d at 1114. Relying on the principle that "[a]lleged trial irregularities which standing alone do not amount to error do not gain the stature of reversible error when taken together," *id.* (quoting *Kubsch*, 934 N.E.2d at 1154) (quotation marks omitted), the Indiana Court of Appeals thus concluded that Mr. Myers's "cumulative error argument" lacked merit, *id.*

The principle from *Kubsch* on which the Indiana Court of Appeals relied is inconsistent with the prejudice analysis mandated by *Strickland*—that the prejudice flowing from all instances of deficient performance must be considered cumulatively, not considered in isolation. Put differently, the Indiana Court of Appeals was wrong to treat each allegation of deficient performance as a stand-alone ineffective-assistance-of-counsel claim; such a claim encompasses all instances of deficient performance and asks whether all of those instances, taken together, were prejudicial. Had the Indiana Court of Appeals correctly applied *Strickland*, it would have had to consider how the cumulative prejudice flowing from every instance where it concluded that trial counsel's performance was deficient or where it bypassed that question and focused solely on prejudice. But, by improperly relying on *Kubsch*, it failed to do so.

Notably, the Seventh Circuit has concluded that the exact mode of analysis employed by the *Myers II* court constitutes an unreasonable application of *Strickland*. *See Harris*, 698 F.3d at 648 ("The question is whether counsel's entire performance . . . prejudiced [the petitioner]. By analyzing each deficiency in isolation, the [state] appellate court clearly misapplied the *Strickland* prejudice prong . . . the state appellate court's prejudice determination was unreasonable insofar as it failed to apply the correct framework."); *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation, as did the Wisconsin Court of Appeals, the pattern of counsel's deficiencies must be considered in their totality. In weighing each error individually, the Wisconsin Court of Appeals overlooked a pattern of ineffective assistance and unreasonably applied *Strickland*." (citing *Washington*, 219 F.3d at 634-35); *see also Raether v. Meisner*, 608 Fed. Appx. 409, 415 (7th Cir. 2015) ("The state court examined the prejudice flowing from each alleged error individually, but the correct question is whether [the defendant] was prejudiced by counsel's errors in the aggregate.").

Having concluded that the Indiana Court of Appeals unreasonably applied *Strickland*'s prejudice analysis, the Court must determine under what standard to evaluate prejudice. As discussed above when analyzing the Indiana Court of Appeals' resolution of Mr. Myers's claim regarding the bloodhound evidence, the continuing applicability of *Richter*'s "could have supported" framework when a state court gives reasons for its decision was cast into doubt by the Supreme Court in *Wilson*. *See* 138 S. Ct. at 1192-95. The Supreme Court's analysis in *Wilson* suggests that the Court should review prejudice *de novo* rather than using *Richter*'s "could have supported" framework. *Id.* But the Court need not resolve this question. In the end, even if the "could have supported" framework continues to apply, the Court concludes that no "fairminded jurist[]" could conclude that trial counsel's cumulative errors did not meet *Strickland*'s prejudice standard. *Richter*, 562 U.S. at 101.

## 2. **This Court's Prejudice Analysis**

The Court turns now to the cumulative prejudice analysis mandated by *Strickland*. To properly evaluate prejudice, the Court will first set forth the evidence supporting the verdict and evaluate its strength. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The Court will then discuss each of trial counsel's errors and assess whether there is a reasonable probability those errors, taken together, impacted the jury's verdict.[23]

---

[23] The Court ordered the parties to submit supplemental briefing solely on two specific questions regarding cumulative prejudice. *See* Filing No. 36 at 3. In the supplemental brief, the respondent for the first time argues that certain errors are procedurally defaulted. *See* Filing No. 41 at 6. Specifically, the respondent argues that certain of trial counsel's errors cannot be considered in the cumulative prejudice analysis because Mr. Myers failed to repeat them in the cumulative prejudice portion of his petition to transfer to the Indiana Supreme Court, even though they were individually included.

The respondent's procedural default argument is waived and lacks merit. Rule 5(b) of the *Rules Governing Habeas Corpus Cases under Section 2254* provides that the respondent's answer "must state whether any claim in the petition is barred . . . by a procedural bar." The respondent's answer did not include this argument, and the Court's supplemental-briefing order did not provide an additional opportunity to raise it. Procedural default is an affirmative

### a.    Evidence Supporting Verdict

Much of the evidence supporting the verdict was referenced in the Indiana Court of Appeals' recitation of the facts in *Myers II* quoted at the beginning of this Order. *See Myers II*, 33 N.E.3d at 1083-88. This evidence can be broken down into five general categories: (1) evidence that Mr. Myers had the opportunity to commit the crime because Ms. Behrman rode north near his residence on the day she disappeared, which also undermined Mr. Myers's alibi that he was home making phone calls; (2) evidence that Mr. Myers had the means to commit the crime in that he had access to a shotgun; (3) evidence suggesting Mr. Myers had a consciousness of guilt; (4) evidence of a connection to the crime or crime scene; and (5) evidence that Mr. Myers exhibited suspicious or strange behavior. The Court will summarize each category of evidence and briefly analyze its potential impact on the verdict.

### i.    Evidence Ms. Behrman Rode North

It was critical for the State to prove that Ms. Behrman rode north from her residence (toward Mr. Myers's residence) rather than south on the day she disappeared. This is because Mr. Myers had an uncontested alibi if she rode south—namely, phone records establish he was home making phone calls when Ms. Behrman disappeared.

The State presented four types of evidence to prove Ms. Behrman rode north that day. First was the mere fact that her bicycle was found in a field along a route north of Ms. Behrman's residence. This does not, however, conclusively establish whether Ms. Behrman rode to that location or whether her bicycle was dumped there by the perpetrator. *See, e.g.*, Trial Tr. 2561-62 (Agent Dunn testifying that although he did not have a "firm conclusion" about whether Ms.

---

defense that can be waived. *See Blackmon v. Williams*, 823 F.3d 1088, 1100 (7th Cir. 2016). The respondent waived it by not raising it in the initial answer. Moreover, for the reasons in Mr. Myers's supplemental brief, the newly raised procedural default argument lacks merit. *See* Filing No. 46 at 9-15.

Behrman rode to the field or the bicycle was dumped there, there was some likelihood that Ms. Behrman's bike was dumped in the field because there was a "strong possibility" that Ms. Papakhian's sighting on Harrell Road was accurate).

The State's primary evidence that Ms. Behrman actually rode north was the testimony of the bloodhound handler, Deputy Douthett. He testified at length regarding the bloodhound tracking he conducted six days after Ms. Behrman disappeared. *See* Trial Tr. 957-88. He concluded that the bloodhound trail showed it was likely Ms. Behrman rode north from her house to the field where the bike was found, which was close to Mr. Myers's residence, and her ride ended there. *Id.* at 988-89. As discussed above, trial counsel should have objected to this bloodhound evidence and, had trial counsel done so, it would not have been admitted at trial.

The remaining evidence that Ms. Behrman rode north consists of the testimony of Robert England and Dr. Houze. Mr. England briefly testified that he saw a female cyclist in her twenties with a bike shirt and helmet that matched Ms. Behrman's description. *Id.* at 1021-22. He was not sure, however, whether he saw this bicyclist on Wednesday morning (the day Ms. Behrman disappeared) or Thursday morning. *Id.* at 1026-28.

Dr. Houze was an experienced bicyclist who testified regarding a timed simulation he conducted of Ms. Behrman's proposed route north. He testified that it would have taken Ms. Behrman between forty and forty-one minutes to ride from her house to the field where her bike was found. *Id.* at 1271. This evidence was presented to show that it was possible for Ms. Behrman to have ridden north to where her bicycle was found and made it back on time for her shift at the SRSC that began at noon.

Had the bloodhound evidence not been admitted, the evidence that Ms. Behrman rode north rather than south was quite weak. Dr. Houze merely demonstrated that Ms. Behrman *could* have

ridden north and returned in time for her work shift. This leaves only Mr. England's testimony that Ms. Behrman actually rode north. While he testified that he saw a bicyclist matching Ms. Behrman's description, he was uncertain whether he saw this biker on the relevant day or not. One witness testifying that he saw a cyclist matching Ms. Behrman's description perhaps on the day in question is far from compelling evidence that Ms. Behrman rode north. As discussed further below, such evidence is, at best, no more convincing than the evidence that Ms. Behrman road south.

### ii. <u>Access to Shotguns</u>

Dan Downing, the Morgan County Coroner, and Dr. Radentz, a forensic pathologist, both testified that the cause of Ms. Behrman's death was a shotgun wound on the back of the head. *Id.* at 517, 1420; *see also id.* at 621, 664 (Dr. Nawrocki, the forensic anthropologist, providing further details regarding the shotgun wound and related evidence). Mark Keisler, a firearms expert with the Indiana State Police, further explained that a twelve-gauge shotgun was used with number eight shot and "very unique" wadding manufactured by the Federal Cartridge Company. *Id.* at 740-41. Due to this evidence regarding the cause of death, it was important for the State to prove that Mr. Myers had access to shotguns during the time Ms. Behrman was murdered, as no murder weapon was produced at trial.

The State adduced such evidence by way of several witnesses. Although no witness testified that Mr. Myers owned or otherwise possessed a shotgun on the date Ms. Behrman disappeared, multiple witnesses testified that he had access to shotguns around this time. For example, Mr. Myers's brother, Samuel Myers, testified that the shotgun he kept at his parents' house went missing around the relevant timeframe. *Id.* at 1667-70, 1675. Richard Swinney, the husband of Mr. Myers's cousin, testified that he spoke with Mr. Myers about hunting with

shotguns. *Id.* at 1921. Debbie Bell, Mr. Myers's aunt, testified that Mr. Myers sold a shotgun to her husband at Mr. Myers's father's funeral. *Id.* at 1798-1802.

In sum, the State produced essentially uncontested evidence that—even though the specific murder weapon was not found, Mr. Myers did not own a shotgun, and there was no evidence that Mr. Myers had a shotgun on the day Ms. Behrman disappeared—Mr. Myers had access to twelve-gauge shotguns around the relevant period.

### iii. Consciousness-of-Guilt Evidence

The State's strongest evidence of guilt consisted of consciousness-of-guilt evidence—evidence that Mr. Myers made statements or exhibited behavior that a guilty person would. This evidence falls into two main categories. First, evidence was presented regarding Mr. Myers's mental and emotional state on and around the day Ms. Behrman disappeared, May 31, 2000, and in the months and years that followed. The evidence came primarily from Mr. Myers's aunt, Ms. Bell, and Mr. Myers's grandmother, Ms. Swaffard. Second, the State presented evidence—with varying degrees of success—that Mr. Myers implicitly or explicitly acknowledged his involvement in Ms. Behrman's murder. This evidence consisted of Mr. Myers's May 2, 2005 interview with law enforcement and the testimony of Mr. Myers's former cellmate at the Monroe County Jail, Mr. Roell. The Court summarizes these two categories of evidence in detail below.

Ms. Bell testified that Mr. Myers was distraught around the time Ms. Behrman disappeared. Although she lived in Tennessee, she occasionally spoke with Mr. Myers. She testified that in April 2000, Mr. Myers asked her for help with his daughter because he was having trouble with his girlfriend (Ms. Goodman) and "felt like he was a balloon full of hot air ready to burst." *Id.* at 1779. Ms. Bell testified that Mr. Myers's mother, Jodie, told her that on May 31 (the day Ms. Behrman disappeared), Mr. Myers was at his parents' house "crying," "distraught," and "almost

hysterical," stating that "he was leaving town and never coming back." *Id.* at 1786. Ms. Bell did not testify why Mr. Myers was upset. Jodie Myers testified that it was because Mr. Myers's father had surgery regarding his cancer the day before, which made "all of [her] boys distraught," *id.* at 1705, but Ms. Bell could not corroborate this, *id.* at 1786.

Five days later, on June 5, Ms. Bell spoke with Mr. Myers and asked him how he was doing and if everything was okay. He told her he was "scared" because "there was a girl who was abducted up here, and [he was] afraid they're going to blame" him since "they found her bicycle about a mile from [his] house, and they blame [him] for everything." *Id.* at 1788. Ms. Bell asked if the girl was dead, and Mr. Myers responded, "uh, well, yeah, I guess." *Id.* at 1789. Mr. Myers told Ms. Bell during that same conversation that he was stopped by a roadblock, which scared him. When Ms. Bell asked him why he was scared, he switched from being scared to "laughing," saying he was "not really scared." *Id.*

Ms. Swaffard, who lived near Mr. Myers and would regularly help take care of his daughter, similarly testified about Mr. Myers's mental and emotional state during this period. She testified that Mr. Myers told her he loved his girlfriend, Ms. Goodman, and hoped to marry her, but that their relationship started to deteriorate in the Spring of 2000, which made Mr. Myers "real upset" and would cause him to "get teary-eyed." *Id.* at 1820-22.

Ms. Swaffard also testified regarding a conversation she had with Mr. Myers on the phone on June 27, 2000, nearly four weeks after Ms. Behrman disappeared. Earlier that day, law enforcement spoke with Mr. Myers's parents about whether Mr. Myers was involved in Ms. Behrman's disappearance. Mr. Myers called Ms. Swaffard and asked to borrow two hundred dollars. She responded that she only had ten dollars, and he said he would "take that." *Id.* at 1828. When Ms. Swaffard told Mr. Myers that he would have to come get it from her house, he responded

that he could not "because they have road blocks up on Maple Grove Road" and he is "a suspect in the Jill Behrman disappearance." *Id.* She testified that Mr. Myers had previously borrowed money from her, but he did not state on this occasion the reason he needed the money. *Id.* at 1828-29.

Ms. Swaffard then called her daughter, Jodie Myers, and told her what Mr. Myers had said. Ms. Swaffard testified that Jodie Myers was upset, stating that she knew Mr. Myers was a suspect because she had spent "three hours of hell talking to the police about it." *Id.* at 1831.

Lastly, Ms. Swaffard testified regarding a conversation she had with Mr. Myers more than three years later, in November 2004. Mr. Myers called her, asking if she could watch his daughter. Although she initially declined, she called him back and said she could. Ms. Swaffard testified regarding that conversation as follows:

> [H]e said, I appreciate it, Grandma. And his voice kind of broke. And I said, are you and your girlfriend going out for the evening or something? And he said, no, I just need the time to myself. He said, I've got a lot of things I need to think about. . . . [H]e said, Grandma, if you just knew the things that I've got on my mind. He said, if the authorities knew it, I'd be in prison for the rest of my life. . . . [H]e said, my dad knew it. He took it to the grave with him.

*Id.* at 1833. Mr. Myers then took his daughter to Ms. Swaffard's house. He sat in her living room and said, "I wish I hadn't done these bad things." *Id.* at 1835.

Ms. Swaffard testified that she reported this to Carl Salzman, the Monroe County Prosecutor, who attended her church. *Id.* at 1838. She did so because her "conscience demanded it," explaining that she "couldn't live with the fact that he had said something like this to me, and I didn't know what it might mean." *Id.* at 1835. She said she "thought about" her conversation with Mr. Myers in June 2000 when she chose to come forward in 2004. *Id.* at 1836.

Although Mr. Myers never acknowledged any involvement in Ms. Behrman's murder to his relatives Ms. Bell and Ms. Swaffard, their testimony undoubtedly weighed heavily in the jury's

assessment of Mr. Myers's guilt. Indeed, Detective Lang testified that it was "significant" when Ms. Bell and Ms. Swaffard contacted law enforcement in December 2004 because they were acting "against their own best interest by providing information about a family member." *Id.* at 2362. If Mr. Myers's own relatives, especially his Grandmother, believed his comments described above and his emotional state could be related to his involvement in Ms. Behrman's murder, the jury would undoubtedly give his own relatives' assessment great weight.

Next, the State presented two types of evidence that it portrayed as Mr. Myers's acknowledgment of guilt. First, as discussed in some detail above, Mr. Myers was interviewed by law enforcement regarding his potential involvement in Ms. Behrman's murder on May 2, 2005, nearly five years after she disappeared. The jury listened to the audio of a redacted version of the pre-arrest interview. *See* Trial Ex. 96B, Trial Tr. 2390. It is not obvious what impact this interview had on the juror's assessment of Mr. Myers's guilt, as different aspects of the interview cut for and against Mr. Myers's guilt.

Casting suspicion on Mr. Myers were statements he made during the interview that directly contradicted other witnesses' testimony.[24] For example, he denied talking to people other than law enforcement about the case, Trial Ex. 96B at 29-30, and he denied telling anyone in his family that he was afraid of the roadblocks police had set up, *id.* at 65. Mr. Myers also readily acknowledged other behaviors that would seems suspicious, such as traveling to Kentucky Kingdom (where Ms. Goodman's senior trip was) by himself, *id.* at 50-51, being "[e]xtremely upset" at the time Ms. Behrman disappeared, *id.* at 62, and hanging up blankets over the windows

---

[24] Mr. Myers also made such statements when he was interviewed regarding Ms. Behrman by Detective Crussen on June 27, 2000. Mr. Myers told Detective Crussen that he planned on going to Myrtle Beach with Ms. Goodman during the week he was on vacation, but that those plans were cancelled. Trial Tr. 1499-1500. Ms. Goodman denied having such plans. *Id.* at 1892. However, Mr. Myers's phone records show that he made calls to Myrtle Beach around that time, as well as Kentucky Kingdom, King's Island, and other locations where one would vacation. *Id.* at 2439-40.

of his trailer (offering that he does this still to block the light since he sleeps in the living room), *id.* at 63-65.

The State portrayed Mr. Myers's conduct during the interview as that of a guilty person. Detective Arvin testified that during the interview Mr. Myers "never adamantly denied" and "never expressly denied" murdering Ms. Behrman.[25]  Trial Tr. 2211-12.  Yet Detective Arvin's testimony, at least with respect to the lack of denials, was completely undermined by the audio of the interview.  Mr. Myers consistently and categorically denied involvement during the portion of the interview played to the jury.  *See, e.g.*, Trial Ex. 96B at 13, 83, 89-96, 103-04.  Indeed, even when law enforcement falsely claimed they had a letter from Mr. Myers's father stating that Mr. Myers confessed to him, Mr. Myers denied confessing to his father because he "didn't have anything to do with the Behrman case and [has] no knowledge other than what [he] ha[d] seen in the newspapers and what [he] ha[d] heard [as] street rumor."  *Id.* at 91-92.

Finally, the State introduced the testimony of Mr. Myers's former cellmate, Mr. Roell, and portrayed Mr. Myers's statements to Mr. Roell as akin to a confession.  Mr. Roell testified that he shared a cell with Mr. Myers in Monroe County Jail for two days in May 2005.  During those two days, Mr. Myers brought up Ms. Behrman, saying that the State Police were investigating her bike being found near his residence, and Mr. Myers was "scared and nervous."  Trial Tr. 2269.  Mr. Roell thought Mr. Myers brought up the bike "[t]hree or four times."  *Id.* at 2270.  According to Mr. Roell, Mr. Myers was angry when he stated, "if she . . . if nothing would have been said, if she wouldn't have said anything, this probably . . . none of this would have happened," and Mr. Roell testified that the pronoun "she" referred to Ms. Behrman.  *Id.*  When asked whether Mr.

---

[25] The State presented a slideshow during closing argument, and the slides were admitted during the post-conviction proceedings.  *See* PCR Ex. 132.  Five slides dedicated to the May 2 Interview were each entitled, "When pressed Defendant never denies guilt."  *Id.*

Myers used any derogatory terms regarding Ms. Behrman, Mr. Roell testified, "There was one comment made in reference to a bitch." *Id.*

Later during his testimony, Mr. Roell was somewhat equivocal on whether the pronoun "she" referred to Ms. Behrman. He initially testified that "she" referred to Ms. Behrman, *id.*, and explained later during re-direct that it did not refer to anyone else because "Jill Behrman was basically the only person that was [sic] talked about," *id.* at 2279. But when pressed about who Mr. Myers meant by "she," his testimony was less certain:

> Q. Someone else could have been the person that said something that caused things to happen. Isn't that possible?
>
> A. I . . anything's . . that's not for me to . . I don't . . I don't know. That's just what was said.
>
> Q. He never said to you, did he, that if Jill Behrman would have said . . wouldn't have said anything that nothing would have happened to her?
>
> A. No, he did not use her name.
>
> Q. Could have been anyone, couldn't it?
>
> A. I don't know.

*Id.* at 2276.

Mr. Roell also testified regarding how he ended up sharing this information with law enforcement. He was arrested in May 2006 for attempting to bring narcotics to his wife, who was incarcerated at the Monroe County Jail. *Id.* at 2266. After he was arrested—which was a year after he shared a cell with Mr. Myers—Mr. Roell brought up "the Behrman case" to law enforcement because he was afraid and "thought that perhaps it could help me." *Id.* at 2267. He met with Detective Lang in the months following May 2006 and told him what he knew. *Id.* at 2272-73.

Although Mr. Roell testified during direct examination that law enforcement did not promise him any benefit for his testimony, he acknowledged during cross-examination that when he stated he thought "it could help" him to tell law enforcement, he was "hoping" it would get him "out of a jam." *Id.* at 2274. He even acknowledged that he stated this hope "several times" when he gave his statement to law enforcement, *id.*, and that his "motivation" in coming forward was to obtain release from jail, *id.* at 2275. On re-direct examination, Mr. Roell elaborated that selfish reasons were not his sole motivation, as he had a daughter and coming forward seemed like the right thing to do. *Id.* at 2278.

How Mr. Roell's testimony weighed in the juror's minds, like much of the evidence in this case, depends on whether it was trustworthy. It either amounted to an implicit acknowledgement by Mr. Myers of his involvement with Ms. Behrman's murder or was the fabrication of a man who was afraid and trying to "get out of a jam." *Id.* at 2274. When pressed during cross-examination, Mr. Roell almost immediately acknowledged he was unsure whether Mr. Myers was talking about Ms. Behrman or not, although he was rehabilitated on this point during re-direct examination. Moreover, the fact that Mr. Roell acknowledged that his motivation in coming forward was to obtain release, and that he repeatedly asked law enforcement if this would benefit him, makes his testimony much less probative than the testimony of Ms. Swaffard or Ms. Bell who lacked any motivation to lie. *Cf. House*, 547 U.S. at 552 (noting that evidence from witnesses with no motive to lie "has more probative value than, for example, incriminating testimony from inmates"). Notably, Detective Lang acknowledged that law enforcement had concerns about jailhouse informants, testifying this was such a "high profile media case" that he was concerned about certain information coming out because "people that were currently in jail would use it as their possible get-out-of-jail-free card." Trial Tr. 2347; *see also id.* at 2399 (Detective Lang, testifying that they

did not publicly name Mr. Myers as a suspect because he "didn't want to gain a bunch of false leads like they did within the confines of most jails. I didn't want any false implications of Mr. Myers for somebody to gain something out of that")

### iv. **Connection to the Crime or Crime Scene**

Little evidence was presented during trial that directly connected Mr. Myers to the crime. Other than certain of the consciousness-of-guilt evidence discussed above, the primary evidence directly connecting Mr. Myers to the crime was the State's attempt to show that Mr. Myers previously took his former girlfriend, Ms. Goodman, to the wooded area where Ms. Behrman's remains were found.[26] This evidence was primarily introduced through the testimony of Detective Lang and Ms. Goodman.

Detective Lang testified the he drove Ms. Goodman around the roads near where Ms. Behrman's remains were found to see if she would recognize any of them. He explained that, while driving across an "iron grated bridge," Ms. Goodman recognized the area, which was approximately seven-tenths of a mile from where Ms. Behrman's remains were found. *Id.* at 2409-13. He then turned around and "stopped directly south" of where Ms. Behrman's remains were

---

[26] Other than Ms. Goodman's testimony regarding Mr. Myers's possible connection to the crime scene, the other primary way the State attempted to connect Mr. Myers to the crime was by creating suspicion that two men driving a white delivery van may have abducted Ms. Behrman near where her bike was found and by establishing that Mr. Myers drove similar white delivery vans as part of his employment at Bloomington Hospital. Joe Penden, a farmer who owned the land adjacent to where Ms. Behrman's bicycle was found, testified that he saw a white van with two men in it driving back and forth three times on Maple Grove Road at approximately 9:00 a.m. the morning Ms. Behrman disappeared. *Id.* at 1245-49. They were driving slowly, and he thought "the people were looking for an address or something." *Id.* at 1249. Indeed, during Mr. Myers's May 2, 2005 Interview with law enforcement, Mr. Myers offered that he knew there were rumors about a white van being involved and that he worked at Bloomington Hospital where he drove their white vans. Trial Ex. 96B. at 14.

In the end, however, there was no evidence presented that Mr. Myers was in the white van in question, nor evidence that the individuals driving the van were connected to Ms. Behrman's murder. Not only did Mr. Myers's supervisor at Bloomington Hospital testify that Mr. Myers did not have access to the white vans while he was on vacation the week Ms. Behrman disappeared, *id.* at 2005, but Detective Lang testified that he attempted but was unable "to positively tie the white van from the hospital to this case," *id.* at 2397, and that hospital employees told him they would have noticed if a white van was missing when Mr. Myers was on vacation, *id.* at 2498.

found and exited the vehicle. *Id.* at 2414. Ms. Goodman told him she recognized the "cut that was in the wooded area" and the "positioning of the woods." *Id.* On cross-examination, Detective Lang acknowledged that the "iron grated bridge" on which he was driving when Ms. Goodman stated she recognized the area was not installed until 2001, that is, a year after she and Mr. Myers relationship ended and Ms. Behrman was killed. *Id.* at 2473. Detective Lang testified, however, that it was the area, not the bridge, that Ms. Goodman recognized. *Id.*

As detailed above, Ms. Goodman testified regarding her recognition of this clearance. She testified that "it was just a wooded area. There was a clearance where you could actually drive into the woods. It wasn't a road. It was just kind of a clearance. And it was completely surrounded by woods." *Id.* at 1900. She was then shown a picture of the clearance where Ms. Behrman's remains were found in 2003, *see* Trial Ex. 12, and testified that she recognized it as where Mr. Myers took her in March 2000, Trial Tr. 1900.

Ms. Goodman also testified regarding how she came to provide law enforcement with this information. Detective Lang contacted her about the case in 2005. In February 2006, he drove Ms. Goodman around the rural area north of Bloomington for at least an hour to different places Mr. Myers had taken her when they were dating several years prior. Ms. Goodman testified that she recognized Gosport, "the creek that we had to go over, and . . . the wooded area and the clearance in the woods." *Id.* at 1905. She testified that those places were familiar to her "[b]ecause that's where [Mr. Myers] took me." *Id.*

During cross-examination, Ms. Goodman struggled to explain what about the clearing in Exhibit 12 where Ms. Behrman's remains were found allowed her to identify it as the clearing Mr. Myers drove her to six years earlier. She testified as follows:

Q.     How do you differentiate [Exhibit 12] from any other picture that'd be taken in the woods?

A.     Because of the way the clearance is.

Q.     How do you . . . differentiate that clearance from any other clearance?

A.     It's . . . just what looks familiar to me.

Q.     But you don't know . . . that could be anywhere, correct?

A.     Yes.

*Id.* at 1905-06.

Ms. Goodman's testimony, if credited by the jury, would have weighed significantly in favor of Mr. Myers's guilt. If Mr. Myers had previously taken Ms. Goodman to the exact clearance in the woods where Ms. Behrman's remains laid undiscovered for three years, the State established some likelihood that Mr. Myers knew the area where Ms. Behrman was killed. Corroborating Ms. Goodman's testimony is Detective Lang's testimony that Ms. Goodman offered on her own accord that she recognized the area seven-tenths of a mile from where Ms. Behrman's remains were found.

However, it is far from certain whether the jury would credit Ms. Goodman's recollection of the clearance. The picture shown to Ms. Goodman depicts a rather nondescript clearance in the woods. *See* Trial Ex. 12. This aligns with Ms. Goodman's inability during cross-examination to describe any feature of the clearance that stood out to her, as well as her explicit acknowledgment that the picture shown to her "could be anywhere." Trial Tr. 1906. Moreover, Mr. Myers had taken her to the wooded clearance at night, while Detective Lang drove her there during the day (and Exhibit 12 is a picture of the clearance during the day), which casts further doubt on her ability to identify the specific clearance in question. *Id.* at 2471, 2474.

Like Mr. Roell's testimony, the jury could view Ms. Goodman's testimony in at least two ways. It either cast significant suspicion on Mr. Myers in that it shows he had previously been to the exact location in the woods where Ms. Behrman's remains were found, or it could be viewed as the unreliable testimony of an ex-girlfriend who, six years later, essentially acknowledged that she could not distinguish the clearance at issue from any other clearance in the woods.

### v.     **Strange or Suspicious Behavior**

The State called several witnesses to testify about strange or suspicious behavior that Mr. Myers exhibited either near the time Ms. Behrman disappeared or in the years that followed. Certain of the evidence is indeed suspicious, while other evidence is simply strange. The Court will summarize these witnesses' testimony below.

First, the State presented testimony that Mr. Myers covered the windows of his trailer and hid his car in the days following Ms. Behrman's disappearance. Mr. Myers's neighbor, Billy Dodd, testified that on the day Ms. Behrman disappeared, Mr. Myers covered the windows of his trailer and parked his car where it could not be seen from the main road, neither of which Mr. Dodd had seen Mr. Myers do before. *Id.* at 1559-63; *see also id.* at 1581 (testimony of Marlin Dodge, a State of Indiana Conservation Officer, that he observed Mr. Myers's windows covered in the week following Ms. Behrman's disappearance). Mr. Myers left the car there for three days and never parked it there again. *Id.* at 1563. When Mr. Dodd inquired why his car was parked there, Mr. Myers told him "he just didn't want nobody to know he was at home." *Id.* Detective Crussen testified that the windows of Mr. Myers's trailer were also covered by blankets or sheets when he interviewed him a few weeks later. *Id.* at 1529. Mr. Myers's mother, Jodie Myers, testified that Mr. Myers had blankets on the windows of his trailer between May 31 and June 4, 2000, and Mr.

Myers told her they were there because he was growing marijuana plants (she testified that she did not see any plants but would not have expected to).  *Id.* at 1714-15.

Second, the State presented evidence that Mr. Myers was so interested in Ms. Behrman's disappearance that he tried to assist law enforcement in solving it.  Jodie Myers testified that sometime in 2001, Mr. Myers told her he was fishing and found a "bone" and "panties."  *Id.* at 1736.  She told him they should report it to law enforcement in case it could help with "the Jill Behrman case."  *Id.* at 1738.  They both agreed that was the best course, so Mr. Myers called the FBI to report what he found.  *Id.* at 1738-39.  Agent Dunn returned their call and left a message on Jodie Myers's answering machine two weeks later.  *Id.* at 1739.  Mr. Myers suggested that "they should save the tape in case they question that this conversation took place."  *Id.* at 1740.

The State also presented the testimony of Johnny Kinser, a correctional officer at Monroe County Jail while Mr. Myers was incarcerated there in March 2002, who testified that Mr. Myers again attempted to assist law enforcement.  He explained that there were a couple of inmates on Mr. Myers's cellblock being held in relation to Ms. Behrman's disappearance.  *Id.* at 2160.  Mr. Myers told Officer Kinser that "he'd found some letters" from other inmates in his cellblock that law enforcement should see, and he also gave Officer Kinser a list of places Mr. Myers created where law enforcement should look for Ms. Behrman's remains.  *Id.*; *see also* Trial Ex. 93 (the handwritten list Mr. Myers provided Officer Kinser listing seven locations).  Officer Kinser testified that Mr. Myers provided this list shortly after law enforcement had drained Salt Creek, that Mr. Myers said he felt bad "that this had happened to that young lady," and that he thought Mr. Myers "seemed like he generally wanted to help."  Trial Tr. 2163.  James Minton, an Indiana State Police Officer, searched the locations provided by Mr. Myers, but he did not find relevant evidence at any of the locations.  *Id.* at 2197.

Third, the State presented several witnesses who testified that Mr. Myers raised Ms. Behrman's disappearance, raised the proximity of his residence to where her bike was found, or raised what may have happened to her in the years that followed her disappearance. The witnesses provided the following testimony:

- James Cantwell, the warehouse supervisor at Bloomington Hospital where Mr. Myers worked, testified that the week following Ms. Behrman's disappearance, Mr. Myers claimed that police had questioned him about Ms. Behrman "because the bike was found fairly close to his home," *id.* at 1998, which was false since Mr. Myers was not questioned by law enforcement until four weeks later.

- Matthew Colbert, who performed deliveries for Bloomington Hospital with Mr. Myers for four months beginning in March 2000, testified that, after Ms. Behrman disappeared, Mr. Myers wondered why law enforcement had searched a particular barn in a field. *Id.* at 1983.

- James Swanay, who worked with Mr. Myers at Bloomington Hospital in 2000, testified that a few weeks after posters about Ms. Behrman's disappearance were hung in the hospital, Mr. Myers mentioned to him that Ms. Behrman was "probably [abducted] around . . . where they found the bicycle." *Id.* at 2145; *see also id.* at 2140-47.

- Kanya Bailey, who dated Mr. Myers' sometime in 2000 or 2001, testified that Mr. Myers pointed to a field while they were driving near his home and told her that is where he found Ms. Behrman's bicycle, even though Mr. Myers was not the one who found her bicycle. She did not know why Mr. Myers brought this up, and they did not discuss it any further. *Id.* at 1600-03.

- Doug Alexander, who worked with Mr. Myers delivering furniture in mid-2001, testified that Mr. Myers raised Ms. Behrman's disappearance once during a delivery, stating that her bike was found near his residence, that he was questioned a couple times about the case, and that "if he was ever going to hide a body, he would hide it up [north] in a wooded area." *Id.* at 1944. On a different occasion, Mr. Myers told him that he knew someone in Florida who had Ms. Behrman's ID or checkbook. *Id.* at 1951.

- Richard Swinney, the husband of Mr. Myers' cousin, testified that Ms. Behrman's disappearance came up at a family get-together in late 2001. He was outside with Mr. Myers when Mr. Myers mentioned his familiarity with the Paragon and Horseshoe Bend areas, where he liked to hunt, and commented, "I bet she's found in the woods." *Id.* at 1921-23.

- Mike Franey, who worked with Mr. Myers at a Kroger grocery store in 2003, testified that on the day the newspaper ran an article about Ms. Behrman's remains being discovered, Mr. Myers saw the newspaper in the break room and said the picture of the woods "looked

familiar to him" because "he had hunted there before," even though the woods did not look distinctive. *Id.* at 2009. Mr. Myers further stated that "it was good they finally found the remains" and, in a tone Mr. Franey described as "probably cocky," Mr. Myers stated he was surprised law enforcement had not contacted him "because he knew the people that they thought . . . did the crime." *Id.* at 2010.

- Michelle Lang, a neighbor of Mr. Myers' who babysat for his daughter, testified that Mr. Myers stated in May 2005 that "the police w[ould] not find [Ms. Behrman's] killer because there's no evidence" and that the police should "look into the low-lifes that live on Delap Road." *Id.* at 2304.

The foregoing evidence clearly established that Mr. Myers discussed Ms. Behrman's disappearance with several people over the five-year period between her disappearance and his arrest. Not only did he theorize about where or how the crime was committed and where her remains would be found, but he lied to increase his perceived knowledge about the case. Perhaps most notably, he was correct that her remains were found in the woods. These comments certainly cast suspicion on Mr. Myers, even though they are far from even an implicit acknowledgment of involvement in Ms. Behrman's murder. They undoubtedly raised the question as to why Mr. Myers appeared so interested in the case and whether his comments that she would be found in the woods were based on actual knowledge.

The probative value of these comments, however, must be evaluated in context. They are the comments of an individual who lived very close to where Ms. Behrman's bicycle was found and was interviewed by law enforcement within a month of her disappearance—that is, an individual who has likely spent significant time thinking about Ms. Behrman's disappearance.

His comments must also be considered in light of the fact that nearly everyone in the area was constantly talking about Ms. Behrman's disappearance at the time. Multiple witnesses testified to this effect. *See, e.g.*, *id.* at 1522 (Detective Crussen testifying that in the early stages of the investigation, "in Monroe County during this period of time you couldn't go to the grocery store without talking about Jill Behrman. You couldn't pick up your laundry without talking about

Jill Behrman"); *id.* at 1925-26 (Richard Sweeney testifying that he had heard people other than Mr. Myers discuss Ms. Behrman's case on "several" occasions); *id.* at 1966 (Bill Mueller, Mr. Myers's employer in 2001, testifying that around this time others discussed Ms. Behrman's case "quite often").

Indeed, when Ms. Owings testified regarding her confession and subsequent recantation, she acknowledged that she had told an individual she "partied with" that she killed Ms. Behrman and told a group of friends that Ms. Behrman was "turtle bait." *Id.* at 2103-04. She downplayed these comments implicating herself and others that were much more suspicious than those made by Mr. Myers by testifying that Ms. Behrman was constantly discussed by nearly everyone in the area. *See id.* at 2105-06 (Ms. Owings testifying, "I have several different kinds of groups of friends, and [Ms. Behrman] was a subject of conversation in all of them. . . . Some people were saying that it was an accident. Some people were saying they thought it was a serial killer. Some people were saying that they thought that it was me and [Alisha Sowders and Uriah Clouse]."); *id.* at 2106 (Ms. Owings testifying that people discussing Ms. Behrman regularly speculated about how she died and where she would be found).

Thus, like much of the evidence of Mr. Myers's guilt, the weight given to these comments significantly depends on the jury's credibility assessment and the assessment of the other evidence against Mr. Myers. This is especially true given that the jury discounted Ms. Owings's much more inculpatory comments presumably because the jury believed other evidence did not support her guilt. Thus, depending on the jury's evaluation of the other evidence and Mr. Myers's defense, his comments were either those of an individual who knew something about Ms. Behrman's disappearance and was potentially involved, or they were the strange and embellished comments

of one who, like much of the community, was interested in the case and what happened to Ms. Behrman.

### vi.    <u>Totality of Evidence Supporting Verdict</u>

The foregoing summary of the evidence supporting the jury's verdict shows it was far from overwhelming. Other than Mr. Roell's testimony, there was no direct evidence linking Mr. Myers to the crime; there were no witnesses that ever saw Mr. Myers with Ms. Behrman; there was no physical evidence linking Mr. Myers to the crime; and, had the rape evidence been properly excluded, there was no evidence that Mr. Myers had any motive to kill Ms. Behrman.

The affirmative evidence supporting Mr. Myers's guilt consisted primarily of consciousness of guilt evidence from two family members, the testimony of a former girlfriend that Mr. Myers had taken to the wooded location Ms. Behrman was ultimately found, and the testimony of a former cellmate that Mr. Myers essentially acknowledged guilt. The testimony of Mr. Myers's grandmother and aunt undoubtedly had a strong impact on the jury, although neither testified that Mr. Myers ever acknowledged involvement. The testimony of Ms. Goodman and Mr. Roell was likely even more damaging for Mr. Myers, but only if credited by the jury; both witnesses' testimony, unlike Mr. Myers's relatives' testimony, directly connected Mr. Myers to Ms. Behrman's murder, but the accuracy of both witnesses' testimony was called into question during cross-examination. Thus, much of the jury's assessment of this evidence depended on a credibility judgment.

Together, this evidence is easily more than sufficient for the jury to find Mr. Myers guilty beyond a reasonable doubt, but it is far from a strong case of guilt. Given this, the prejudice caused by trial counsel's errors more likely impacted the verdict. *See Strickland*, 466 U.S. at 696 ("[A]

verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

### b.   The Prejudice Caused by Trial Counsel's Errors

Having discussed the strength of the evidence supporting the verdict, the Court turns to how trial counsel's deficient performance prejudiced Mr. Myers's defense. The Court will first discuss each of the three instances of deficient performance and the prejudice flowing therefrom. The Court will then assess the cumulative prejudice of these errors.[27]

### i.   Trial Counsel's False Statements During Opening

As detailed above, trial counsel made two critical false statements to the jury during opening regarding the Hollars theory—namely, that a bloodhound tracked Ms. Behrman's scent to Mr. Hollars's residence but was pulled away by law enforcement and that Mr. Hollars and Ms. Behrman were seen arguing a day or two before she disappeared. No evidence was admitted supporting either of these assertions. As to the former, Patrick Baker admitted to the Indiana Supreme Court that he should have known that no evidence supported this assertion. *See In re Baker*, 955 N.E.2d at 729.

These false statements prejudiced Mr. Myers in two ways. First, they eliminated whatever remaining possibility that the Hollars theory created reasonable doubt. Second, and more prejudicial, they destroyed trial counsel's credibility with the jury as a general matter. Trial counsel's false statements left the jury with the impression that Mr. Myers's best defense involved

---

[27] As discussed above, the Indiana Court of Appeals did not assess cumulative prejudice as *Strickland* requires. This leaves the Court to analyze cumulative prejudice in the first instance. The Court notes, however, that for two of the identified errors—trial counsel's errors regarding the false statements and the rape evidence—the Indiana Court of Appeals determined that Mr. Myers was not sufficiently prejudiced by the individual error such that relief was warranted. Thus, even though this Court's cumulative prejudice analysis is necessarily different than the individual prejudice analysis conducted by the Indiana Court of Appeals, the Court will, when appropriate, discuss in several footnotes below how the Indiana Court of Appeals assessed the prejudice from the individual errors.

trial counsel concocting a sensational theory of an unwanted pregnancy leading to murder and a police cover-up.

To evaluate these two types of prejudice, it is important to examine how the Hollars theory was otherwise supported during trial. As explained below, trial counsel presented scant evidence supporting the Hollars theory, and the State presented compelling evidence undermining it. This would leave the jury with the unmistakable impression that the two false statements by trial counsel during opening were not mere oversights of peripheral matters regarding an otherwise strong theory. Instead, the false statements would more likely be perceived as deliberate fabrications meant to focus the jury's attention on a theory of the crime that, in truth, was supported by very little compelling evidence. The jury would ultimately be left to believe that a false sensational story was part of Mr. Myers's best defense.

As an initial matter, Mr. Hollars had a solid alibi. Both he and Ms. Behrman's supervisor at the SRSC, Wes Burton, testified that Mr. Hollars was working at the SRSC during the timeframe in which Ms. Behrman disappeared. Trial Tr. 1044-50. Trial counsel did not meaningfully undermine this evidence during cross-examination. At most, it was acknowledged that Mr. Hollars's whereabouts could not be confirmed minute-by-minute.

Moreover, law enforcement witnesses, who investigated Ms. Behrman's murder both before and after her remains were found, testified without meaningful opposition that Mr. Hollars was categorically excluded as a suspect. Detective Arvin explained that he interviewed Mr. Hollars and five or six other individuals regarding Mr. Hollars and concluded he had "no involvement." *See* Trial Tr. 2204-06. He further explained that Mr. Hollars became a "person of interest due to a psychic from Michigan that had labeled him," and that he followed up with the psychic and determined she was not credible. *Id.* at 2203-04; *see also id.* at 942 (Marilyn Behrman

testifying that Mr. Hollars's possible involvement was first raised by "a psychic"); *id.* at 2241 (Detective Arvin testifying, in response to a juror's question regarding why Mr. Hollars became a person of interest, that "a psychic from Michigan . . . stated that she was a specialist in remote viewing and [Ms. Behrman] had shown her that . . . possibly [Mr. Hollars] was involved."); *id.* at 2493 (Detective Lang testifying, in response to a juror's question of whether Mr. Hollars was ever implicated, that his understanding is that Mr. Hollars's "implication comes from a conversation that Eric Behrman had with a psychic early-on in the investigation."). Agent Dunn, who was Mr. Myers's witness, testified that Mr. Hollars was "absolutely" excluded as a suspect and that the "sole connecti[on]" between Mr. Hollars and Ms. Behrman was that they worked together. *Id.* at 2584, 2599-61. The State highlighted this during closing, noting that it showed how thorough law enforcement's investigation had been. *See id.* at 2817 (noting that Mr. Hollars "was a suspect because of a psychic"); *id.* at 2823 (arguing that Detectives Dunn and Arvin investigated Mr. Hollars "and eliminated him," and noting that it was even surprising that they looked at him at all "based on the word of a psychic," but this "shows you the detail" with which law enforcement investigated).

Against this, trial counsel provided little evidence connecting Mr. Hollars to Ms. Behrman, let alone implicating him in her murder.[28] Indeed, the evidence meant to cast suspicion on Mr. Hollars was the following:

- Mr. Hollars interviewed Ms. Behrman when she applied to work at the SRSC, *id.* at 1100;

---

[28] When setting forth the evidence implicating Mr. Hollars, the Indiana Court of Appeals stated, "[i]mportantly, the jury was presented with evidence that a bloodhound tracked Behrman's scent near Hollars' residence." *Myers II*, 33 N.E.3d at 1093. First, this evidence would have been excluded from trial but for trial counsel's deficient performance. Second, even if it was not excluded, this fact did little, if anything, to implicate Mr. Hollars. Not only did Mr. Hollars have a solid alibi that he was at work and no evidence was presented that he was at home, but the bloodhound evidence itself suggested that Ms. Behrman rode several miles past Mr. Hollars's residence and ultimately to the field in which her bike was found. Without more, such evidence hardly implicates Mr. Hollars. Most important, as discussed herein, trial counsel should have objected to the bloodhound evidence and that objection would likely have been sustained.

- Mr. Hollars gave Ms. Behrman his name and telephone number because he heard she was a member of a cycling club, Discycles, and he had a nice road bike he wanted to sell, *id.* at 921; Ms. Behrman told her mother about this and her mother did not see anything "unusual" about it because Mr. Hollars was "just a guy she met at work," *id.* at 924, 942;

- Mr. Hollars called Ms. Behrman's residence multiple times the day after she disappeared, which Ms. Behrman's mother thought was odd, *see id.* at 1529, but Detective Lang testified that Mr. Hollars first called because Ms. Behrman's tennis shoes were left at the SRSC, and after he heard she was missing, he thought this might help provide a reference time for her whereabouts; Marilyn Behrman could not remember the contents of the second call, *id.* at 2453-54, 2483;

- Mr. Hollars owned a twelve-gauge shotgun, which was the type of gun used to kill Ms. Behrman; but despite trial counsel making much of law enforcement's failure to test this gun, the State presented evidence that the shotgun wadding found with Ms. Behrman's remains did not match the wadding used by Mr. Hollars, *id.* at 740-41, 747, 1118, 2815-16; and

- Ms. Behrman missed church because she (incorrectly) thought she was subbing for someone's work shift at the SRSC on a Sunday morning in mid-May, so instead of returning to church, Ms. Behrman exercised but at a different recreational center than normal, which her mother testified was "unusual," *id.* at 913-18.[29]

Trial counsel also repeatedly suggested and attempted to prove that Ms. Behrman was pregnant, arguing this could have been Mr. Hollars's motive for murdering her. Evidence was presented that condoms, a pregnancy test, emergency contraceptive medication, and several books regarding pregnancy were found in Ms. Behrman's bedroom. *See, e.g.*, *id.* at 925-31. But there was also significant evidence presented that Ms. Behrman was not pregnant, including testimony from Marilyn Behrman (that her daughter would have told her had she been pregnant and that she

---

[29] The Indiana Court of Appeals cited to this evidence, reasoning that "although trial counsel failed to deliver on these specific promises, other evidence casting suspicion on Hollars was presented to the jury." *Myers II*, 33 N.E.3d at 1093. But, as noted, the "other evidence" potentially implicating Mr. Hollars was at best weak. Given this, it is unclear to the Court how this makes trial counsel's false promises that he would present much more damaging evidence regarding Mr. Hollars *less* prejudicial. The opposite is more likely. Presented with very little evidence that Mr. Hollars was involved, trial counsel's false statements regarding the two most potentially damaging pieces of evidence makes the already weak case against Mr. Hollars have the appearance of being a deliberate fabrication to bolster an unsupportable theory with dramatic claims.

did not see any signs of morning sickness) and Detective Lang (that his investigation uncovered no evidence that she was pregnant). *See, e.g.*, *id.* at 926-27, 952-54, 2484.

More important, even if the jury believed Ms. Behrman was pregnant, there was no specific evidence presented that Mr. Hollars and Ms. Behrman had any sort of relationship, let alone a sexual relationship to cause a pregnancy and thus a motive for murder. The closest such evidence was the testimony of Becky Shoemake, who was Ms. Behrman's cousin and roommate at Indiana University. She testified that an older man "wanted to go out to lunch or something, and [Ms. Behrman] was concerned because he was over 21, and she wasn't old enough to drink, so she wasn't sure, you know, do I go . . . ." *Id.* at 1013. Ms. Shoemake made clear that she had no idea who this person was or anything other information about him. *See id.* at 1013-14.

Against this evidence—evidence that at most invites the jury to engage in complete speculation that the older man was Mr. Hollars[30]—several witnesses consistently testified that there was no evidence substantiating a relationship between Mr. Hollars and Ms. Behrman. Mr. Hollars denied it. *See id.* at 1100-01. But more persuasive are the litany of other witnesses who testified that there was no such relationship. *See, e.g.*, *id.* at 942 (Marilyn Behrman testifying that Mr. Hollars was "just a guy she met at work"); *id.* at 1055 (Mr. Burton denying knowledge of any relationship); *id.* at 2456 (Detective Lang testifying "that there was . . . no basis . . . of any kind of rumor that [Mr. Hollars] and Jill were ever romantically linked"); *id.* at 2601 (Agent Dunn testifying that the "sole connecti[on]" between Mr. Hollars and Ms. Behrman was that they worked together).

---

[30] Mr. Myers aptly explains why this theory is simply implausible: "Behrman's mother testified that Jill had only met Hollars in mid-May, one or two weeks before her disappearance. Trial Tr. 945, 921-24. That is, even if Behrman (who had recently expressed doubts about the propriety of having *lunch* with someone over 21 years old because she wasn't old enough to drink (Trial Tr. 1014)) had decided to have unprotected sex with Hollars the day she met him . . . , it is unlikely she would have been *aware* of any resulting pregnancy before she was abducted, let alone been able to share this information with Hollars." Filing No. 33 at 36-37 (citation format altered).

Perhaps no incident at trial highlighted both how poorly the Hollars theory came off and how blatantly false trial counsel's promises were than trial counsel's lone attempt to present any evidence supporting his second false statement—that Ms. Behrman and Mr. Hollars were seen arguing a day or two before she disappeared. During Detective Lang's testimony, Patrick Baker directed him to a case report Detective Lang had written to refresh his memory about what Ms. Behrman's father told him. *See* Trial Tr. 2454. The report stated: "Mr. Behrman recalled that on May 30th, 2000, BRIAN had a softball game at the Cascades in Bloomington. BRIAN and his girlfriend were present at the game. Mr. BEHRMAN recalled JILL was also present at the game and seeing her and BRIAN talk. He learned that they actually made plans to have lunch together before JILL went to camp." D. Trial Ex. B at 5. After Detective Lang reviewed this paragraph, trial counsel asked the following questions:

Q. Does that refresh your recollection?

A. I'm still looking for Hollars in the first paragraph.

Q. First complete paragraph on that page, sir. He talked about Brian Hollars being at the softball game.

A. In the middle of the page?

MR. SONNEGA: Judge, objection. That's not Brian. .

THE COURT: He's just trying to get him focused on what he's asking about. You want to point to it or tell him?

A. I . . . found it.

. . . .

Q. Mr. Behrman told you that Jill had been talking to Brian at the softball game. Is that correct?

A. That's her brother.

Q. She'd been talking to Brian. Correct?

119

A.      Brian, her brother.

Q.      And they actually made plans to go have lunch.  Is that correct?

        MR. SONNEGA:        Judge, I'm going to object.

A.      It's her brother.

Trial Tr. 2454-55.  In short, trial counsel believed (or at least tried to deceive the jury into believing) that Mr. Hollars had been with Ms. Behrman at a softball game and made plans to have lunch together shortly before she disappeared (presumably, attempting to prove that Mr. Hollars and Ms. Behrman were together the evening before she disappeared and/or that Mr. Hollars was the older man Ms. Shoemake testified asked Ms. Behrman on a date).  But the "Brian" in the report was not Brian Hollars; it was Ms. Behrman's brother, Brian Behrman.

This incident is a microcosm of how poorly the Hollars theory went during trial.  Not only did trial counsel have little to no evidence supporting the Hollars theory, but this incident undoubtedly created the same impression trial counsel's false statements did—that trial counsel was trying to mislead them.  After all, the jury had by this time already heard Ms. Behrman's mother testify that their family went to watch Jill's brother Brian's softball game the evening before Jill disappeared.  *See id.* at 901.

Finally, the parties' closing arguments highlighted how damaging trial counsel's false statements were.  Patrick Baker returned to the Hollars theory in closing.  At that point he knew that he had failed to present evidence supporting his two false promises during opening argument, but he did not address this failure head on.  Instead, he attempted to press forward with the Hollars theory, albeit in a significantly watered-down fashion.  The below portion of Patrick Baker's closing argument, especially the emphasized portions, show how tenuous the Hollars theory had become by the end of trial, even in trial counsel's own telling of it:

Motive, there is actual motive here. Not motive by John Myers. There's evidence that the victim may have been involved with an older man. There's your evidence right there. . . . There is evidence that the victim was concerned about being pregnant. Brian Hollars, an older man who . . . worked with her[] is considered a suspect. Ladies and Gentlemen, these books [found in Ms. Behrman's bedroom] are not for sexuality class, okay. Let's talk about the new medicine books, "Pills That Don't Work Over-the-Counter" ones, "Pregnant Too Soon", "Poor Baby, Poor Body", a pregnancy kit from IU. This is the physical evidence as to motive. The police dropped Brian Hollars as a suspect without following all of the very important evidence. *He interacted with Jill Behrman.* Yes he gave her his number regarding a bicycle and maybe he says, I want to sell a bicycle, but he calls three or four times the next day after her disappearance. Is that about a bicycle? The bloodhound, Samantha, followed his scent, *which was near the house of Mr. Hollars, but the trail was stopped. She was taken to the other side of 37, which by the way is pretty hard to get across on a bicycle.* Mr. Hollars was an enthusiastic hunter owning a twelve-gauge shotgun matching the description of the gun that the doctors said that was used. Matching the description of the same gun the doctors said was used. They questioned Mr. Hollars but they did not examine his shotgun. Why? Why didn't the police take that extra step to look at his shotgun? Twelve gauge. Mr. Hollars had a twelve gauge. That's why this is important. That's why these books are important, ladies and gentlemen. This lady should not have lost her life but ladies and gentlemen it's called motive. It's called the motive of Brian Hollars *or someone else. (Inaudible) associated with Brian Hollars or maybe it was another man completely. An unwanted pregnancy who it had motivated someone to commit this crime. There it is.*

Trial Tr. 2791-92 (emphases added).[31]  Trial counsel had produced so little evidence supporting

the Hollars theory—and no evidence supporting his two most important promises during opening

---

[31] Patrick Baker's description of the bloodhound evidence during closing—that the bloodhound tracked near Mr. Hollars' "but the trail was stopped"—appears to be an attempt to continue pressing the false narrative he began during opening that law enforcement somehow directed the bloodhound away from Mr. Hollars's residence. At best, this is a misleading gloss on the evidence, if not simply false. Deputy Douthett testified about the need to use drop trails—where a bloodhound is driven along the direction it is scenting and then periodically dropped off to see if it can pick up the scent—so the bloodhound does not become too tired. *See* Trial Tr. 975-96, 983. After the bloodhound scented near the field where Ms. Behrman's bicycle was found, drop trails were used to allow the bloodhound to scent south along Maple Grove Road. *Id.* at 974-75. Deputy Douthett requested that law enforcement driving the vehicle "stop prior to any major roadway." *Id.* at 978. Thus the bloodhound was loaded into the vehicle significantly north of Mr. Hollars's residence near Maple Grove Road and dropped off shortly before Highway 37, where it picked up the scent and continued tracking south and east along the proposed northern route. *Id.* at 974-85. The drop trail near Highway 37 was *past* Mr. Hollars's residence when heading south, and the bloodhound continued tracking south. *See* Trial Ex. 74. Nothing about this testimony suggests that the bloodhound scented "near" Mr. Hollars's residence but was then "stopped," as Patrick Baker argued. If anything, it showed that the drop trail began long before Mr. Hollars's residence and the bloodhound was not dropped off until immediately after Mr. Hollars's residence. It is true that this prevented the bloodhound from having the opportunity to divert toward Mr. Hollars's residence. But this is not what Patrick Baker argued. The bloodhound did not, as he stated, track near Mr. Hollars's residence but was then stopped. Notably, during Deputy Douthett's testimony Patrick Baker did not attempt to elicit any testimony regarding Mr. Hollars's

related to that theory—that he nearly abandons it in closing, vaguely suggesting that it could have been another man altogether who murdered Ms. Behrman because she was (perhaps) pregnant.

During closing, the State capitalized on trial counsel's false statement regarding Detective Arvin leading a bloodhound to Mr. Hollars's residence. Specifically, the State noted that the bloodhound Samantha "never tracked at Brian Hollars' front door as you heard the Defense [claim during] opening." *Id.* at 2817. The State then juxtaposed trial counsel's failure to follow through with their promises to the State's truthfulness during opening argument:

> In the State's opening the State showed you everything we were going to show you and then think we delivered that and more. We didn't tell you about the dog. We played poker too but we showed you everything and we told you and we proved everything (inaudible). In the Defense's opening the dog (inaudible) Tom Arvin's dog (inaudible) right up to the front door. I don't know if it's in evidence whether it's a toy poodle or not but he certainly doesn't have a police dog.

*Id.* at 2822-23.

In sum, the evidence presented at trial regarding the Hollars theory revealed that Mr. Hollars had a strong alibi; there was no evidence that Mr. Hollars was romantically involved with Ms. Behrman; law enforcement absolutely excluded him as a suspect, including Mr. Myers's own witness; despite trial counsel's protestations that law enforcement refused to check Mr. Hollars's shotgun, Mr. Hollars used shotgun wadding different than that found at the crime scene; and Mr. Hollars was only even considered a suspect due to a psychic from Michigan. The only evidence connecting Mr. Hollars to Ms. Behrman is that they worked together, Mr. Hollars gave Ms. Behrman his phone number because he was trying to sell a bicycle (perhaps to someone in Ms. Behrman's cycling club), and he called her house multiple times the day she disappeared after she did not show up for work.

---

residence, nor did he ever suggest that the drop trail locations were selected for any reason but that testified to by Deputy Douthett—namely, to stop before any major intersection.

Against this backdrop, trial counsel's two false statements during opening were prejudicial. Had they been true, they would have been by far the strongest evidence supporting the Hollars theory showing (1) Ms. Behrman was at Mr. Hollars's residence the morning she disappeared, (2) law enforcement covered it up, and (3) the possibility of a relationship between Mr. Hollars and Ms. Behrman shortly before her disappearance.

Simply put, trial counsel promised to produce specific, dramatic evidence to implicate Mr. Hollars, but, without explanation, failed to follow through. This caused significant prejudice. *See Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening. . . . The promise was dramatic, and the indicated testimony strikingly significant."); *United States v. Crawford*, 680 F. Supp. 2d 1177, 1194-95 (E.D. Cal. 2009) ("Failure to produce a witness promised in opening statement may constitute ineffective assistance of counsel, if the promise was sufficiently specific and dramatic and the evidence omitted would have been significant."). When, as here, counsel's unfulfilled promises relate directly to a critical aspect of the defense, it is even more prejudicial. *See Saesee v. McDonald*, 725 F.3d 1045, 1049-50 (9th Cir. 2013) (noting that prejudice exists "particularly [in] cases where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained"). Whatever viability the Hollars theory had—which, to be sure, was not much—trial counsel's false statements undoubtedly led the jury to reject it.

More importantly, trial counsel's false statements undermined Mr. Myers's defense in a second, more fundamental way: They destroyed trial counsel's credibility with the jury. It is true that the evidence supporting the Hollars theory was so weak that even without considering trial counsel's false statements, the jury likely would have rejected it. But given how weak the Hollars theory was, trial counsel's false statements likely created the impression that Mr. Myers's best

defense involved trial counsel concocting a sensational theory that was utterly unsupported by the evidence such that trial counsel needed to falsely promise that strong evidence would be presented to support it.

Counsel's credibility with the jury is of immense importance during a trial. Even small misstatements about what the evidence will show could damage counsel's credibility and thereby prejudice the jury against the defendant. But as detailed above, trial counsel's false statements here were not peripheral. Trial counsel promised a sensational story of a young woman in a relationship with an older coworker who then murders her because she becomes pregnant. The most direct way trial counsel promised to show this was also rather sensational: law enforcement used a bloodhound to track to Mr. Hollars residence but pulled the dog away, implying that law enforcement were covering for the true murderer.[32] Trial counsel also promised evidence of a fraying relationship shortly before Ms. Behrman was murdered: Mr. Hollars and Ms. Behrman were seen arguing shortly before she disappeared.

As the jury found out during trial, however, neither of these critical promises was true. Since trial counsel was untruthful regarding two key pieces of evidence that were supposed to support his defense theory, the jury was left with the unmistakable impression that Mr. Myers's

---

[32] In its prejudice analysis of trial counsel's false statements during opening, the Indiana Court of Appeals stated that the jurors' questions showed they were interested in the Hollars theory generally—including questions regarding Mr. Hollars's alibi and whether he was romantically involved Ms. Behrman—but they did not ask the "canine handler," Deputy Douthett, regarding trial counsel's claim that a bloodhound had alerted at Mr. Hollars's residence. *Myers II*, 33 N.E.3d at 1093-94. This, reasoned the Indiana Court of Appeals, shows that the jury was not focused on trial counsel's misstatements and thus the false statements were not prejudicial.

This analysis ignores the fact that the State asked Deputy Douthett on direct whether the bloodhound tracked to "any houses," to which he responded, "[n]o." Trial Tr. 986. It is thus entirely unsurprising that the jurors did not repeat this question. They were already categorically told that the bloodhound did not track to any houses. Moreover, jurors *did* ask questions regarding the bloodhound tracking to Mr. Hollars's residence to other witness, thus showing that they remembered trial counsel's false promises during opening and were searching for supporting evidence. For example, a juror asked Mr. Hollars if he was "ever questioned about a bloodhound coming up to your door?" Trial Tr. 1162. Mr. Hollars responded that "the first time [he] ever heard that was in the paper, and so I don't know anything about a bloodhound coming to my door, no." *Id.* Jurors also asked Mr. Hollars and Mr. Burton whether Ms. Behrman had been to Mr. Hollars's house, both of whom responded in the negative. *See id.* at 1057, 1159.

best defense involved misleading the jury and attempting to distract them with sensational claims. Any reasonable jury would conclude not merely that the Hollars theory was meritless, but that any defendant whose best defense includes a sensational theory predicated on lies has no viable defense at all. This would lead the jury to discount trial counsel's other defense theories, not to mention trial counsel's credibility regarding anything else disputed during trial.

Federal courts have recognized the negative effects caused when defense counsel is untruthful with the jury: the jury imputes defense counsel's lack of credibility to the defendant himself, which can cause substantial prejudice. The Seventh Circuit explained this in *Hampton*: "Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and *may also question the attorney's credibility*." 347 F.3d at 260 (emphasis added).[33] Similarly, the Ninth Circuit aptly described how damaging counsel's promise that a witness will testify can be when it goes unfulfilled. *Saesee*, 725 F.3d at 1049-50. This dynamic plays out in a similar manner when, as here, critically important promised evidence goes unpresented:

> A juror's impression is fragile. It is shaped by his confidence in counsel's integrity. . . . Having waited vigilantly for the promised testimony, counting on it to verify the defense theory, the juror may resolve his confusion through negative inferences. In addition to doubting the defense theory, the juror may also doubt the credibility of counsel. By failing to present promised testimony, counsel has broken a pact between counsel and jury, in which the juror promises to keep an open mind

---

[33] The Indiana Court of Appeals concluded that Mr. Myers was not prejudiced, in part, because *Hampton* is distinguishable in that the false promise made by the defendant's counsel in *Hampton* was that the defendant himself would testify, but never did. The Indiana Court of Appeals is correct that *Hampton* is distinguishable on that basis. *See Barrow v. Uchtman*, 398 F.3d 597, 606-07 (7th Cir. 2005) (distinguishing *Hampton* on multiple bases, one of which that in *Hampton* the Seventh Circuit "placed special importance on the fact that trial counsel had specifically promised the jury that the defendant would testify *himself*"). But that is not the end of the analysis. Merely because this case does not fall directly within *Hampton*'s specific holding, does not mean either that different false promises during opening cannot be prejudicial nor that *Hampton*'s reasoning is not persuasive in a different, albeit related, context. Indeed, the Seventh Circuit and others have recognized that the failure to follow through on promises about what evidence will be presented can amount to ineffective assistance of counsel even when the promised evidence is not the defendant's own testimony. *See English*, 602 F.3d at 728; *Harris*, 894 F.2d at 879.

in return for the counsel's submission of proof. When counsel breaks that pact, he breaks also the jury's trust in the client. Thus, in some cases—particularly cases where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained—a counsel's broken promise to produce the witness may result in prejudice to the defendant.

*Id.* (citing *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1167 (E.D. Cal. 2012)); *see English*, 602 F.3d at 729 ("The jury in this case must have wondered what happened to [the witness] after she was promised [during opening] as a corroborating witness for [the defendant's] story, and the jury may well have counted this unfulfilled promise against [the defendant] and his attorney."); *McAleese*, 1 F.3d at 166 ("The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel.").

The Court will consider below how the two types of prejudice flowing from trial counsel's false statements, along with the prejudice from trial counsel's other errors, impacted the jury's verdict.

### ii. <u>Improper Rape Evidence</u>

The Court turns next to the prejudice flowing from trial counsel's failure to object to the improper evidence that Ms. Behrman was raped before she was murdered. To assess the impact this evidence had at trial, the Court will first set forth the improper rape evidence that was presented and how the State used it during closing argument.

As detailed above, Dr. Radentz, a forensic pathologist called by the State, testified regarding the "dumping" of a body:

[A] homicide in which the individual is taken to a remote spot and dumped. Sometimes they are killed at the spot or killed elsewhere. The classic scenario is that of a rape homicide in which you have the remains of a young female, and the clothes, if they're present, are in disarray, and in this case though there is very little, if no, clothing found at the scene. So this is a fairly classic for a rape homicide and then subsequent dumping of the body.

Trial Tr. 1423.  This testimony undoubtedly prompted a juror to ask Dr. Radentz, "Do you believe the body was raped before being shot," to which Dr. Radentz replied, "yes."  *Id.* at 1454.

During follow-up questioning, trial counsel attempted to undermine this testimony instead of simply objecting to it.  On one hand, trial counsel brought out testimony that there was no physical evidence proving that Ms. Behrman was raped.  But on the other, the exchanges—which, again, would not have been necessary had counsel simply objected to the testimony—belabored Dr. Radentz's testimony regarding rape and, worse still, allowed Dr. Radentz to further explain why he strongly believed Ms. Behrman was raped.

Trial counsel asked and Dr. Radentz answered as follows:

Q.      . . . [Y]ou don't have any evidence that she was raped, do you?

A.      No. That's based on my training and experience.

Q.      It's based on speculation, isn't it?

A.      No. As an expert witness, it's based on my training and experience.

Q.      Yeah, but you're looking at that from a way that a scientist looks at statistics.  You don't have any evidence that . . . here because you don't have any soft tissues.  Isn't that correct?

A.      In terms of physical evidence.

Q.      . . . Right.

A.      No.

*Id.* at 1458.  Trial counsel ended his questioning, and the State immediately followed-up on this subject:

Q.      . . . Based on your training and experience, what did you observe that led you to that conclusion?

A.      The . . . scene is classic . . . with a dumping or a scene of a homicide, more specifically a rape homicide.  When you find the remains of a female in a

remote area with, again, clothing either in disarray or being absent, as I believe it was in this case, that is considered a rape homicide and dumping until proven otherwise. The other characteristic of this case which is found in the rape homicides is the depersonalization effect of the shotgun wound to the back of the head. It is fairly common for an individual after a rape to occur to depersonalize the individual to make the crime seem less severe to them, so they'll frequently disfigure the face with multiple blunt force injuries or a massive wound to the head such as a shotgun would which would completely fragment and disrupt the head and face.

*Id.* at 1459-60. Thus, not only was Dr. Radentz permitted to testify that the jury should believe Ms. Behrman was raped unless Mr. Myers "prove[s] otherwise," he was permitted to elaborate on his theory of why this case was a rape-homicide in a manner that, as set forth below, the State utilized during closing argument.

Finally, trial counsel followed-up with further questioning, again attempting to undermine Dr. Radentz's testimony:

Q. And you have no evidence of [rape] in this case other than your own opinion . . . correct?

A. Well, I mean, other than the evidence of the fact that the body was found in a remote scene, the fact that the body was that of a young female, the fact . . . that there were very few if no clothing items present. Other than that, no.

Q. Okay. And . . . you certainly . . . even if your conclusion is correct, you don't know who performed that duty because you don't have any scientific evidence to determine that.

A. That's correct.

*Id.* at 1460-61. Dr. Radentz was so insistent that Ms. Behrman was raped that Hugh Baker essentially ceded the point by pointing out that, even if she was raped, there's no scientific evidence establishing who raped her.

Dr. Radentz's testimony regarding rape featured in the State's closing in three respects. First, the State detailed the factors Dr. Radentz discussed that make this the "classic" rape-

homicide. *Id.* at 2750, 2753. Specifically, the State argued that "Dr. Radentz also talked about a classic rape versus homicide case," and compared the two types of body "dumping." *Id.* at 2750, 2753. The State downplayed the first type where an individual overdoses and friends or acquaintances who panic leave the body somewhere it will easily be found, then turned to this case:

> And compare that that with what Dr. Radentz said was the classic rape homicide. Look at those factors and see how they apply to this case. Yo[u]ng female. That's Jill. Remote area. That's that area up there, isn't it? Remote? Yeah. There's barely a house around, very little traffic, it's way off the beaten path. No clothing found. Dr. Nawrocki searched. Detective Lang had the recruit school out. No clothing was found. And then depersonalization. Can you think of anything more . . . dehumanizing or more impersonal than putting somebody down, stripped naked, shooting them in the back of the head?

*Id.* at 2753. [34]

Second, the State returned to Dr. Radentz's testimony regarding depersonalization of a rape victim to argue that Mr. Roell's testimony was credible. In the midst of discussing Mr. Roell's testimony, the State noted that Mr. Roell, given that he was facing criminal charges, had a reason to lie, but his testimony should be believed because he "said things that were corroborated." *Id.* at 2764. First, Mr. Myers "talked three or four times about the bike. Remember the Defendant's pacing, he's nervous, the Defendant was worried about the bike." *Id.* Second, the State explained:

> He also said something pretty important and I'm not going to use the language but he used the B word. The Defendant was angry and referred to Jill using the B word. Now remember what Doctor Radentz said about depersonalizing the victims. Stop and think what more way, better way or worse way rather, to depersonalize a human than refer to her as a female dog. It's starting to make sense.

*Id.* [35]

---

[34] The State's slideshow used during closing contained two slides regarding Dr. Radentz's testimony, one of which highlighted Dr. Radentz's testimony regarding rape. Specifically, it noted that Dr. Radentz, "Explained 'Body Dump vs Rape/Homicide'" and highlighted that this was a "Classic Rape/Homicide case" because it involved a "Young female," "Remote Area," "No clothing found," and "'Depersonalization of the Victim.'" *Id.*

[35] The State folded back to Dr. Radentz's depersonalization theory later during closing: "[R]ecall what Doctor Radentz said about depersonalizing the victim. At a time when everybody is hoping that Jill comes home safe . . . here's what

Third, the State turned to the evidence of rape to show that Mr. Myers was the perpetrator of the crime, as rape was his motive:

> You know the motive in this crime is clear. It's (inaudible) when Doctor Radentz told you that this was a classic rape murder. Rape is a crime of control. Rape is not a sex crime. It is pure and simple control over another human being and dominating them. The Defendant did not have control over [Ms. Goodman]. He was a balloon of hot air about ready to burst, April 28th, 2000. She broke up with him May 5th, that first week he didn't have to (inaudible). He is still obsessing about her when she went on her high school trip to Kentucky Kingdom. He wanted control over her pure and simple and unfortunately Jill happened to be between Carly's house and Lost Man's Lane near the Defendant's trailer at the wrong place at the wrong time.

*Id.* at 2816-17.

The foregoing shows that trial counsel's failure to object to Dr. Radentz's testimony regarding rape caused three distinct types of prejudice. First is the general prejudice flowing from society's desire to ensure that those who commit sex crimes are held accountable. Second, the State used the rape evidence to bolster Mr. Roell's credibility—a witness whose credibility was otherwise questionable but was important to the State's case. Third, and perhaps most prejudicial, the rape evidence allowed the State to create motive for Mr. Myers to murder a complete stranger when there otherwise was none.

The Supreme Court has discussed the first two types of prejudice in an analogous, albeit different, context. In *House*, the Supreme Court held that the petitioner had demonstrated his actual innocence—a difficult standard requiring a showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"—such that his procedural default of certain claims could be overlooked. 547 U.S. at 537. The Supreme Court discussed several factors that led to this conclusion. One such factor was that, in direct contradiction of evidence presented at trial, DNA evidence showed that semen on the victim's

---

[Mr. Myers] calls this, a piece of human excrement, waste, it's depersonalizing and when you see what Doctor Radentz said you start adding the pieces up." *Id.* at 2772.

nightgown came from her husband, not the petitioner. The State argued that this evidence was immaterial because "neither sexual contact nor motive were elements of the offense" of murder. *Id.* at 540. But, by way of reasoning directly applicable to this case, the Supreme Court held that the new evidence was of "central importance." *Id.*

First, the Supreme Court noted as a general matter that "[l]aw and society, as they ought to do, demand accountability when a sexual offense has been committed." *Id.* at 541. Thus, the fact that a sexual offense occurred, even though the petitioner was not charged with one, "likely was a factor in persuading the jury not to let him go free." *Id.* Much the same can be said for Mr. Myers. Although Mr. Myers was not charged with rape, the fact that the jury believed Ms. Behrman was raped before she was murdered was likely a factor in their decision to find him guilty. *Cf. Daniel v. Commissioner*, 822 F.3d 1248, 1277 (11th Cir. 2016) ("Rape is, of course, highly inflammatory, so unrebutted evidence that [the defendant] tried to rape someone is highly prejudicial.").

Second, the Supreme Court rejected the State's argument in *House* that the new evidence was irrelevant by noting how important evidence of motive is in criminal cases, especially cases like the instant case where the primary issue at trial is the identity of the perpetrator. The Supreme Court observed that the trial in *House* "[f]rom beginning to end . . . [was] about who committed the crime," and "[w]hen identity is in question, motive is key." *House*, 547 U.S. at 540; *see also Ford v. Wilson*, 747 F.3d 944, 952 (7th Cir. 2014) ("[W]hile motive was not an element of the offense, it was certainly relevant."); *Turner v. State*, 953 N.E.2d 1039, 1057 (Ind. 2011) ("Evidence of a defendant's motive is always relevant in the proof of a crime."). The Supreme Court highlighted that the importance of motive "was not lost on the prosecution, for it introduced the evidence and relied on it in the final guilt-phase closing argument," *House*, 547 U.S. at 540, just as the State did during closing here.

In both this case and *House*, the jury was told rape was the motive, but the evidence supporting that should not have been presented. The Supreme Court explained how this can impact the jury:

> A jury informed that fluids on [the victim's] garments could have come from House might have found that House trekked the nearly two miles to the victim's home and lured her away in order to commit a sexual offense. By contrast a jury acting without the assumption that the semen could have come from House would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative.

*Id.* at 541. Moreover, the Supreme Court noted how evidence of sexual assault as motive can color the jury's perception of other evidence: without the evidence of sexual assault as motive, "House's odd evening walk and his false statements to authorities, while still potentially incriminating, might appear less suspicious." *Id.*

In sum, the rape evidence prejudiced Mr. Myers in the three foregoing ways. How this prejudice weighs in cumulation with the prejudice flowing from trial counsel's other errors is considered below. [36]

---

[36] The Indiana Court of Appeals in *Myers II* addressed the improperly admitted rape evidence only on the prejudice prong. *See Myers II*, 33 N.E.3d at 1106-07. It first set forth the reasons the *Myers I* court determined that the admission of the rape evidence, although an error, did not amount to fundamental error such that Mr. Myers was entitled to a new trial. Those reasons were: (1) "the question of rape was peripheral to the murder charge and received relatively minimal attention at trial"; (2) "defense counsel thoroughly cross-examined Dr. Radentz, eliciting his testimony that there was no physical evidence that Behrman had been raped and that the only basis upon which he opined that a rape had occurred was his training and experience with respect to circumstances surrounding the general disposal of human remains"; and (3) because all other evidence that Mr. Myers engaged in inappropriate sexual conduct was excluded, "[t]he references to rape . . . did nothing to implicate Myers as the perpetrator of this charged crime, which was the central issue at trial." *Id.* at 1107 (quoting *Myers I*, 887 N.E.2d at 187) (internal quotation marks omitted). The *Myers II* court recognized that establishing prejudice under *Strickland* requires a lesser showing than that to establish fundamental error, but stated that "[f]or the same reasons this court [in *Myers I*] concluded no fundamental error occurred, we also conclude that Myers has not established prejudice." *Id.* at 1107.

The preceding analysis of the rape evidence undermines all three bases on which the Indiana Court of Appeals discounted its prejudicial effect. First, the rape evidence was only "peripheral" in the sense that only Dr. Radentz, who was one of many witnesses at trial, testified about it. But he was also the only witness who *could have*, given that the rape testimony was based solely on his expertise. More important, it was not at all peripheral in the sense that it was the *only* evidence of motive and was discussed several times by the State during closing, both to argue that Mr. Myers had motive and to bolster Mr. Roell's credibility. Second, Dr. Radentz forcefully and rather persuasively defended his opinion that Ms. Behrman was raped during cross-examination. He even testified that all relevant factors suggesting Ms. Behrman was raped were met such that the jury should conclude as much unless Mr. Myers "prove[s]

### iii.     **Improper Bloodhound Evidence**

The Court turns finally to the bloodhound evidence.[37] The Court concluded above that trial counsel should have objected to Deputy Douthett's testimony regarding his bloodhound search and, had trial counsel done so, that objection likely would have been sustained. To assess the potential prejudice flowing from this error, the Court will set forth the role the bloodhound evidence played during trial and, had it not been introduced, what the remaining evidentiary picture would have led the jury likely to conclude. In the end, the bloodhound evidence was the State's strongest evidence undermining Mr. Myers's alibi, and it also undermined the Owings theory.

Trial counsel's defense of Mr. Myers consisted of offering two different theories of who else may have committed the crime, the Hollars and Owings theories, and offering an alibi for Mr. Myers. *See* Trial Tr. 472-75. The alibi, as previously discussed, was based on phone records showing that Mr. Myers was home several miles northwest of Ms. Behrman's residence during the timeframe when she disappeared. *See* D. Trial Ex. A. Given this, if Ms. Behrman had ridden south from her home on the day she disappeared, Mr. Myers had a solid alibi. Establishing that Ms. Behrman rode south also aligned with the Owings theory—that Ms. Owings, Ms. Sowders, and Mr. Clouse hit Ms. Behrman with a vehicle when she was riding south of her residence, killed her, dumped her bike, and hid her body.

Mr. Myers's alibi was a central part of his defense. Trial counsel noted several times during opening that Ms. Behrman was last seen south of her residence by Ms. Papakhian. *See* Trial Tr. 472-74, 480. He not only argued that if Ms. Behrman rode south, the phone records establish that

---

otherwise." Trial Tr. 1459-60. Finally, the Supreme Court's analysis in *House*—of how evidence of sexual assault and motive are critical for determining who committed a crime—is directly contrary to the Indiana Court of Appeals' conclusion that the rape evidence "did nothing to implicate Myers as the perpetrator of this charged crime." *Myers II*, 33 N.E.3d at 1107.

[37] The Indiana Court of Appeals did not address prejudice as to Mr. Myers's claim regarding the bloodhound evidence, as it decided this claim only on the deficient performance prong. *See Myers II*, 33 N.E.3d at 1099-1100.

it was "absolutely impossible for [Mr. Myers] to be involved," *id.* at 475, but he pointed out that, after several years of investigations and grand jury proceedings, law enforcement never even obtained or considered Mr. Myers's phone records, *id.* at 475-76. Trial counsel returned to this argument during closing, arguing that Agent Dunn "worked this case for three years" and "believed [the southern] theory because it matches as to where Jill Behrman was last seen, 4700 South [Harrell] Road." *Id.* at 2781-82. This southern route theory, trial counsel continued, was "corroborated by the Wendy Owings statement." *Id.* at 2782.

Indeed, the alibi was likely his best defense, as it was undisputed during trial that Mr. Myers made phone calls from his residence. Thus, trial counsel only had to show some reasonable likelihood Ms. Behrman rode south for Mr. Myers's alibi to create reasonable doubt. This stands in stark contrast to the difficulty of creating reasonable doubt by convincing the jury of the Hollars or Owings theories, both of which had significant problems.

To undermine Mr. Myers's alibi and the Owings theory, the State attempted to prove that Ms. Behrman rode north on the day she disappeared. As described above, the State attempted to prove this by pointing out that the bike was found on the northern route and offering three additional witnesses. By far the most compelling evidence was the bloodhound testimony of Deputy Douthett. His testimony, if credited by the jury, showed that Ms. Behrman rode north to the field where her bicycle was found and stopped there. *Id.* at 988-89. Such evidence almost entirely undermined Mr. Myers's alibi that he was home, given that the field was less than a mile from Mr. Myers's residence.

Had trial counsel moved to exclude this evidence, as he should have sought to do, the remaining evidence that Ms. Behrman rode north rather than south was quite weak. As noted above, Dr. Houze merely demonstrated that Ms. Behrman *could* have ridden north and returned in

time for her work shift, which leaves only Mr. England's testimony that Ms. Behrman actually rode north. Mr. England testified that he saw a bicyclist matching Ms. Behrman's description, but he was uncertain whether he saw this biker on the relevant day or not. Trial Tr. 1019-26. One witness testifying that he saw a cyclist matching Ms. Behrman's description perhaps on the day in question is far from compelling evidence that Ms. Behrman rode north. Notably, the State argued during closing that other than Ms. Papakhian's sighting of Ms. Behrman, "all the other evidence points north," but to support this argument, pointed only to the bloodhound evidence that should have been excluded. *Id.* at 2746.

Critically, the remaining evidence that Ms. Behrman rode north is just as tenuous as the evidence presented showing Ms. Behrman rode south. The jury heard that Ms. Behrman's high school classmate, Ms. Papakhian, originally told law enforcement that she saw Ms. Behrman riding south on May 31, 2000, the day she disappeared.[38] *Id.* at 2203. Agent Dunn confirmed this, testifying that, based on various sources of information, he thought there was a "strong possibility that [Ms. Behrman] was on South Harrell Road" where Ms. Papakhian saw her. *Id.* at 2563; *see also id.* at 1080 (Brian Behrman testifying that he was aware of reports that his sister was last seen south on Harrell Road); *id.* at 2463 (Detective Lang testifying that there were "several" reported sightings of Ms. Behrman, but Agent Dunn focused solely on Ms. Papakhian's sighting of Ms. Behrman south on Harrell Road). This was also consistent with the story Ms. Owings originally told law enforcement (although she testified during trial that it was false)—namely, that while driving on Harrell Road, she hit Ms. Behrman. *Id.* at 2095.

---

[38] The Court did not ultimately decide whether trial counsel's performance was deficient for failing to present additional evidence that Ms. Behrman rode south on the day in question because the three errors identified were together sufficient to establish prejudice. If trial counsel was also deficient for this reason, the additional evidence supporting that Ms. Behrman rode south that trial counsel should have presented would, of course, make it even more likely that the jury would have concluded Ms. Behrman rode south on the day in question. This, in turn, would have made Mr. Myers's alibi defense even stronger.

Detective Arvin, however, testified that he interviewed Ms. Papakhian several years later and disagreed with Agent Dunn's and the FBI's original conclusion that Ms. Papakhian saw Ms. Behrman on the Wednesday morning she went missing. *Id.* at 2227-28. Instead, after interviewing five other individuals who were at the same party as Ms. Papakhian the night before she saw Ms. Behrman, *id.* at 2203, Detective Arvin concluded that it was "more likely" Ms. Papakhian saw Ms. Behrman the day before she disappeared, *id.* at 2228. Detective Arvin also concluded that the timeline for Ms. Papakhian to have seen Ms. Behrman, based on when Ms. Behrman logged off her computer and when Ms. Papakhian almost always left for class, suggested that it was unlikely Ms. Papakhian saw her on the day she disappeared. *See id.* at 2230-32.

Without the bloodhound evidence, the jury would have been left with evidence that an individual who personally knew Ms. Behrman reported to law enforcement that she saw her riding south on the day in question. The FBI's investigation led it to believe there was a "strong possibility" that this report was correct. Trial Tr. 2561-62. But, based on interviews and a recreation of the timing of that sighting conducted several years later, different law enforcement officials concluded the sighting was the day before Ms. Behrman disappeared. *Id.* at 2228. The jury would have had to weigh this evidence that Ms. Behrman rode south—that may have been undermined—against the testimony of Mr. England, an individual who did not know Ms. Behrman but saw a rider matching her description on the northern route either the day she disappeared or the day after. Because Mr. Myers had a solid alibi if Ms. Behrman rode south, the jury would only need to believe there was some likelihood Ms. Behrman rode south to create reasonable doubt that Mr. Myers murdered her. Given this, it would be difficult to overstate how prejudicial the bloodhound evidence was to Mr. Myers's alibi defense.

The bloodhound evidence also damaged trial counsel's Owings theory. During opening, trial counsel offered the Owings theory and Hollars theory as alternative bases on which to find reasonable doubt that Mr. Myers murdered Ms. Behrman. Trial counsel told the jury that Ms. Owings, Ms. Sowders, and Mr. Clouse hit Ms. Behrman with a vehicle when they were driving south of Ms. Behrman's residence, then killed her to cover up their crime, placed her body in Salt Creek, and eventually moved it to where it was ultimately found three years later. Trial Tr. 471-72. This theory, trial counsel argued, was supported by several things, one of which was that Ms. Behrman was last seen by Ms. Papakhian riding on 4700 Harrell Road. *Id.* at 471-73. As discussed above, Ms. Owings confessed (but later recanted) that while driving on Harrell Road, she hit Ms. Behrman. *Id.* at 2095. The bloodhound evidence bolstered the State's position that Ms. Owings's confession was false because it showed Ms. Behrman rode north, not south on Harrell Road.

Much like the Hollars theory, there were significant problems with the Owings theory even without trial counsel's errors. The most glaring were that (1) Ms. Owings told law enforcement Ms. Behrman was stabbed to death, yet once Ms. Behrman's remains were found, the forensic evidence strongly suggested that her cause of death was a shotgun wound, and (2) Ms. Behrman's remains were not found in Salt Creek. *Id.* at 517, 621, 664, 1420. For these reasons, and because all law enforcement agencies believed Ms. Owings's confession was false, the Indiana Court of Appeals determined that trial counsel decided not to "pursue Owings's confession as its primary theory of defense" and thus only pursued it "to some extent." *Myers II*, 33 N.E.3d at 1111.

Despite these difficulties and trial counsel's own reservations about the strength of the theory, trial counsel repeatedly presented the Owings theory to the jury as a basis for reasonable doubt. Yet trial counsel's failure the exclude the bloodhound evidence undermined a key part of Ms. Owings's confession—that she hit Ms. Behrman on Harrell Road, the very road where Ms.

Papakhian saw Ms. Behrman. Thus, to the extent the jury thought the Owings theory could have been true, the bloodhound evidence undermined its foundation—that the incident started by Ms. Owings hitting Ms. Behrman on Harrell Road.

In sum, trial counsel's failure to move to exclude the unreliable bloodhound evidence destroyed Mr. Myers's otherwise strong alibi defense and weakened the already weak Owings theory. The Court will consider this prejudice along with the prejudice flowing from trial counsel's other errors below.

### c.  <u>Cumulative Prejudice Analysis</u>

The Court turns finally to the cumulative prejudice analysis required by *Strickland*. To demonstrate prejudice, Mr. Myers "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This requires a "substantial, not just conceivable" likelihood of a different result. *Richter*, 562 U.S. at 112. But prejudice can be shown "[e]ven if the odds that the defendant would have been acquitted had he received effective representation appear to be less than fifty percent, . . . so long as the chances of acquittal are better than negligible." *Harris*, 698 F.3d at 644. As noted above and applicable here, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696.

The prejudice analysis requires the Court to "assess the totality of the omitted evidence under *Strickland* rather than the individual errors." *Washington*, 219 F.3d at 634-35 (citing *Williams*, 529 U.S. at 397-98); *Sussman*, 636 F.3d at 360-61. "[E]ven if [counsel's] errors, in

isolation, were not sufficiently prejudicial, their cumulative effect" can amount to prejudice under *Strickland*. *Martin*, 424 F.3d at 592 (citing *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000)).

The cumulative impact of trial counsel's errors was devastating to Mr. Myers's defense. Trial counsel's errors impacted the jury's verdict in at least four specific ways that, taken together, undermine the Court's confidence in its accuracy. Because the Court discussed the prejudice flowing from each of trial counsel's errors in detail above, the Court will more succinctly summarize how those types of prejudice, together, show that there is a "reasonable probability" they impacted the outcome of trial. *Strickland*, 466 U.S. at 694.

### i.     Trial Counsel Undermined All Three of Mr. Myers's Defenses

Trial counsel's false statements during opening and failure to object to the bloodhound evidence, together, significantly undermined all three of Mr. Myers's defenses. Trial counsel's false statements regarding the Hollars theory—that a bloodhound tracked Ms. Behrman's scent to Mr. Hollars's residence and that he was seen arguing with Ms. Behrman shortly before she disappeared—were, if true, the best evidence supporting the theory. But they were simply false. Thus, to whatever extent the jury was considering the Hollars theory by the end of trial, it came to realize not only that the best evidence promised to support it was not presented, but that the theory was predicated on rather sensational lies. After this, no reasonable jury would consider the Hollars theory a basis for reasonable doubt.

Then, trial counsel's failure to exclude the bloodhound evidence undermined Mr. Myers's remaining two defenses. As explained above, Mr. Myers's alibi defense was likely his strongest defense. But for the bloodhound evidence, the evidence of whether Ms. Behrman rode north toward Mr. Myers's residence or south (in which case Mr. Myers had an alibi) was at best a close call, as there was not compelling or undisputed evidence either way. Given this, the bloodhound

evidence tipped the scale strongly in favor of Ms. Behrman riding north and, in doing so, destroyed Mr. Myers's alibi.

Because the Owings theory relied on Ms. Behrman riding south, the bloodhound evidence undermined it as well. Even though trial counsel only pursued the Owings theory "to some extent," *Myers II*, 33 N.E.3d at 1111, trial counsel repeatedly offered it to the jury as a basis to find reasonable doubt. But trial counsel's failure the exclude the bloodhound evidence undermined a key part of Ms. Owings's confession—that she hit Ms. Behrman on Harrell Road, the very road where Ms. Papakhian saw Ms. Behrman. This failure showed yet another aspect of Ms. Owings's confession that was false.

In the end, trial counsel's errors undermined all three of Mr. Myers defenses. The errors destroyed two of his defenses, including his best defense, and further undermined a defense that trial counsel only attempted to pursue in a limited fashion. Together, this left Mr. Myers without a meaningful defense theory through which any jury would find reasonable doubt.

### ii. Trial Counsel Allowed the State to Present Evidence of Motive when There was Otherwise None

Trial counsel's failure to object to the rape evidence allowed the State to argue that Mr. Myers had motive when, but for that error, the State had no evidence explaining why Mr. Myers would have murdered Ms. Behrman. The State was able to use the rape evidence to argue in closing that Mr. Myers's motive was "clear"—rape is a "crime of control," and since he could not control his ex-girlfriend, Ms. Goodman, he used rape to control Ms. Behrman, who was "at the wrong place at the wrong time." Trial Tr. 2816-17. Whether Mr. Myers or someone else killed Ms. Behrman was essentially the only question at trial, and the Supreme Court has made clear that "[w]hen identity is in question, motive is key." *House*, 547 U.S. at 540. Without the rape evidence, the jury "would have found it necessary to establish some different motive, or, if the same motive,

an intent far more speculative." *Id.* at 541. Simply put, the rape evidence was the only evidence that allowed the jury to make sense of why Mr. Myers would have randomly murdered a stranger riding a bicycle near his residence. Trial counsel's failure to keep out the evidence that allowed the State to explain why Mr. Myers did so, when no other reason was apparent, was extremely prejudicial. *See id.* at 540-41 ("Particularly in a case like this where the proof was . . . circumstantial, we think a jury would have given th[e] evidence [of sexual assault] great weight.").

### iii. Trial Counsel Allowed the State to Bolster the Credibility of its Most Important Witness, Who had Significant Credibility Problems

Trial counsel's failure to object to the rape evidence also permitted the State to bolster the otherwise weak credibility of Mr. Roell, who, if credited, was one of the most, if not the most, damaging witness against Mr. Myers. When asked if Mr. Myers used any derogatory terms regarding Ms. Behrman, Mr. Roell testified, "There was one comment made in reference to a bitch." Trial Tr. 2271. The State, recognizing both the importance of Mr. Roell's testimony and his credibility issues, twice during closing argument connected this testimony to the rape evidence to bolster Mr. Roell's credibility.

After acknowledging that Mr. Roell had a motive to lie, *id.* at 2763, the State argued, "Mr. Roell though said things that were corroborated," *id.* at 2764. One of those things—that the State described as "pretty important"—was that Mr. Myers "referred to [Ms. Behrman] using the 'B' word." *Id.* The State then tied that "depersonalizing" language to Dr. Radentz's rape testimony, arguing what "better way . . . to depersonalize a human than refer to her as a female dog." *Id.* Connecting Mr. Roell's testimony to the rape evidence, the State argued, made the whole picture "start[] to make sense." *Id.* at 2764.

How much this line of argument bolstered Mr. Roell's credibility is debatable. But, given the strong reasons to doubt Mr. Roell's credibility, even minimal corroboration meaningfully prejudiced Mr. Myers because Mr. Roell's testimony was the only direct evidence of Mr. Myers's guilt introduced during the entire trial. If the jury did not credit it, the following jury instruction would come into play: "Where proof of guilt is by circumstantial evidence only, it must be so conclusive in character and point so surely and unerringly to the guilt of the accused as to exclude every reasonable theory of innocence." *Id.* at 2734. At the very least, Mr. Myers's alibi was a reasonable theory of innocence, if not a strong one. Thus Mr. Roell's credibility was paramount for the State. Had trial counsel excluded the rape testimony, the State would not have been able to bolster the credibility of arguably the most important witness, whose credibility was certainly in question.

### iv.    Trial Counsel's Errors Cast a Prejudicial Cloud Over the Entire Trial, Leading the Jury to Believe He was Untrustworthy and that Mr. Myers Committed a Sex Crime

Trial counsel's false statements and failure to object to the rape evidence cast two clouds over Mr. Myers and the entire trial. The former created the impression that trial counsel was untrustworthy, and the inflammatory rape evidence caused the jury to feel that Mr. Myers could not be set free, since "society . . . demand[s] accountability when a sexual offense has been committed." *House*, 547 U.S. at 541. It is difficult to know precisely how these more amorphous forms of prejudice impacted the verdict, yet they likely caused significant prejudice.

Trial counsel falsely promised evidence supporting a sensational story of a pregnant college student in a relationship with an older, married coworker who murdered her because she was pregnant, and whose guilt was covered up by law enforcement who pulled a tracking dog away from the coworker's residence. Given the dramatic opening by trial counsel, the false

promises did not simply destroy whatever was left of the Hollars theory as a viable defense, but they undoubtedly turned the jury against both trial counsel and Mr. Myers generally. *See Saesee*, 725 F.3d at 1049-50 ("A juror's impression is fragile. It is shaped by his confidence in counsel's integrity. . . . In addition to doubting the defense theory, the juror may also doubt the credibility of counsel. By failing to present promised testimony, counsel has broken a pact between counsel and jury, in which the juror promises to keep an open mind in return for the counsel's submission of proof. When counsel breaks that pact, he breaks also the jury's trust in the client.").

In a case highly dependent on how the jury would evaluate the credibility of witnesses, the prejudice to Mr. Myers was significant. When one defense theory is presented as equal to the others, but it turns out to be in large part a sensational theory predicated on lies, it undermines the jury's confidence in the others. [39] For example, why would the jury have any faith in trial counsel's alibi defense or Owings theory when he lied about sensational evidence supporting the Hollars theory? Why would the jury give any credence to the fact that law enforcement failed to obtain Mr. Myers's phone records that may have given him an alibi during six years of investigating when trial counsel lied about an alleged cover-up of evidence implicating Mr. Hollars? Why would the jury credit trial counsel's attempt to undermine Mr. Roell's or Ms. Goodman's credibility, when trial counsel himself lacked credibility?

---

[39] Notably, the Indiana Court of Appeals in *Myers II* recognized that trial counsel's credibility with the jury is an important consideration and that presenting a weak theory can damage that credibility. In concluding that trial counsel's performance was not deficient for failing to more aggressively present evidence supporting the Owings theory (an allegation this Court did not ultimately decided), the Indiana Court of Appeals concluded that trial counsel's decision to only "pursue the Owings theory to a limited extent was actually quite shrewd" because it prevented the jury from being exposed to "many conflicting versions of the story." *Myers II*, 33 N.E.3d at 1112. "This information," the Indiana Court of Appeals continued, "might have resulted not only in the elimination in the jurors' minds of the possibility that Owings's confession was true, *but also in trial counsel's loss of credibility with the jury*." *Id.* (emphasis added). But if it was shrewd to not expose the jury to significant weaknesses in the Owings theory in part because that would damage trial counsel's credibility, it was catastrophic for trial counsel's credibility to make sensational false claims in support of the Hollars theory. This is especially true given that, unlike the Owings theory, all of the weaknesses in the Hollars theory were presented to the jury in detail.

The improper rape evidence similarly prejudiced Mr. Myers as a general matter. Rape is "highly inflammatory" and undoubtedly gives any jury second thoughts about finding a defendant not guilty. *Cf. Daniel*, 822 F.3d at 1277 ("Rape is, of course, highly inflammatory, so unrebutted evidence that [the defendant] tried to rape someone is highly prejudicial."). When a jury believes a victim was raped before being murdered, the jury's desire to hold someone accountable increases. *House*, 547 U.S. at 541 ("Law and society, as they ought to do, demand accountability when a sexual offense has been committed, so not only did th[e] evidence [of sexual assault] link [the defendant] to the crime; it likely was a factor in persuading the jury not to let him go free."). Thus, like trial counsel's sensational false promises, the inflammatory rape evidence prejudiced Mr. Myers in that it made it less likely the jury would resolve close or difficult credibility decision in his favor.

### v.     <u>Cumulative Prejudice Conclusion</u>

In the end, the cumulative prejudice caused by trial counsel's errors create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Together, trial counsel's errors all but destroyed Mr. Myers's best defense (his alibi); eviscerated the Hollars theory, which although weak, was the defense theory on which trial counsel focused; and undermined the Owings theory, which was his only remaining defense, one that trial counsel declined to push too hard given its perceived weaknesses. This left Mr. Myers without even a tenable defense. This is likely prejudice sufficient to warrant relief, but it is undoubtedly so when considered with trial counsel's other errors.

Trial counsel's cumulative errors not only left him without a defense, but they also allowed the State to create evidence of a motive when there otherwise was none and bolster the credibility of arguably the State's most important witness who had significant credibility issues. Finally, trial

counsel's false statements and the inflammatory rape evidence both cast a shadow over the entire trial, making it even more unlikely that the jury would trust anything trial counsel presented or be capable of neutrally weighing the evidence.

The foregoing analysis reveals why it is critical to evaluate the cumulative prejudice from trial counsel's errors, rather than the prejudice from each error in isolation. The Indiana Court of Appeals in *Myers II* considered only the latter. When doing so, it is much easier to view the prejudice from a single error as insufficient to meet the *Strickland* standard. But when considered together, trial counsel's errors "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. This is especially true given that the case against Mr. Myers was based almost entirely on circumstantial evidence that was far from overwhelming. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). In short, the Court concludes that trial counsel's errors were "so serious" that Mr. Myers was deprived of a trial "whose result is reliable." *Id.* at 687.

Trial counsel's errors so fundamentally undermined his own strategy, that even if *Richter*'s "could have supported" framework remains applicable after *Wilson*, "no fairminded jurist" could conclude that Mr. Myers has not met *Strickland*'s prejudice standard. *See Richter*, 562 U.S. at 102. And this is so even though "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* at 105. Simply put, when trial counsel lies to the jury during opening regarding what the evidence will show; undermines all three of his own defense theories, including a strong alibi defense; allows the State to improperly introduce evidence of motive when there otherwise was none; and improperly permits inflammatory rape evidence to be

introduced, there is "no reasonable argument" that *Strickland*'s prejudice standard was not met. *Id.*

For these reasons, § 2254(d) does not pose a barrier to relief, and Mr. Myers has established that he failed to receive the effective assistance of counsel to which he was entitled under the Sixth Amendment.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, Mr. Myers's petition for a writ of habeas corpus is **granted** because he failed to receive effective assistance of counsel during trial in violation of his Sixth Amendment rights.  Since Mr. Myers is entitled to relief on this claim, the Court need not reach his claims that the State presented false evidence in violation of *Giglio v. United States*, 405 U.S. 150, 153 (1972), and withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

A writ of habeas corpus shall issue ordering Mr. Myers's release from custody unless the State elects to retry Mr. Myers within 120 days of entry of Final Judgment in this action.

Again, a new trial will likely come only at considerable cost—to the State and to the victim's family and community—but the Constitution and its protections demand a new trial in this case.

**IT IS SO ORDERED.**

Date:  9/30/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Marie F. Donnelly
ATTORNEY AT LAW
mfdonnelly05@gmail.com

Andrew A. Kobe
INDIANA ATTORNEY GENERAL
andrew.kobe@atg.in.gov